## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**EDRA D BLIXSETH**,

        Debtor.

Case No. **09-60452-7**

**WESTERN CAPITAL PARTNERS, LLC**,

        Plaintiff.

-vs-

**EDRA D BLIXSETH**,

        Defendant.

Adv No. **09-00100**

# MEMORANDUM of DECISION

At Butte in said District this 27th day of September, 2010.

In this Adversary Proceeding, Plaintiff Western Capital Partners, LLC ("WCP") filed a Motion for Summary Judgment to Determine the Non-Dischargeability of a Debt on August 20, 2010. *See* docket entry no. 26. WCP's Motion for Summary Judgment was accompanied by a Brief in support thereof, a Statement of Uncontroverted Facts and various affidavits and supporting exhibits. The following are WCP's purported uncontroverted facts:

### STATEMENTS OF UNCONTROVERTED FACTS/GENUINE ISSUES

1. On March 26, 2009 (the "Petition Date") Edra D. Blixseth ("Debtor") filed a voluntary

1

petition for relief under Chapter 11, of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Montana. (*See,* Complaint at ¶1 and Answer at ¶1).

2.  The filing of the above-referenced petition created the case in this District entitled *In re Edra D. Blixseth*, Case No. 09-60452. (*See*, Complaint at ¶2 and Answer at ¶1).

3.  On or about June 15, 2007, WCP entered into a certain Loan Agreement with certain borrowers and guarantors, whereby WCP loaned $13,065,000.00 ("$13 Million Loan") to various entities in which Debtor had a direct, indirect, and/or familial relationship (the "Loan Agreement").  (*See* the Affidavit of Jeffrey Adams ("Adams Affidavit"), filed concurrently herewith, at ¶ 1, and Exhibit 1 to Adams Affidavit).

4.  The $13 Million Loan by WCP was evidenced by a Commercial Promissory Note ("Note").  (Adams Affidavit at ¶ 2, and Exhibit 2 to same).

5.  As a material condition to entering into and advancing funds under the Loan Agreement, WCP required the Debtor to execute a Loan Affidavit in which Debtor made certain affirmative representations regarding her financial and legal condition (the "Loan Affidavit"). (Adams Affidavit at ¶ 3).

6.  A true and correct copy of the Loan Affidavit is attached to the Complaint as Exhibit 1 and is also attached to the Adams Affidavit as Exhibit 3.  (Adams Affidavit at ¶3).

7.  The affirmative representations made by the Debtor, as a guarantor, in the Loan Affidavit include, but are not limited to the following ("Affirmative Representations"):

   a.  As of June 15, 2007, the Debtor was neither: (i) currently insolvent on a balance sheet basis; or (ii) unable to pay her debts as they came due (*see* ¶ 3 of Exhibit 3 to Adams Affidavit);

    b.     As of June 15, 2007, the Debtor had no judgments pending against her, jointly or severally (see ¶ 7 of Exhibit 3 to Adams Affidavit);

    c.     As of June 15, 2007, the Debtor had no delinquent tax obligations, including, without limitation, federal income tax, state income tax, withholding tax, sales tax, or personal property tax obligations (*see* ¶ 8 of Exhibit 3 to Adams Affidavit);

    d.     As of June 15, 2007, the Debtor was not being threatened with any suit or arbitration (*see* ¶ 11 of Exhibit 3 to Adams Affidavit); and

    e.     The Debtor understood that WCP was relying on her representations, and that it would not have advanced the contemplated loan if any one of the representations were inaccurate or misleading in any way.  Further, the Debtor understood that she was warranting that the above statements and representations were accurate in all respects and not misleading in any manner. (*See* ¶ 61 of Exhibit 3 to Adams Affidavit)

8.  WCP reasonably relied on the truth and accuracy of the Affirmative Representations in the Loan Affidavit by Debtor when it advanced funds under the Loan Agreement. (Adams Affidavit at ¶ 4).

9.  Had WCP known that any of the Debtor's Affirmative Representations were false or misleading in any way, WCP would not have advanced funds under the Loan Agreement. (Adams Affidavit at ¶ 5).

10.  Debtor admitted under oath that the Affirmative Representation in the Loan Affidavit stating that Debtor was able to pay her debts as they came due was only partially correct.  Debtor

testified that she was only intermittently able to pay her debts when they came due. (*See* the Affidavit of Christopher J. Conant ("Conant's Affidavit"), at ¶ 1 . . .; and Deposition Transcript of Edra D. Blixseth, dated December 17, 2009 "Edra Deposition", Tr. P. 87 at l.1-4 attached as Exhibit 1 to Conant Affidavit).

11. Debtor was aware that Western Capital Partners was relying on the information she provided in the Loan Affidavit when it advanced funds under the $13 Million Loan, and acknowledged that lenders rely on this type of information when contemplating whether or not to loan money to a borrower. (*See* Conant Affidavit at ¶ 2, and Edra Deposition, Tr. P. 96-97 at l. 25 & 1-12, attached as Exhibit 2 to Conant Affidavit).

12. As an additional material condition of advancing funds under the Loan Agreement, WCP required Debtor to personally guaranty repayment of the borrowers' obligations under the Loan Agreement. (Adams Affidavit at ¶ 6).

13. On June 15, 2007, Debtor executed a Guaranty Agreement for the benefit of WCP (the "Guaranty Agreement") pursuant to which Debtor guaranteed repayment of the $13 Million Loan. (Adams Affidavit at ¶ 7, and Exhibit 4 same).

    a.    The Guaranty Agreement specifically provides that it "shall be construed and enforced in accordance with the laws of the State of Colorado." (*See* ¶ 11 of Exhibit 4 to Adams Affidavit).

14. Based on Debtor's representations regarding her financial condition and wealth to WCP, WCP understood that Debtor had sufficient funds to satisfy her guaranty obligations, and WCP underwrote the Loan on Debtor's guaranty and purported wealth. (Adams Affidavit at ¶ 8).

15. Certain "Recitals" specifically set forth in the Guaranty Agreement stated that:

    a.       Debtor held an ownership interest in the borrowers and wished to have the borrowers obtain the Loan from WCP (*see* ¶ C of Exhibit 4 to Adams Affidavit); and

    b.       WCP was unwilling to make the Loan to the borrowers unless payment of the borrower's liabilities and other sums arising under the Note and other Loan Documents were unconditionally, independently, and directly guaranteed by Debtor pursuant to the terms of the Guaranty Agreement (*see* ¶ D of Exhibit 4 to Adams Affidavit).

16.  Had Debtor not executed the Guaranty Agreement, or had WCP known that Debtor lacked sufficient funds to satisfy her guaranty obligations, WCP would not have entered into the Loan Agreement and advanced funds thereunder. (Adams Affidavit at ¶ 9).

<u>May 24, 2007 Letter from Jaffe & Clemens</u>

17.  As a condition of entering into the Loan Agreement under the $13 Million Loan, WCP required Debtor to provide a written statement regarding her financial and legal condition from her legal counsel so that WCP could evaluate and corroborate the same and be assured that Debtor was in a financial position to guaranty repayment of the Note. (Adams Affidavit at ¶ 10).

18.  Debtor's divorce attorneys at the law firm of Jaffe & Clemens in Los Angeles, California provided WCP's counsel with a letter explaining Debtor's financial condition and expected financial condition following the resolution of her divorce from Tim Blixseth (the "May 24, 2007 Letter").  (*See* Adams Affidavit at ¶ 11, and Exhibit 5 to same).

19. In the May 24, 2007 Letter, Debtor's counsel, Mr. Ryden, stated:

    "It appears from a preliminary review of the assets of the estate, all of

5

which were accumulated by Mr. and Mrs. Blixseth since their marriage, which would make them community property, total in excess of $500 million dollars.

One of the assets which we anticipate being received by Mrs. Blixseth is the residential property known as "Porcupine Creek." Our best estimate of the value of that property exceeds $200 million dollars.

I do not believe that [WCP] should have any concerns in making this loan to Mrs. Blixseth." (Exhibit 5 to Adams Affidavit).

20.  WCP reasonably relied on the statements of Debtor's agent, Mr. Ryden, when it entered into the Loan Agreement and advanced funds thereunder. (Adams Affidavit at ¶ 12).

21.  Had the true facts been revealed to WCP by the Debtor's agent, Mr. Ryden, WCP would not have made the loan. (Adams Affidavit at ¶ 13).

22.  On July 27 2007, just weeks after WCP advanced funds under the Loan Agreement, Debtor signed a declaration under penalty of perjury in her divorce proceedings in which she represented to the California Superior Court that she was several months in arrears to her creditors and that such arrears totaled $2 million. (*See* Conant Affidavit at ¶ 3, and Edra Deposition, Exhibit 15 at pp. 1:9-10, 9, ¶ 3, attached as Exhibit 3 to Conant Affidavit).

   a.   In her July 27, 2007, sworn declaration under oath, Debtor specifically stated, "…I am presently in arrears to creditors in the approximate amount of two million dollars, even after using all of the proceeds from the sale of my real estate parcel. These debts are primarily due to the ordinary expenses of Porcupine Creek, and they are increasing by the hundreds of thousands of dollars per month." (P.10, ¶ 3 of Exhibit3 to Conant Affidavit).

6

23.  Had WCP known that the Debtor was misrepresenting material facts concerning her financial position, it would not have entered into the Loan Agreement and would not have advanced funds thereunder. (Adams Affidavit at ¶ 14).

<u>June 2008 Loan Modification</u>

24.  In May of 2008, the borrowers and Debtor defaulted on their respective obligations under the Loan Agreement and Guaranty Agreement by failing to make their required interest payment under the $13 Million Loan. (Adams Affidavit at ¶ 15).

25.  In June of 2008, Debtor approached WCP and requested modification of the $13 Million Loan. As an accommodation to the borrowers and Debtor, WCP agreed to modify the terms of the Loan Agreement and Note rather than pursue its collection remedies under the Loan Agreement for the borrowers' and Debtor's default. (Adams Affidavit at ¶ 16).

26.  Specifically, on June 25, 2008, Debtor and the borrowers executed that certain First Promissory Note, Loan Agreement, Trust Deed and Security Agreement Modification ("Loan Modification") wherein Debtor conveyed to WCP as additional collateral to secure repayment of the Note, a first position deed of trust on her condominium in Bellevue, Washington. (Adams Affidavit at ¶ 17, and Exhibit 6 to same).

27.  When Debtor executed the Loan Modification, she specifically reaffirmed each and every Affirmative Representation that she made to WCP when she executed the Loan Affidavit. Specifically, the Loan Modification provides in relevant part:

>  "Also, that certain Loan Affidavit, dated June 15, 2007, which is part of the Loan Documents (the "Affidavit") is hereby amended to include the Additional Collateral and the Borrower and Guarantor hereby reconfirm and remake all of the

7

representations and warranties made in the Affidavit . . . ." (*See* ¶ 2 of Exhibit 6 to Adams Affidavit).

28.  Again, WCP reasonably relied on the truth and accuracy of Debtor's Affirmative Representations in the Loan Affidavit as reaffirmed by her in the Loan Modification. (Adams Affidavit at ¶ 18).

29.  However, on May 30, 2008, just 25 days before Debtor approached WCP and requested modification of the Loan, Debtor executed a sworn declaration under oath, in which she specifically admitted to having total combined bank balances of less than zero (*see* page 2, ¶ 7h of Exhibit 4 to Conant Affidavit), being over $8 million in arrears to her creditors, and owing over $3 million to federal and state tax authorities for her community income tax liability in 2006. (*See generally* Conant Affidavit at ¶¶ 4-5).  Specifically, Debtor declared:

a.   "The Internal Revenue Service (IRS) is threatening to levy against my property. I still owe $3,177,921 in 2006 community income tax liability to the federal and state taxing authorities . . . ." "The California Franchise Tax Board (FTB) has threatened to file a lien against my property because I have not paid outstanding 2006 community income tax liability . . . ." (See page 2, ¶¶4(f)-7 of Exhibit 4 to Conant Affidavit).

b.   "At this time, I have $8,154,007.05 in outstanding bills and invoices that I owe to various vendors, many of which are past due. Attached . . . collectively as Exhibit C is a small sample of the many past-due invoices and delinquency notices I have received but have not been able to pay. There are far too many such notices and invoices for me to submit with

this ex parte application, so I am only providing a small sample." (*See* page 2, ¶ 7i of Exhibit 4 to Conant Affidavit).

30. Debtor also misrepresented the fact that she was involved in pending litigation when she executed the Loan Affidavit and Loan Modification, and when she provided the May 24, 2007, Letter, as follows:

a. When Debtor executed the Loan Affidavit and the Loan Modification, she was either already involved in litigation or knew that she was being threatened with imminent litigation. Specifically, Debtor was a defendant in at least the following cases:

i. Case Nos. 3:06-cv-00056 and 3:06-cv-00145 in the United States District Court for the District of Nevada (hereinafter "Nevada Litigation");

ii. Cause Nos. DV-29-2006-26 and DV-29-2007-5 in the Montana 5th Judicial District, Madison County.

*See*, Complaint at ¶55(d) and Answer at ¶32.

31. In the Nevada Litigation, Debtor personally executed a Confession of Judgment in favor of Warren Trepp in the amount of $5 million (*see* Edra Deposition, Exhibit 33, at p. 5, attached as Exhibit 5 to Conant Affidavit), and a Confession of Judgment in favor of eTreppid Technologies, LLC, in the amount of $20 million (*see* Edra Deposition, Exhibit 34, at pp 1-2, attached as Exhibit 6 to Conant Affidavit). (*See generally* Conant Affidavit at ¶ 6).

32. Had WCP known that any of the Debtor's Affirmative Representations as reaffirmed by her in the Loan Modification were false or misleading in any way, WCP would not have agreed to modify the Loan Agreement. (Adams Affidavit at ¶ 19).

In a separate Statement of Genuine Issues filed September 24, 2010, Edra stipulates to WCP's Uncontroverted Fact numbers 1 and 2.  Edra then proceeds to assert the following in her Statement of Genuine Issues:

2. Edra stipulates to WCP's Uncontroverted Facts numbers 3, 4, 13, and 15 to the extent they reflect a loan agreement was entered with Edra's son, Matthew Crocker, and that she was a guarantor on that loan. Further, the documents speak for themselves and any interpretation of their contents amounts to an issue of law as to contractual interpretation and, thus, are not appropriate as "Uncontroverted Facts".

3. Edra stipulates to WCP's Uncontroverted Facts numbers 5, 6, 7, 12 and 14 to the extent the Loan Affidavit is a true and correct copy and that it was part of the loan application process. Edra disputes the claim of the material nature of the Loan Affidavit as a condition to entering into the loan and advancing funds and WCP's reliance thereon.  Further, Edra disputes the claimed false nature of these representations. Edra disputes these supposed undisputed facts on the following bases:

    a.    WCP's position is based on the Affidavit of Jeffery Adams which merely reiterates the opinion of the material nature of the information provided in the affidavit. No actual factual basis is provided. Facts exist reflecting WCP's knowledge of the falsity of at least some of the alleged representations and the loan was entered and funds advanced despite this knowledge. This, at a minimum, raises a question of fact as to whether the representations by Edra were actually treated as material in the issuance of the loan.

    b.    WCP has failed to provide responses to discovery propounded on January 19,

10

2010. A Motion to Compel these answers is currently pending (dkt #24 and #25).
On good faith and belief, Blixseth understands there potentially exists documents
reflecting witnesses and knowledge of communications showing WCP knew of
the facts contrary to the alleged wrongful representations and entered the loan and
advanced the funds irregardless of that knowledge rendering the representations
immaterial. Until such time as WCP properly responds to the discovery requests
propounded, it should not be permitted to take advantage of its own improper
conduct to create a situation where Edra cannot set forth disputed issues. To
permit such conduct on the part of WCP would be to deny Edra due process.

c.      WCP also relies on the Affidavit of Christopher J. Conant who represents that he
is the attorney for WCP in this adversary action. Mr. Conant is currently also the
attorney for Tim Blixseth. As a matter of basic agency principal, the knowledge of
the principal is imputed to the agent and the knowledge of the agent is imputed to
the principal. Applying that basic concept here, all knowledge of Tim Blixseth is
imputed to Mr. Conant as principal of the agent and all knowledge of Mr. Conant
is imputed to WCP as agent principal. Clearly, all knowledge of Tim Blixseth as
to all aspects of his fraudulent activity as outlined by this Court in its
Memorandum of Decision (MOD) dated August 16, 2010, is imputed to WCP.
Accordingly, WCP is deemed to have been aware of the negative financial aspects
of everything Tim Blixseth had knowledge. In proceeding to agree to the loan in
this matter and produce the funds WCP is deemed to have done so with that
knowledge and, as such falsely claims here that had they known that information

11

they would not have proceeded.

d.     The representations made as to the financial condition, tax obligations, and related matters are directly tied to Edra's then existing knowledge. This Court is asked to take judicial notice of its own Memorandum of Decision of August 16, 2010, in *Blixseth, et al. v. Blixseth, et al.*, Adversary Proceeding No. 09-00014.  In particular, this Court is reminded of its findings of fraudulent conduct by Tim Blixseth, his freezing out of Edra Blixseth as to control of certain businesses (referred to therein as "Debtors"), and Tim Blixseth's maintaining control of those entities, thus, misleading Edra Blixseth as to the true financial condition she was in.  Further, this Court found Edra Blixseth mistakenly had underestimated her assets, but found this underestimation reasonable under the circumstances and, thus, did not undermine her credibility. This only shows that the combination of the fraud and Edra Blixseth's justified reliance on the information provided, led to a belief as to the representations made in the loan application process at issue herein.

4.  Edra disputes WCP's Uncontroverted Facts numbers 8, 9, 11 and 16 and asserts there is a genuine issue for the following reasons:

a.     The claim for "reasonable reliance", is opinion and not fact. No actual factual basis is provided.  Facts exist reflecting WCP's knowledge of the falsity of at least some of the alleged representations and the loan was entered and funds advanced despite this knowledge. This, at a minimum, raises a question of fact as to whether the representations made by Edra were actually treated as material in the issuance

12

of the loan.

b.    WCP has failed to provide responses to discovery propounded on January 19, 2010. A Motion to Compel these answers was filed (dkt #24 and #25). On good faith and belief, [Edra] understands there potentially exists documents reflecting witnesses and knowledge of communications showing WCP knew of the facts contrary to the alleged wrongful representations and entered the loan and advanced the funds irregardless of that knowledge rendering the representations immaterial. Until such time as WCP properly responds to the discovery requests propounded, it should not be permitted to take advantage of its own improper conduct to create a situation where Edra cannot set forth disputed issues. To permit such conduct on the part of WCP would be to deny Edra due process.

c.    WCP claimed in its alleged undisputed fact that "any" false or misleading representation would have resulted in the loan not be[ing] given and the funds not advanced. This is contrary to WCP's own actions. In fact, WCP was aware of facts contrary to those set forth in the representations and proceeded with the loan anyway.

d.    WCP's claimed reliance is not valid because the loan in fact was based on the assets of Edra's son Matthew Crocker which at the time the loan was granted and the collateral provided more than adequately covered the loan amount.  It was only after the market drastically changed did the values of the assets diminish and WCP looked to Edra.

5. Edra disputes WCP's Uncontroverted Fact #10 and asserts there is a genuine issue

13

for the following reasons:

    a.    WCP claims as an undisputed fact their interpretation of Edra's testimony. At a minimum, they take liberties with this interpretation. The actual testimony reads:

        Q. Were you able to pay your debts as they came due on June 15th of 2007?

        A. I think I was intermittently able to based on how I was making loans and how cash flow came in.

    Edra Blixseth's Affidavit, page 87, lines 1-4.

    Whether such testimony can be interpreted as contrary to a representation in the loan affidavit is a question of fact for the trier of fact.

    b.    Even WCP needs to qualify its claim that such a statement is false or misleading by conceding the response is "partially correct". Statement of Uncontested Facts, page 3, paragraph 10. If WCP concedes the statement is at least partially correct, clearly WCP has conceded that a question of fact exists. Further, this testimony must be viewed in a light most favorable to Edra. In so doing, it clearly raises a disputed issue of fact.

6. Edra disputes WCP's Uncontroverted Facts numbers 17 through 23 and asserts there is a genuine issue for the following reasons:

    a.    The letter sought and obtained by WCP and supposedly relied upon by WCP sets forth opinion, not fact. WCP apparently accepted opinion as sufficient to meet its required needs. As such, their claim of reliance on facts provided, when in actuality they were willing to rely on opinion, negates any assertion of rightful

14

reliance on fact.

b.      The opinions made in the letter of May 24, 2007, as to financial conditions, tax

obligations, and related matters are directly tied to Edra's counsel's then existing

knowledge. The Court is asked to take judicial notice of its own Memorandum of

Decision of August 16, 2010, in *Blixseth, et al. v. Blixseth, et al.*, Adversary

Proceeding No. 09-00014. In particular, this Court is reminded of the findings of

fraudulent conduct of Tim Blixseth, his freezing out of Edra Blixseth as to control

of certain business (referred to therein as "Debtors"), and Tim Blixseth's

maintaining of control of those entities, thus, misleading Edra Blixseth as to the

true financial condition she was in. This Court specifically found fraudulent

conduct by Tim Blixseth with regard to the Martial Settlement Agreement which

reflects the same knowledge Edra Blixseth's divorce attorney would have been

relying upon to provide the May 24, 2007, letter. Further, this Court found that

Edra Blixseth mistakenly had underestimated her assets, found this

underestimation reasonable under the circumstances and, thus, did not undermine

her credibility. This only shows that the combination of the fraud and Edra

Blixseth's justified reliance on the information provided led to the belief as to the

representations made, not only as to the loan application but as to the opinions

provided by Edra Blixseth's divorce attorney in his letter of May 24, 2007.

7. Edra disputes WCP's Uncontested Facts numbers 24 through 32 and asserts there is a

genuine issue. The remaining claimed uncontested facts deal with the 2008 loan modification.

This loan modification, on Edra's part, was a reiteration of the prior representations. At the time

of the loan modification, WCP was aware of all the factual issues set forth above and, as such, was without a reasonable basis for reliance as previously set forth.

## SUMMARY JUDGMENT

Summary judgment is governed by F.R.B.P. 7056. Rule 7056, incorporating FED.R.CIV.P. 56(c), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)). The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

> If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan dissent) (citations omitted). *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

16

*Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding summary judgment).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e). *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute"). That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or

defense and whose existence might affect the outcome of the suit.  The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id*.

If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986).  Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.  *T.W. Elec. Serv.*, 809 F.2d at 631.  In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

### 11 U.S.C. § 523(a)(2)(A)

It is well-settled that the Bankruptcy Code's central purpose is to provide a fresh start to the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  However, under certain circumstances, a creditor may seek to except from a debtor's discharge certain debts.  *See* 11 U.S.C. §§ 523(a).  Nevertheless, consistent with effectuating the underlying purposes of the Bankruptcy Code, exceptions to discharge under § 523 are to be narrowly construed.  *See Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).  Notwithstanding the weighty burden, a creditor, in order to prevail, need only establish the elements of nondischargeability under 11 U.S.C. § 523, by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 287-88.

18

To establish nondischargeability as a result of fraud under § 523(a)(2)(A)[1], courts in the Ninth Circuit employ the following five-part test:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;
> (2) knowledge of the falsity or deceptiveness of his statement or conduct;
> (3) an intent to deceive;
> (4) justifiable reliance by the creditor on the debtor's statement or conduct; and
> (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001*); American Express Travel Related Services Co. Inc. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996). The determination of nondischargeability under § 523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A) mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the Restatement (Second) of Torts (1976) §§ 525-557A.  *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443-44, 133 L.Ed.2d 351 (1995) ("'false pretenses, a false representation, or actual fraud,'. . . are common-law terms, and...in the case of 'actual fraud,'...they imply elements that the common law has defined them to include.").

1.  Intent to Deceive

---

[1]  11 U.S.C. § 523(a)(2)(A) reads:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–

* * *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

19

The first three elements of § 523(a)(2)(A), when taken together, establish the element of intent to deceive, which the creditor must establish by a preponderance of the evidence. In other words, a creditor must establish that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor. In a two-party transaction, as distinguished from a three-party credit card transaction, the alleging party must prove the elements of misrepresentation and reliance directly and by a preponderance of the evidence and not by reference to the totality of the circumstances. *Compare Turtle Rock Meadows Homeowners Assoc. v. Slyman (In re Slyman)*, 234 F.3d 1081, 1086 (9th Cir. 2000) *with Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996). As to the remaining elements, a creditor sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of a particular case, answers the following two inquiries in the affirmative: 1) did the creditor justifiably rely on the debtor's representation–reliance; and 2) was the debt sought to be discharged proximately caused by the first two elements–causation.

## 2. Reliance

A creditor must establish that it relied on the false representations made by the debtor. *Field*, 116 S.Ct at 438 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id*. As the Supreme Court held in *Field*, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id*. at 444 (quoting § 540 Restatement (Second) of Torts (1976)). This standard depends upon the knowledge and experience of the person to whom the representations were made. As the Supreme Court in *Field* further explained:

[A] person is "required to use his senses, and cannot recover if he blindly relies

20

upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.  Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect.  On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses.  Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id*. (quoting § 541, Comment a., RESTATEMENT (SECOND) OF TORTS (1976)).  Interpreting this standard, the Ninth Circuit Court of Appeals teaches:  "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud."  *Apte*, 96 F.3d at 1322.

### 3.  Causation

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with the intent to deceive.  *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991).  "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible."  *Id*. at 604.  Moreover, as the United States Supreme Court explained in *Field*, a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common law of torts" for guidance on this issue.  *Field*, 116 S.Ct. at 443.

The RESTATEMENT (SECOND) OF TORTS (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss, § 546; and (2) legal causation, which

21

requires a creditor's loss to "reasonably be expected to result from the reliance." § 548A. *See also In re Creta*, 271 B.R. 214, 220 (1st Cir. BAP 2002). In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. (In re Siriani),* 967 F.2d 302, 306 (9th Cir. 1992).

As discussed above, the WCP, as the Plaintiff, has the threshold burden of showing that the Debtor/Defendant had an intent to deceive WCP.

## 11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge debt for money obtained by the use of a written statement concerning a debtor's (or insider's) financial condition. The statute reads:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> * * *
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> * * *
>
> (B) use of a statement in writing–
>   (i) that is materially false;
>   (ii) respecting the debtor's or an insider's financial condition;
>   (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>   (iv) that the debtor caused to be made or published with intent to deceive[.]

The Ninth Circuit has reworded these requirements as follows:

> (1) a representation of fact by the debtor,
> (2) that was material,
> (3) that the debtor knew at the time to be false,

 (4) that the debtor made with the intention of deceiving the creditor,
 (5) upon which the creditor relied,
 (6) that the creditor's reliance was reasonable,
 (7) that damage proximately resulted from the representation.

*Siriani v. Northwestern Nat'l Ins. Co., of Milwaukee, Wis. (In re Siriani)*, 967 F.2d 302, (9th Cir. 1992); *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. BAP 1999) (adopting the elements required under the companion section 523(a)(2)(A), with the additional and obvious requirement that the alleged fraud stem from a false statement in writing); *Candland v. Insurance Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996); *Avco Fin. Services of Billings v. Kidd (In re Kidd)*, 219 B.R. 278, 282 (Bankr. D. Mont. 1998); *In re Osborne*, 257 B.R. 14, 20 (Bankr. C.D. Cal. 2000).

 In discussing the difference between §§ 523(a)(2)(A) and 523(a)(2)(B), the Supreme Court instructs that § 523(a)(2)(B) applies where the debt at issue "follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied." *Field v. Mans*, 516 U.S. 59, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). On the issue of materiality, a financial statement that leaves "any discrepancy" between the overall impression left by the statement and the endorser's true financial status gives rise to a material falsehood for purposes of § 523(a)(2)(B). *North Park Credit v. Harmer (In re Harmer)*, 61 B.R. 1, 5 (Bankr. D.Utah 1984) (citing cases); *accord Texas Am. Bank, Tyler, N.A. v. Barron, (In re Barron)*, 126 B.R. 255 (Bankr. E.D. Texas 1991) (citing cases). A "long line of cases" has held that in a personal financial statement, the "omission, concealment, or understatement of any of [a] debtor's material liabilities constitutes a 'materially false' statement." *Harmer*, 61 B.R. at 5.

Moreover, even if a debtor does not know of inaccuracies contained in a written financial statement, the Ninth Circuit has held that reckless disregard for the truth satisfies the knowledge element of § 523 and its predecessor. *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996). *See also Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir. 1986) (gross recklessness to the truth also satisfies the fourth element of intention of deceiving).

## DISCUSSION

In the pending matter, WCP has two hurdles to overcome: (1) all reasonable doubt as to the existence of genuine issues of material fact must be resolved against WCP; and (2) exceptions to discharge under § 523 are narrowly construed. Additionally, the Court does not consider WCP's motion in a vacuum, but rather, undertakes this case after having over 22 months of time on task with the Yellowstone Club and the associated proceedings, including Debtor's bankruptcy case.

The Court has heard a lot of testimony over the past 22 months about Debtor and her ex-spouse's long and bitter divorce. Debtor and Timothy L. Blixseth separated in December of 2006 and following the separation, Debtor claims she was "frozen out" of various business affairs for about two years, or until approximately mid-August of 2008, when Debtor was awarded various assets, including BLX Group, Inc. – which owned the ultra exclusive Yellowstone Club -- under the terms of a Marital Settlement Agreement.

Debtor has testified previously that she believed that her share of the marital assets were worth well in excess of $100 million between December of 2006 and August of 2008. The 2007 Loan Agreement at issue in this Adversary Proceeding and a modification of the Loan Agreement

made in June of 2008 were all done during a period of time when Debtor was frozen out of the majority of the marital business dealings.  Such fact precludes this Court from making a summary ruling that Debtor possessed the requisite intent to deceive WCP under either § 523(a)(2)(A) or § 523(a)(2)(B).

Moreover, WCP contends that it relied on certain representations made by Debtor. However, Debtor counters that WCP has not fully responded to discovery propounded in January of 2010.  Debtor asserts that WCP has delayed responding to all Debtor's discovery requests on grounds WCP has information showing it knew Debtor's true financial position, but nevertheless proceeded to make the loan and modification at issue.  The foregoing allegations raise a material issue of fact as to whether WCP relied on any statements made by Debtor.  Such conclusion is buttressed by the fact that one of WCP's attorneys, Christopher J. Conant, also serves as counsel for Debtor's ex-spouse.

Finally, Debtor asserts that WCP has received payments in excess of $41 million toward the $13 million Loan Agreement.  Under such scenario, WCP may already be fully compensated, thus putting WCP's damages at zero.

In sum, after construing § 523(a)(2) narrowly, the Court cannot determine beyond a reasonable doubt that Debtor made any statements, whether oral or in writing, with the intent to deceive WCP.  The Court similarly cannot conclude that WCP relied on statements made by Debtor.  Finally, WCP has not shown that any of its alleged damages were the proximate result of statements made by Debtor.  WCP has simply failed to satisfy its burden of proof at this stage of the litigation.  Therefore, the Court will enter a separate order as follows:

IT IS ORDERED that Western Capital Partners, LLC's Motion for Summary Judgment to

Determine the Non-Dischargeability of a Debt filed August 20, 2010, is DENIED.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

26