Edra D. Blixseth  -  December 17, 2009

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

```
                            )
In re                       )
                            )
                            )
EDRA D. BLIXSETH,           ) Case No.: 09-60452-RBK
                            )
          Debtor.           )
                            )
_____    )
                            )
In re Yellowstone Club, LLC,)
Debtor                      )
                            )
TIMOTHY L. BLIXSETH,        )
                            )
              Plaintiff,    )
                            )
      vs.                   ) Case No.: 09-00014
                            )
OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS,                  )
                            )
              Defendant.    )
_____    )
```

```
       Deposition of:    EDRA D. BLIXSETH

       Date:            December 17, 2009

       Reported by:     Stephanie P. Borthwick
                        C.S.R. No. 12088
```

Yates Court Reporters   800.669.1866

**EXHIBIT 8 (Part I)**

WCP00510

Edra D. Blixseth  -  December 17, 2009

Page 2

1      Deposition of EDRA D. BLIXSETH, taken on behalf of

2  the Plaintiff, before Stephanie P. Borthwick, a

3  Certified Shorthand Reporter, commencing at the hour of

4  9:14 a.m., Thursday, December 17, 2009, at the offices

5  of Yates Court Reporters, 74-967 Sheryl Avenue,

6  Palm Desert, California.

7  APPEARANCES:

8       For the Plaintiff Timothy L. Blixseth:

9           MICHAEL FLYNN, ESQ

10          Attorneys at Law

11          BY:  MICHAEL FLYNN, ESQ.

12          6125 El Tordo

13          Rancho Santa Fe, California  92062

14          (858) 756-0771

15       For the Debtor, Edra D. Blixseth:

16          LAW OFFICES OF DENNIS HOLAHAN

17          Attorneys at Law

18          BY:  DENNIS HOLAHAN, ESQ.

19          2049 Century Park East

20          Suite 3180

21          Los Angeles, California  90067

22          (310) 286-3344

23  ///

24  ///

25  ///

WCP00511

Edra D. Blixseth  -  December 17, 2009

Page 3

1          DESCHENES & SULLIVAN

2          Attorneys at Law

3          BY:  GARY DESCHENES, ESQ. (via speakerphone)

4          309 1st Avenue North

5          Great Falls, Montana  59401

6          (406) 761-6112

7     For Marc Kirschner, Trustee:

8          BAILEY & GLASSER, LLP

9          Attorneys at Law

10         BY:  BRIAN A. GLASSER, ESQ.

11         209 Capitol Street

12         Charleston, West Virginia  25301

13         (304) 345-6555

14         MULLIN HOARD BROWN, LLP

15         Attorneys at Law

16         BY:  STEVEN L. HOARD, ESQ.

17         800 Amarillo National Plaza Two

18         500 South Tyler

19         Amarillo, Texas  79101

20         (806) 337-1112

21    ///

22    ///

23    ///

24    ///

25    ///

WCP00512

Edra D. Blixseth  -  December 17, 2009

Page 4

 1      For the Trustee BLX:

 2           BALLARD SPAHR ANDREWS & INGERSOLL, LLP

 3           Attorneys at Law

 4           BY:  CHRISTINE K. MIN, ESQ.

 5           2029 Century Park East

 6           Suite 800

 7           Los Angeles, California  90067-2909

 8           (424) 204-4400

 9      For the Dick Samson as Trustee of the Edra Blixseth

10      bankruptcy estate:

11           DATSOPOULOS, MAC DONALD AND LIND, PC

12           Attorneys at Law

13           BY:  DAVID B. COTNER, ESQ. (via speakerphone)

14           Central Square Building

15           Suite 201

16           201 West Main

17           Missoula, Montana  59802

18           (406) 728-0810

19      For the Montana Department of Revenue:

20           Joel Silverman, Esq. (via speakerphone)

21           125 North Roberts

22           Helena, Montana  59604

23           (406) 444-7990

24   ///

25   ///

WCP00513

Edra D. Blixseth  -  December 17, 2009

Page 5

```
 1      For CrossHarbor, CIP Yellowstone Lending:

 2           DUANE MORRIS, LLP

 3           Attorneys at Law

 4           BY:  PAUL D. MOORE, ESQ. (via speakerphone)

 5           470 Atlantic Avenue

 6           Suite 500

 7           Boston, Massachusetts 02210-2243

 8           (857) 488-4230

 9      For Western Capital Partners:

10           HATCH JACOBS, LLC

11           Attorneys at Law

12           BY:  CHRISTOPHER J. CONANT, ESQ. (via speakerphone)

13           950 Seventeenth Street

14           Suite 1700

15           Denver, Colorado  80202

16           (303) 298-1800

17      Also Present:

18           Timothy L. Blixseth

19

20

21

22

23

24

25
```

Yates Court Reporters    800.669.1866

WCP00514

Edra D. Blixseth  -  December 17, 2009

Page 6

```
 1                          INDEX

 2

 3   Deposition of EDRA D. BLIXSETH

 4       Taken on December 17, 2009

 5

 6   Examination By:                           Page

 7   MR. FLYNN                            15, 358

 8   MR. GLASSER                              319

 9

10   Information Requested:           Page   Line

11                                     298     18

12

13   Questions Instructed Not to Answer:

14   Q.  Have you made any cash transfers within  15    13

15       the last year?

16   Q.  Did Mr. Scalia purchase a Bentley from   17     7

17       Desert European Motors based on funds

18       that you had wire-transferred to him in

19       the amount of roughly $220,000?

20   Q.  Did you report on your income tax        17    21

21       return a gift of $220,000 wire-

22       transferred to Mr. Scalia?

23   Q.  The amount was 230,000 that you wire-    18     2

24       transferred.  Did you do that,

25       Ms. Blixseth?
```

Yates Court Reporters    800.669.1866

**WCP00515**

Edra D. Blixseth  -  December 17, 2009

Page 7

| | | | | |
|---|---|---|---|---|
| 1 | Q. | Did Mr. Scalia report it as income? | 18 | 7 |
| 2 | Q. | Within the two-year period prior to | 18 | 13 |
| 3 | | your filing your bankruptcy petition, | | |
| 4 | | Ms. Blixseth, did you transfer or give | | |
| 5 | | to Mr. Scalia approximately $450,000? | | |
| 6 | Q. | Would it surprise you if I told you it | 19 | 9 |
| 7 | | is in the range of close to half | | |
| 8 | | a million dollars? | | |
| 9 | Q. | Is any of that cash -- was any of that | 22 | 3 |
| 10 | | cash given to Mr. Scalia? | | |
| 11 | | | | |
| 12 | Answer Requested Marked: | | Page | Line |
| 13 | A. | Well, I don't know how to answer | 36 | 8 |
| 14 | | that, because I didn't have anything to | | |
| 15 | | do with fake letters.  Tim Blixseth | | |
| 16 | | actually is the one that reached out to | | |
| 17 | | me to say he'd like to get a copy of | | |
| 18 | | those and I tried to get a copy of | | |
| 19 | | them. | | |
| 20 | /// | | | |
| 21 | /// | | | |
| 22 | /// | | | |
| 23 | /// | | | |
| 24 | /// | | | |
| 25 | /// | | | |

Yates Court Reporters    800.669.1866

WCP00516

Edra D. Blixseth  -  December 17, 2009

Page 8

| 1 | Exhibits: | | Page |
|---|---|---|---|
| 2 | 8 | One-page letter dated | 54 |
| 3 | | December 12, 2007, on the | |
| 4 | | letterhead of the US Department | |
| 5 | | of Justice Criminal Division | |
| 6 | | from Ronald Sharpe, Assistant | |
| 7 | | United States Attorney | |
| 8 | 9 | One-page letter dated | 54 |
| 9 | | November 8, 2007, on the | |
| 10 | | letterhead of the US Department | |
| 11 | | of Justice Environment and | |
| 12 | | Natural Resources Division with | |
| 13 | | name of author redacted | |
| 14 | 10 | 16-page Western Capital | 80 |
| 15 | | Partners, LLC, Loan Affidavit | |
| 16 | 11 | 14-page Western Capital | 97 |
| 17 | | Partners, LLC, Loan Agreement | |
| 18 | 14 | Letter dated May 24, 2007, on | 102 |
| 19 | | Jaffe and Clemens letterhead to | |
| 20 | | Mr. Hatch from Mr. Ryden | |

21  ///
22  ///
23  ///
24  ///
25  ///

Yates Court Reporters    800.669.1866

WCP00517

Edra D. Blixseth  -  December 17, 2009

Page 9

| | | | |
|---|---|---|---|
| 1 | 15 | 11-page Plaintiff's Reply Brief | 119 |
| 2 | | in Support of Motion for | |
| 3 | | Indemnity; Supplemental | |
| 4 | | Declarations of Edra D. | |
| 5 | | Blixseth and Robert M. Shore in | |
| 6 | | Superior Court of California, | |
| 7 | | County of Riverside Case | |
| 8 | | No. INC 066840 | |
| 9 | 16 | 37 pages identified as First | 111 |
| 10 | | Promissory Note, Loan | |
| 11 | | Agreement, Trust Deed and | |
| 12 | | Security Agreement Modification | |
| 13 | 17 | Four-page Order re Case | 122 |
| 14 | | No. CV06-00114 in the Second | |
| 15 | | Judicial District Court of the | |
| 16 | | State of Nevada, County of | |
| 17 | | Washoe | |
| 18 | 18 | Two-page Order re Case | 125 |
| 19 | | No. 3:06-CV-00056-PMP-VPC in | |
| 20 | | United States District Court, | |
| 21 | | District of Nevada | |
| 22 | 19 | Six-page Federal Bureau of | 127 |
| 23 | | Investigation report of SAs | |
| 24 | | Piser and West | |
| 25 | /// | | |

Yates Court Reporters   800.669.1866

**WCP00518**

Edra D. Blixseth  -  December 17, 2009

Page 10

| 1 | 20 | FBI report, Bates | 128 |
|---|---|---|---|
| 2 | | Nos. 00119-00137, Dated | |
| 3 | | September 11, 2006 | |
| 4 | 21 | Three-page Second Declaration | 129 |
| 5 | | of SA Michael A. West | |
| 6 | 22 | Nine-page March 6, 2008, | 135 |
| 7 | | Wachovia Bank letter to | |
| 8 | | Ms. Blixseth | |
| 9 | 23A | Five-page Collateral Assignment | 148 |
| 10 | | of License Agreement | |
| 11 | 24 | Pages 1-4 and 6-8 of a Software | 149 |
| 12 | | License Agreement | |
| 13 | 28 | 14-page Pledge Agreement | 155 |
| 14 | 30 | Seven pages of emails | 159 |
| 15 | 31 | Eight-page Order to Show Cause | 196 |
| 16 | 32 | Five-page Minutes of | 198 |
| 17 | | Proceedings dated August 18, | |
| 18 | | 2008 | |
| 19 | 33 | 14-page Confession of Judgment | 202 |
| 20 | 34 | 14-page Confession of Judgment | 207 |
| 21 | 35 | Two-page Amended Expedited Writ | 208 |
| 22 | | of Execution on Personal | |
| 23 | | Property | |
| 24 | 36 | Six pages of emails | 212 |
| 25 | /// | | |

Yates Court Reporters    800.669.1866

WCP00519

Edra D. Blixseth  -  December 17, 2009

Page 11

| | | | |
|---|---|---|---|
| 1 | 37 | Nine-page email packet to | 215 |
| 2 | | Michael Sandoval and Dennis | |
| 3 | | Montgomery dated August 11, | |
| 4 | | 2006 | |
| 5 | 41 | Five-page Edra Blixseth | 224 |
| 6 | | Executive Summary | |
| 7 | 51 | Three-page Personal Financial | 218 |
| 8 | | Statement of Edra Blixseth  as | |
| 9 | | of 10/13/2007 | |
| 10 | 55 | Four-page Edra Blixseth Post | 227 |
| 11 | | Settlement Asset List and | |
| 12 | | Liability as of 7/15/08 | |
| 13 | 56 | Four-page Edra Blixseth Post | 230 |
| 14 | | Settlement Asset List and | |
| 15 | | Liability as of 8/15/08 | |
| 16 | 56A | Four-page Edra Blixseth Post | 331 |
| 17 | | Settlement Asset List and | |
| 18 | | Liability as of 8/15/08 | |
| 19 | 111 | Email dated July 8, 2008, from | 247 |
| 20 | | LearG2 to Jory Russell | |
| 21 | 112 | Edra Blixseth Personal | 249 |
| 22 | | Financial Statement as of | |
| 23 | | 6/30/08 | |
| 24 | /// | | |
| 25 | /// | | |

Yates Court Reporters    800.669.1866

**WCP00520**

Edra D. Blixseth  -  December 17, 2009

Page 12

```
 1    113        Four-page Edra Blixseth Post      252
 2               Settlement Asset List and
 3               Liability as of 7/15/08
 4    114        Three-page email string, top      253
 5               email dated July 22, 2008, from
 6               Andrea Heller to Jory Russell
 7               re $20mm from PEM tomorrow
 8    115        Email dated August 5, 2008,       255
 9               from LearG2 to Jory Russell re
10               Interest
11    116        11-page document entitled         256
12               Discussions between Edra/YC
13               Entitites and CrossHarbor
14               Capital Partners, August 1,
15               2008
16    117        Email string, top email dated     270
17               August 20, 2008, from Sam Byrne
18               to Edra Blixseth, Jory Russell
19               re Lot 48
20    118        Email string, top email dated     280
21               August 22, 2008, from Jory
22               Russell to Edra Blixseth re
23               Stockman check signing
24    ///
25    ///
```

WCP00521

Edra D. Blixseth  -  December 17, 2009

Page 13

| 1  | 119 | Ten-page Memorandum dated | 283 |
| 2  |     | September 5, 2008, from Marc | |
| 3  |     | Heller | |
| 4  | 122 | Five-page letter on Jaffe and | 245 |
| 5  |     | Clemens letterhead dated | |
| 6  |     | June 10, 2008 | |
| 7  | 123 | Three-page July 6, 2008, letter | 305 |
| 8  |     | to Yellowstone Club Members | |
| 9  |     | from Ms. Blixseth | |
| 10 | 124 | Document entitled Exhibit 16 | 319 |
| 11 |     | Tim Blixseth Solvency Analysis | |
| 12 |     | Balance Sheet Test as of | |
| 13 |     | December 31, 2007 | |
| 14 | 125 | 17-page Assignment of Company | 355 |
| 15 |     | Interests Agreement, Bates | |
| 16 |     | Nos. YSC00305964-980 | |
| 17 | 126 | Six-page Amendment to Marital | 357 |
| 18 |     | Settlement Agreement dated | |
| 19 |     | June 26, 2008, Bates | |
| 20 |     | Nos. CHE02114-119 | |
| 21 | 127 | Seven-page Second Amendment to | 357 |
| 22 |     | Marital Settlement Agreement, | |
| 23 |     | Bates Nos. CHE26010-016 | |
| 24 | /// | | |
| 25 | /// | | |

Yates Court Reporters    800.669.1866

**WCP00522**

Edra D. Blixseth  -  December 17, 2009

Page 14

| | | | |
|---|---|---|---|
| 1 | 128 | 55-page Marital Settlement | 358 |
| 2 | | Agreement, Bates | |
| 3 | | Nos. CHE02059-113 | |
| 4 | 129 | Three-page email string, top | 358 |
| 5 | | email dated March 20, 2008, | |
| 6 | | from LearG@ to | |
| 7 | | syankelovitz@linerlaw.com re | |
| 8 | | FYI | |
| 9 | 130 | Four-page email string, top | 366 |
| 10 | | email dated 3/28/2008 from Jim | |
| 11 | | Fultz to | |
| 12 | | CEO@1800-investmentgroup.com | |
| 13 | /// | | |
| 14 | /// | | |
| 15 | /// | | |
| 16 | /// | | |
| 17 | /// | | |
| 18 | /// | | |
| 19 | /// | | |
| 20 | /// | | |
| 21 | /// | | |
| 22 | /// | | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

WCP00523

Edra D. Blixseth  -  December 17, 2009

Page 15

1                     EDRA D. BLIXSETH,

2        having been first duly sworn by the court reporter,

3        was examined and testified as follows:

4

5                        EXAMINATION

6    BY MR. FLYNN:

7        Q.   State your name, please.

8        A.   Edra Blixseth.

9        Q.   Ms. Blixseth, have you concealed any cash

10   amounts that are not reported on your bankruptcy

11   schedules?

12       A.   No, none.

13       Q.   Have you made any cash transfers within the

14   last year?

15            MR. DESCHENES:  I'm going to object.  The scope

16   of this deposition, Mike -- this must be why you're

17   starting with these questions -- is for your adversary.

18   It is not regarding the adversary that you filed

19   regarding objection to her discharge.

20            This is regarding the Yellowstone case and the

21   Snow case, none of which are these answers to these

22   questions relevant.

23   BY MR. FLYNN:

24       Q.   Please answer, Ms. Blixseth.

25            MR. DESCHENES:  I'm instructing her not to

WCP00524

Edra D. Blixseth  -  December 17, 2009

Page 16

1    answer.

2            MR. FLYNN:  In order not to delay,

3    Mr. Deschenes, I'm going to move forward, but that

4    obstruction -- I will state for the record once is

5    obstructing our discovery, the overall defenses involved

6    here, in pari delicto, unclean hands, a large scheme by

7    Ms. Byrne -- by Mr. Byrne and Ms. Blixseth to basically

8    steal the Yellowstone Club is what's at issue and are

9    the defenses in Adversary 14 and 18 and this question is

10   directly germane.

11       Q.   Ms. Blixseth, did you --

12            MR. COTNER:  Mike --

13            MR. FLYNN:  Gary, I'm moving forward.  You

14   state your objections under the rules.

15            MR. COTNER:  -- this is Dave Cotner.  I just

16   want to introduce myself.  The court reporter had asked

17   for all the participants and Paul had given his answer

18   and information and then everybody chimed in.

19            And I just wanted the record to reflect that

20   Dave Cotner is also on the phone reflecting --

21   representing Dick Samson as Trustee of the Edra Blixseth

22   bankruptcy estate.

23            And, Court Reporter, I didn't catch your name,

24   but I'm happy to get you my information with respect to

25   my firm during a break, if that would help you.

WCP00525

Edra D. Blixseth  -  December 17, 2009

Page 17

1              THE REPORTER:  Thank you.

2              MR. COTNER:  Thank you.

3    BY MR. FLYNN:

4        Q.   Ms. Blixseth, did you write out a $225,000

5    check to Jack Scalia to purchase a Bentley?

6        A.   No.

7        Q.   Did Mr. Scalia purchase a Bentley from Desert

8    European Motors based on funds that you had wire-

9    transferred to him in the amount of roughly $220,000?

10             MR. HOLAHAN:  I don't think -- I don't think

11   this has anything to do with the case that we're here

12   on, so I'm going to object to that question.

13             And if we can't limit the scope, the proper

14   scope of the deposition now, we just should stop, Mike,

15   and call the judge.  You've done it before; let's do it

16   again.

17             No, she's not going to answer the question.

18             MR. FLYNN:  You're instructing her?

19             MR. HOLAHAN:  Yeah.

20   BY MR. FLYNN:

21       Q.   Did you report on your income tax return a gift

22   of $220,000 wire-transferred to Mr. Scalia?

23             MR. HOLAHAN:  She's not going to answer that

24   question.

25   ///

WCP00526

Edra D. Blixseth  -  December 17, 2009

Page 18

1   BY MR. FLYNN:

2       Q.   The amount was 230,000 that you wire-

3   transferred.  Did you do that, Ms. Blixseth?

4           MR. HOLAHAN:  She's not going to answer that

5   question.

6   BY MR. FLYNN:

7       Q.   Did Mr. Scalia report it as income?

8           MR. HOLAHAN:  How would she possibly know?

9   She's not going to answer that question for the same

10  reason.  This is beyond the proper scope of this

11  deposition, as you well know.

12  BY MR. FLYNN:

13      Q.   Within the two-year period prior to your filing

14  your bankruptcy petition, Ms. Blixseth, did you transfer

15  or give to Mr. Scalia approximately $450,000?

16          MR. HOLAHAN:  There are going to be no

17  questions about Mr. Scalia that she's going to answer.

18  It's an invasion of privacy and has nothing to do with

19  the scope of this deposition, so you can go ahead and

20  ask and she's not going to answer.

21  BY MR. FLYNN:

22      Q.   Ms. Blixseth, did you, within the two years

23  before your filing bankruptcy, take out approximately

24  $9,000 routinely virtually every week during 2007, 2008,

25  in cash from your bank accounts?

WCP00527

Edra D. Blixseth  -  December 17, 2009

Page 19

1          MR. HOLAHAN:  You can answer that, if you know.

2          THE WITNESS:  Every week, no.

3   BY MR. FLYNN:

4      Q.   Virtually every week?

5      A.   No.

6      Q.   How much money for the two years before you

7   filed bankruptcy did you take out in cash?

8      A.   I don't know.

9      Q.   Would it surprise you if I told you it is in

10  the range of close to half a million dollars?

11         MR. HOLAHAN:  If you're going to testify, we

12  can swear you in and then you can testify instead of

13  her.  We're not going to proceed down this road, Mike.

14  This is not about her bankruptcy, so she's not going to

15  answer any questions.

16         MR. FLYNN:  Concisely, and then you be quiet,

17  Mr. Holahan.

18         MR. HOLAHAN:  No, I won't be quiet.  Don't tell

19  me to be quiet.

20  BY MR. FLYNN:

21     Q.   Ms. Blixseth --

22         MR. HOLAHAN:  I'm not through.

23  BY MR. FLYNN:

24     Q.   -- what did you do with the cash?

25         MR. HOLAHAN:  Don't tell me to be quiet.  I

Yates Court Reporters    800.669.1866

**WCP00528**

Edra D. Blixseth  -  December 17, 2009

Page 20

1    represent her.  If I have an objection to any of your

2    questions, you're going to listen to the entire

3    objection -- even if takes seven hours -- and then we'll

4    leave, so don't try to tell me to be quiet.

5              MR. FLYNN:  Mr. Holahan, you're obstructing and

6    prejudicing my client's rights.

7              MR. HOLAHAN:  You're out of record.

8    BY MR. FLYNN:

9         Q.   Ms. Blixseth, what did you do with the cash

10   that you took out in the two years prior to filing

11   bankruptcy?

12             MR. HOLAHAN:  Object to the form of the

13   question.  It's irrelevant and beyond the scope of

14   this -- this case and this exam.

15             You can answer if you know.  It's also vague,

16   overbroad.  If you -- if you can possibly --

17             THE WITNESS:  I don't know.

18   BY MR. FLYNN:

19        Q.   Did you deposit it into any other bank

20   accounts?

21        A.   Not that I recall.

22        Q.   How did you spend it?

23        A.   A variety of ways.

24        Q.   What are the variety of ways?

25        A.   I don't really recall.

WCP00529

Edra D. Blixseth  -  December 17, 2009

Page 21

1      Q.   So for two years if you were taking out

2   routinely $9,000, you don't know what you were doing

3   with it; is that your testimony?

4      A.   That's not my testimony; that's your testimony.

5   My testimony was I don't recall and my testimony was I

6   did not take out 9,000 a week.

7      Q.   How much did you take out?

8      A.   I'm not sure.

9      Q.   What's your best estimate?

10     A.   I'm not sure.  I don't want to guess on

11  answering questions.

12     Q.   More than a hundred thousand dollars or less?

13     A.   I don't want to guess on answering questions.

14     Q.   More than $500,000 or less?

15     A.   My answer is the same.

16     Q.   And you have no idea what you did with that

17  money; is that correct?

18     A.   I didn't say that.  I said I don't recall.

19     Q.   Did you give any of that cash to your children?

20     A.   I don't recall.

21     Q.   Is any of that cash currently in bank accounts

22  that you have not reported on your bankruptcy schedules?

23     A.   No.

24          I mean, do you want me to answer?

25          But no.

Yates Court Reporters    800.669.1866

**WCP00530**

Edra D. Blixseth  -  December 17, 2009

Page 22

1           MR. HOLAHAN:  Let him ask two more.

2    BY MR. FLYNN:

3      Q.   Is any of that cash -- was any of that cash

4    given to Mr. Scalia?

5           MR. HOLAHAN:  She's not going to answer any

6    questions about Mr. Scalia.  That's beyond the scope of

7    this and it's an invasion of privacy.

8           MR. FLYNN:  Okay.  It's on the record and we'll

9    take that up with the judge at the appropriate time.

10          MR. HOLAHAN:  Good.

11   BY MR. FLYNN:

12     Q.   Did you graduate from Manteca High School?

13     A.   No.

14     Q.   Have you testified before that you graduated

15   from Manteca High School?

16     A.   No, I just finally graduated from high school.

17     Q.   What high school did you graduate from?

18     A.   San Leandro.

19     Q.   What year did you graduate from that high

20   school?

21     A.   I'm trying to think of the year.

22          '72 or '73.

23     Q.   You were given notes by Michael Sandoval in the

24   approximate amount of $8 million to resolve claims

25   between you and Mr. Sandoval; is that correct?

Yates Court Reporters   800.669.1866

WCP00531

Edra D. Blixseth   -   December 17, 2009

Page 23

1      A.   There were notes given, I don't recall exact

2    amounts.

3      Q.   What is your best estimate of the amounts?

4      A.   I think there was one for 5- and then there was

5    another one and I don't remember what that amount was.

6      Q.   Was it for 3-?

7      A.   I don't recall.

8      Q.   Okay.  Where, physically, are those notes

9    today?

10     A.   I would assume they're in the -- I would assume

11   they're in the files with the settlement with Opsprings

12   and xPatterns, but I'm not positive.  I didn't -- Jory

13   had them and Jory is not with us, so I'm not sure.

14     Q.   Did you give the notes to Mr. Samson?

15     A.   He's aware of them.  I don't -- I don't think

16   that he has them physically.

17     Q.   Who do you think has them?

18     A.   I just said I'm not -- I'm not sure.

19     Q.   You said they're in the files, I believe, of

20   Opsprings.  Who has those files?

21     A.   I believe Pat would have those now.  Jory had

22   them and so most of the things Jory had Pat now has, Pat

23   Yarborough.

24     Q.   Is Pat Yarborough the same Pat Yarborough --

25   the Pat Yarborough that is currently your bookkeeper, is

WCP00532

Edra D. Blixseth  -  December 17, 2009

Page 24

1    that the same Pat Yarborough that has been convicted of

2    embezzlement?

3        A.   I have no idea.

4        Q.   When did you hire Pat Yarborough?

5        A.   I didn't hire Pat Yarborough.  Jory brought

6    Yarborough on and I don't recall when it was.

7        Q.   Is it your testimony that Jory Russell made the

8    decision and not you?

9        A.   He brought her to me as a recommendation to be

10   hired and I okayed it.

11       Q.   What did you know about her background when you

12   brought her on?

13       A.   Just the information that I had been given

14   through Jory and I believe -- I believe at that time it

15   was either Steve Crisman and/or Nick Rhodes that were

16   part of that as well, but they just gave me the

17   information and recommended her.

18       Q.   Did you get a resume?

19       A.   I don't think I ever saw her resume, but I may

20   have.  I don't recall.

21       Q.   Has she concealed any funds for you?

22       A.   No, she has not.

23       Q.   Has she diverted any funds to bank accounts

24   that are not reported on your schedules?

25       A.   No, she has not.

Yates Court Reporters    800.669.1866

WCP00533

Edra D. Blixseth  -  December 17, 2009

Page 25

1      Q.   And do you have any knowledge or understanding
2   from any source about her prior criminal background?
3      A.   You keep referring to that she has a criminal
4   background.  I'm not aware of any criminal background,
5   so I can't answer that.
6      Q.   Okay.  Who currently has -- strike that.
7           Where are the Opspring files with the Sandoval
8   notes?
9      A.   I think I answered that.  I'm assuming they're
10  with the things that Jory turned over that were with his
11  records, but I'm not sure.
12     Q.   I believe what you testified to was that
13  they're with, the Opspring files are with Pat
14  Yarborough; is that correct?
15     A.   You asked me again, so I thought maybe you
16  wanted further explanation of that.
17     Q.   I do.  Where are those files, Ms. Blixseth?
18     A.   They're with all the other files of the
19  companies and BGI and everything with Pat.
20     Q.   Where?
21     A.   At Pat's home office.
22     Q.   Where is her home office?
23     A.   I don't have the address in my head.
24     Q.   What country is it in, Ms. Blixseth?
25     A.   It's in the United States.

WCP00534

Edra D. Blixseth  -  December 17, 2009

Page 26

1      Q.    What state is it in?

2      A.    California.

3      Q.    What city is it in?

4      A.    She lives in the LA area, but I'm not sure of

5    the exact city.  There's a lot of cities in LA.

6      Q.    So is it your testimony she has all of the

7    Opspring Blxware files and you don't even know what city

8    they're in?  Is that your testimony?

9           MR. HOLAHAN:  That's -- I'm going to object to

10   that question.  The form of that question is

11   argumentative and it misstates her testimony.

12   BY MR. FLYNN:

13     Q.    Okay.  Do you have your cell phone here with

14   you?

15     A.    No, I do not.

16     Q.    How do we find Ms. Yarborough?

17     A.    I have an address in my office and there's a

18   phone number.

19     Q.    Okay.  At the break --

20     A.    Sam -- Dick Samson has all of her information,

21   her email address.  He's got everything.

22     Q.    What is your best understanding of where

23   Ms. Yarborough lives?

24     A.    In the LA area.

25     Q.    When did she get possession of all the Opspring

WCP00535

Edra D. Blixseth   -   December 17, 2009

Page 27

1    Blxware files?

2       A.   I'm having to guess on this, but I'm assuming

3    when Jory Russell -- you asked two different questions.

4            MR. HOLAHAN:  If you don't know, don't guess.

5            THE WITNESS:  Okay.

6            MR. HOLAHAN:  If you don't know, just say you

7    don't know.

8            THE WITNESS:  I'm not sure.

9    BY MR. FLYNN:

10      Q.   Is it a fact that Jory Russell turned over all

11   the files to you, Ms. Blixseth?

12      A.   Jory Russell turned over no files to me.

13      Q.   What is your best understanding of how many

14   files comprise the Opspring Blxware files?

15      A.   I really don't know.  Other people handled that

16   and I only asked for things when I needed it for

17   specific things.

18      Q.   So if Mr. Russell testified he turned over

19   everything to you, is he incorrect?

20      A.   I just said nobody turned over files to me.

21      Q.   Do you have any Opspring Blxware files at

22   Porcupine Creek?

23      A.   Not that I'm aware of.

24      Q.   Do you have any of those files at any of your

25   other locations?

Yates Court Reporters   800.669.1866

WCP00536

Edra D. Blixseth  -  December 17, 2009

Page 28

1     A.   I don't have any other locations.

2     Q.   Do you own homes in Montana?

3     A.   No, I don't.

4     Q.   Do you have any files at all at Porcupine

5   Creek?

6     A.   I didn't really retain files.  The files stayed

7   in the offices and when I needed something, somebody

8   would email me the information or send me the

9   information, I'd use it and return the files.

10          I don't have a file-keeping system right now.

11    Q.   Have you made any effort to find the Michael

12   Sandoval notes, the actual notes he gave you?

13    A.   You keep asking me about those and I keep

14   saying that I'm assuming Jory had them.  I'm assuming

15   Jory gave them to Pat.  Nobody has asked me to find

16   those notes and do something with them.

17    Q.   When did you first meet Michael Sandoval?

18    A.   Right before I met you, so whatever time frame

19   that was.

20    Q.   When did you first meet Dennis Montgomery?

21    A.   Same day I met you.

22    Q.   Now in late 2005 you were in possession of

23   proceeds of the Credit Suisse loan; is that correct?

24    A.   I wasn't personally, no.

25    Q.   Did you have access to any of the proceeds of

WCP00537

Edra D. Blixseth  -  December 17, 2009

Page 29

1    the Credit Suisse loan in late 2005?

2        A.    If Tim made any proceeds available to me for

3    specific things then I would have access to, but only

4    through Tim.

5        Q.    In early 2006 how much money did you give to

6    Michael Sandoval and Dennis Montgomery from the Credit

7    Suisse loan proceeds?

8        A.    I don't know if it was from the Credit Suisse

9    loan proceeds.  It came through from Tim wiring the

10   money in, but I believe the initial part was $5 million.

11       Q.    And that was an investment in the technology

12   companies?

13       A.    Correct.

14       Q.    And those technology companies were Azimyth,

15   xPatterns and Opspring?

16       A.    That is not correct.

17       Q.    What is incorrect about that, those three

18   companies?

19       A.    There was never an investment in Azimyth.

20       Q.    Only in Opspring and xPatterns?

21       A.    Correct.

22       Q.    How much did you invest?

23       A.    I believe there were two payments of 5 million

24   that were divided between xPatterns and Opsprings.  I

25   don't recall without notes in front of me exactly

Yates Court Reporters    800.669.1866

WCP00538

Edra D. Blixseth  -  December 17, 2009

Page 30

1  when -- xPatterns came first, Opsprings came second and

2  it was additional monies after that as well.

3      Q.   As you sit here today is it your testimony,

4  Ms. Blixseth, that you do not know that those monies

5  came from the Credit Suisse loan?

6      A.   I know they came out of bank accounts that Tim

7  set up that -- some of which were opened and remained

8  open with some of the funds of Credit Suisse loans, but

9  I don't know what other monies went in or out of there,

10  no.

11      Q.   What was the total amount of your investment in

12  the technology company?

13      A.   I believe it was around 16 million.

14      Q.   When did you first obtain possession of the FBI

15  reports indicating that Dennis Montgomery and the

16  technology he purportedly possessed were fraudulent?

17      A.   You're going to have ask that question again.

18      Q.   When did you first see the FBI reports that

19  disclosed that Dennis Montgomery and any technology he

20  possessed was a fraud?

21      A.   I have not to this day seen FBI reports that

22  said that they were a fraud.

23      Q.   When were you first put on notice,

24  Ms. Blixseth, that Dennis Montgomery could not write

25  source code and that he was a fraud?

Yates Court Reporters    800.669.1866

**WCP00539**

Edra D. Blixseth  -  December 17, 2009

Page 31

1      A.    I was never put on notice that he was a fraud.

2      Q.    Did you have a meeting with Joseph Jonas, a

3    sit-down, face-to-face meeting with Joseph Jonas, in

4    January 2007 where he told you that Montgomery did not

5    possess any of the technology that he had represented to

6    you?

7      A.    I don't recall who Joseph Jonas is.

8      Q.    So is it your testimony you don't recall the

9    meeting?

10     A.    I don't recall who he is, so I certainly

11   wouldn't recall a meeting.

12     Q.    Do you recall a meeting in your office on

13   April 12th and 13th, 2009, with Jack Kemp and myself and

14   Dennis Montgomery where we reviewed the FBI reports?

15     A.    In 2009?

16     Q.    Strike that.

17           2007.

18     A.    In what office?

19     Q.    In your office at Porcupine Creek on the second

20   floor.

21     A.    I don't recall that.

22     Q.    How much did you initially loan to Dennis

23   Montgomery?

24     A.    There was an employment contract with Dennis

25   Montgomery that Michael Sandoval had drawn up, had legal

Yates Court Reporters    800.669.1866

Edra D. Blixseth  -  December 17, 2009

Page 32

1   counsel draw up, and there was a signing bonus for

2   Dennis and I believe it was either a million or a

3   million and a half.  I don't recall specifically which

4   one it was.

5          And then it was talking about his salary, which

6   was a hundred thousand a month.  He had the right to

7   additional loans or bonuses based on performance and

8   turning over certain specific things that I don't think

9   that he ever actually got.

10         He got some additional monies when he was

11  purchasing a home, but I don't recall the exact amount.

12     Q.   Okay.  Did you give him loans totaling

13  $3 million in April of 2006?

14     A.   I don't believe so, no.

15     Q.   What is your best memory of the total amount of

16  money you loaned to him from Credit Suisse loan proceeds

17  in April 2006?

18     A.   I can't testify to anything from Credit Suisse

19  loan proceeds.  They came from the Tim Blixseth personal

20  account into -- wiring into the xPatterns or Opsprings

21  accounts.

22     Q.   Did Mr. Blixseth tell you that he opposed this

23  investment and didn't want you to use the Credit Suisse

24  loan proceeds to give to Mr. Montgomery?

25     A.   No, he did not.

Yates Court Reporters    800.669.1866

**WCP00541**

Edra D. Blixseth  -  December 17, 2009

Page 33

1      Q.   What is your best memory, regardless of the
2    source of the funds, as to how much you loaned Dennis
3    Montgomery in April 2006?
4      A.   I've already testified to that.  My best
5    recollection is it was a signing bonus, which was either
6    a million or a million and a half, and I don't recall
7    which one it was.
8      Q.   So that was a loan?
9      A.   That was part of -- I think it was a signing
10   bonus, actually.  If it was a loan, it was a loan.  I
11   don't remember the contract.  There's been a lot of
12   contracts and things between that time frame so --
13     Q.   Did you ever forgive that loan?
14     A.   No, I did not.
15     Q.   Did you report those loans on your bankruptcy
16   schedules?
17     A.   Those were monies that were into corporations
18   that I reported what was invested in the corporations,
19   but it wasn't for me personally.
20     Q.   Are those loans still outstanding?
21     A.   That's within the Opsprings Blxware books.  I'd
22   have to go back and look.  To the best of my knowledge,
23   if that's how they were and they weren't signing
24   bonuses.
25     Q.   Just so we're clear, Ms. Blixseth, the loans

Yates Court Reporters    800.669.1866

**WCP00542**

Edra D. Blixseth  -  December 17, 2009

Page 34

1   have never been forgiven; is that correct?

2       A.   I'm telling you I'm not sure if they were loans

3   or signing bonuses.  I'm telling you that I'm not aware

4   if they were loans of any monies being repaid from

5   Dennis Montgomery to the companies.  It wasn't to me,

6   personally.

7       Q.   Did Mr. Montgomery ever turn over to you the

8   source codes that were being given to you in exchange

9   for those loans?

10      A.   The reason he wasn't given the additional

11  money, whether it was loans or not loans, was because

12  the source codes had not been turned over.

13      Q.   To this day have the source codes ever been

14  turned over?

15      A.   Not to my knowledge.

16      Q.   And what is the total amount of money you have

17  given either in loans or salary, signing bonuses or any

18  other characterization to Dennis Montgomery as we sit

19  here today?

20      A.   I don't recall off the top of my head.

21      Q.   Is it over $5 million?

22      A.   No, it's not.

23      Q.   Isn't it a fact -- strike that.

24           How long did you continue to pay him a hundred

25  thousand dollars a month?

WCP00543

Edra D. Blixseth  -  December 17, 2009

Page 35

1        A.    Until we couldn't afford to keep the company

2   running.

3        Q.    Yeah.  When was that?

4        A.    I think April or May of this year.

5        Q.    So from April '06 to April or May of '09 you

6   paid him a hundred thousand dollars a month; is that

7   correct?

8        A.    That is correct.

9        Q.    What role, if any, did you play in having him

10  arrested for the $1.9 million casino fraud that he was

11  involved in?

12       A.    I had no role in it.

13       Q.    In the last 60 days have you been texting

14  messages with Mr. Montgomery?

15       A.    Yes, I have.

16       Q.    Have you texted messages with Mr. Montgomery

17  relative to the fake target letters that you and he

18  contrived to try to destroy the --

19             MR. HOLAHAN:  Stop.  Stop.

20  BY MR. FLYNN:

21       Q.    -- sale of the Yellowstone Club?

22             MR. HOLAHAN:  Objection to that question.  It

23  assumes facts not in evidence and this entire line of

24  questioning, I think, is beyond the scope of this

25  deposition.

Yates Court Reporters    800.669.1866

Edra D. Blixseth   -   December 17, 2009

Page 36

1           I don't know how you want to answer that

2      question or if you want to answer it.  You want to --

3           Could you read that question, back, please.

4           THE REPORTER:  Question, "Have you texted

5      messages with Mr. Montgomery relative to the fake target

6      letters that you and he contrived to try to destroy the

7      sale of the Yellowstone Club?"

8      **      THE WITNESS:  Well, I don't know how to answer

9      that, because I didn't have anything to do with fake

10     letters.  Tim Blixseth actually is the one that reached

11     out to me to say he'd like to get a copy of those and I

12     tried to get a copy of them.

13          MR. FLYNN:  Would you mark that, please.

14     Q.   You just testified you didn't have anything to

15     do with the fake letters.

16          Is that truthful testimony, Ms. Blixseth?

17     A.   You just asked me if I had contrived and had

18     something to do with making the fake letters.  If you're

19     asking if I was aware of the letters -- I can't answer

20     your question the way you worded it.

21     Q.   When did you first become aware of the letters,

22     Ms. Blixseth?

23     A.   Dennis told me he -- actually, I'm only aware

24     of one.  Dennis told me he had a letter saying that Tim

25     had received a target letter that he was being

WCP00545

Edra D. Blixseth  -  December 17, 2009

Page 37

1   investigated.

2       Q.   The question was "when," Ms. Blixseth?

3       A.   I don't remember.  It was quite a while ago.

4       Q.   What does "quite a while ago" mean?

5       A.   I think it was sometime in '07, but I don't

6   really recall.

7       Q.   Was the discussion about the fake letters --

8       A.   I didn't know them to be fake.  I only knew

9   that there was letter that was told -- I was told there

10  was a letter, so I can't answer.  When you say fake

11  letters I can't answer that in that way.  I don't know

12  to this day they're fake.

13      Q.   In the last three months have you received any

14  notification from any state or federal agency as to

15  whether you are the subject of a state or federal

16  investigation of any type?

17      A.   No, I have not.

18      Q.   In the last 30 days have you had any

19  conversations with Mr. Blixseth about the fake target

20  letters?

21      A.   Well, you keep referring to fake.  I've had

22  conversations with him and I've had texts with him about

23  the letters.  He wanted the letters.  He called me, he

24  texted me and said it meant a lot to him to get them and

25  I said, "I don't have them.  Why don't you do a deal

WCP00546

Edra D. Blixseth  -  December 17, 2009

Page 38

1    with Dennis and see if you can get them?"

2           I tried to help him do that.

3      Q.   When you first learned about the letters, and I

4    believe your testimony was sometime in '07, who did you

5    learn about it from?

6      A.   Dennis Montgomery.

7      Q.   This was when you were paying him a hundred

8    thousand dollars per month?

9      A.   I think I've already answered that, that he was

10   being paid a hundred thousand dollars a month working

11   for the technology company.

12     Q.   Did you know at that time that he was hacking

13   into computers on your behalf, namely late '07?

14     A.   I'm not aware of him ever hacking to this day

15   into computers and -- nor on my behalf.

16     Q.   Isn't it correct, Ms. Blixseth, that given all

17   of the money you've paid Mr. Montgomery, including the

18   hundred thousand dollars a month in salary, that he has

19   never produced any source code or any technology or any

20   product that you've been able to market to anybody?

21     A.   No.  That is not true.

22     Q.   How much money have you paid Mr. Montgomery in

23   the year 2009?

24     A.   I think he got his salary.  He was owed back

25   salary when I couldn't pay starting, I believe it was,

WCP00547

Edra D. Blixseth  -  December 17, 2009

Page 39

1    September, October, for the burn rate of Blxware.

2             He got that caught up, I believe, it was in

3    January and then after that I still didn't have money to

4    be paying him.  Some funds did come in on something we

5    were working on and, to the best of my knowledge, he

6    was -- his salary was paid through, I think, May or June

7    of this year.

8        Q.   When the $2.5 million was paid by the

9    government, the United States government, for the return

10   of the archives that Mr. Montgomery had in his

11   possession in February of 2009, how much of that

12   $2.5 million did you give to Montgomery?

13       A.   That wasn't what the money was for.

14       Q.   Is that truthful testimony, Ms. Blixseth?

15            MR. HOLAHAN:  Yours or hers?

16            MR. FLYNN:  Hers.

17       Q.   Is it truthful testimony that the 2.5 million

18   was not for the return of the archives?

19       A.   No, it was not.

20       Q.   Now how much of the 2.5 million, regardless of

21   the designation of the funds, went to Montgomery?

22       A.   I'm not sure that the instructions were to get

23   everyone paid current when the money came in.  There

24   were certain people loaned money for Blxware to continue

25   during that time.  The instructions were to get them

Yates Court Reporters    800.669.1866

WCP00548

Edra D. Blixseth  -  December 17, 2009

Page 40

1   paid back for loaning the money to keep it going, so I

2   really don't have an accounting of exactly what Dennis

3   Montgomery got.

4           It was supposed to be his back salary and any

5   out-of-pocket expenses that he had not been reimbursed.

6       Q.   Was it approximately $600,000?

7       A.   I don't have it in front of me.  I don't know.

8       Q.   Well, was it approximately $600,000?

9       A.   Same answer.

10      Q.   Okay.  At the time he got the money was he in

11  Washington, DC, and did he email you that he was

12  resigning from Blxware?

13          MR. HOLAHAN:  Which question do you want her to

14  answer first?

15          MR. FLYNN:  Both.

16          MR. HOLAHAN:  Okay.  You want to divide it up

17  into two questions.

18  BY MR. FLYNN:

19      Q.   When he got the money, did he resign from

20  Blxware?

21      A.   Dennis is emotionally volatile, so I don't

22  know.  He could have -- he could have done that, but I'm

23  not -- I'm not aware of getting a resignation from him

24  at that time, no.

25      Q.   Are you aware that an article's coming out in

WCP00549

Edra D. Blixseth  -  December 17, 2009

Page 41

1  Playboy Magazine relating to Mr. Montgomery's fraud in

2  connection with the technology we're discussion?

3      A.   Tim Blixseth told me about the article and I

4  was -- through my PR person was approached by the

5  reporter, but I'm not ware of anything about the article

6  and I never spoke to the reporter.

7      Q.   Okay.  As you sit here today, Ms. Blixseth,

8  have you inquired of Mr. Montgomery whether his

9  technology is legitimate or fraudulent?

10     A.   Have I inquired?

11     Q.   Yeah.  Have you ever asked him, "Is it real,

12  Dennis?"

13     A.   Years ago, yes.

14     Q.   You sent him many emails asking whether it was

15  real, didn't you, Ms. Blixseth?

16     A.   I would not say that's true.  That's not a

17  correct response, no.

18     Q.   The answer is no?

19          Let's go back to the target letters.  Did you

20  send or read the target letters to Lisa Myers of NBC?

21     A.   No.

22     Q.   Did Lisa Myers visit you in early March 2008

23  just before Mr. Byrne terminated the sale of the

24  Yellowstone Club and you gave her a copy of the fake

25  target letters?

Yates Court Reporters   800.669.1866

WCP00550

Edra D. Blixseth  -  December 17, 2009

Page 42

1      A.    That is not correct.

2      Q.    Did you give a copy or read a copy of the fake

3  target letters to Jim Popkin during the early part of

4  2008, Ms. Myers' executive producer?

5      A.    Not that I recall.

6      Q.    You may have, but you don't recall?

7      A.    I -- I -- not only do I not recall, I don't

8  have any recollection at all of doing that.

9      Q.    John Wilke, you knew Mr. Wilke before he passed

10 on?

11     A.    Yes, I did.

12     Q.    And you, in fact, had fed Mr. Wilke information

13 relating to Governor Gibbons and purported bribes; is

14 that correct?

15     A.    That is not correct.

16     Q.    Did you engineer the Wall Street Journal

17 article on November 1, 2006, relating to Governor

18 Gibbons?

19     A.    Absolutely not.

20     Q.    Did you pass -- did you have any discussions

21 with Mr. Wilke prior to November 1, 2006, relative to

22 the bribery of Governor Gibbons?

23     A.    I don't have any information on that.  John

24 Wilke's name was given to me on, at that time, our boat

25 by Robert Frank with Wall Street Journal saying he would

WCP00551

Edra D. Blixseth  -  December 17, 2009

Page 43

1    be someone that might be interested in looking at what

2    Dennis was saying with the allegations.

3         Q.   During the settlement with Warren Trepp where

4    you confessed $26.5 million in judgments, did

5    Mr. Montgomery withdraw his allegation that Trepp had

6    bribed Gibbons?

7         A.   I don't believe so.

8         Q.   Did you confess to a $5 million judgment

9    relating to defamation in connection with Montgomery's

10   claims that Trepp had bribed Gibbons?

11        A.   There was discussion from Warren Trepp's -- it

12   was important to Warren Trepp's wife that something be

13   acknowledged of that because of the press and I don't

14   remember how it was worded, but it was not worded where

15   Dennis had to take back anything that he had stated.

16        Q.   Did he admit during those settlement

17   discussions that he had fabricated two emails

18   purportedly from Warren Trepp or his wife relating to

19   the bribery of Gibbons?

20        A.   Not only did not admit that he had fabricated

21   them, he told me that he absolutely did not fabricate

22   them.

23        Q.   When did he tell you that?

24        A.   When I asked him when we were there.

25        Q.   Prior to November 1, 2006, did you talk to him

WCP00552

Edra D. Blixseth  -  December 17, 2009

Page 44

1   about the emails and whether or not he had fabricated

2   them?

3       A.   I talked to him about -- in general about

4   anything that -- is there anything to do with the things

5   that you're saying happened that's not true and he told

6   me that it was all true.

7       Q.   With regard to John Wilke, did you give a copy

8   of the fake target letters to John Wilke of the Wall

9   Street Journal?

10      A.   I did not.

11      Q.   Did you read the fake target letters to John

12  Wilke?

13      A.   I did not.

14      Q.   Did you have Dennis Montgomery give a copy of

15  the fake target letters to John Wilke?

16      A.   I didn't have Dennis Montgomery do anything.

17      Q.   Did you have Dennis Montgomery give Lisa Myers

18  a copy of the fake target letters?

19      A.   I think I've answered that.  I didn't have

20  Dennis Montgomery do anything.

21      Q.   Did you give Robert Frank a copy of the fake

22  target letters?

23      A.   I didn't give anybody a copy of the target.

24      Q.   How long had you been a friend of Robert Frank?

25      A.   We'd known him on and off for a while.  He was

Yates Court Reporters   800.669.1866

**WCP00553**

Edra D. Blixseth  -  December 17, 2009

Page 45

1   working on -- he'd done some articles on Yellowstone

2   Club working on his book.  I can't remember what it's

3   called, but it came out in '07.

4        So, you know, we had had dinners with him.  We

5   had spent time with him.

6        Q.   And how many times had you used Robert Frank to

7   spread stories in the media against your opponents,

8   Ms. Blixseth?

9        A.   I don't know how to answer a question like

10  that.

11       MR. HOLAHAN:  The question assumes facts not in

12  evidence.

13       MR. FLYNN:  We'll see, Mr. Holahan.

14       MR. HOLAHAN:  Oh, yeah.  We will see.

15       MR. FLYNN:  We will, sir.  Trust me, we will

16  see.

17       MR. HOLAHAN:  Okay.

18  BY MR. FLYNN:

19       Q.   Ms. Blixseth, is it your testimony under

20  oath -- strike that.

21       Did you have any discussion with Robert Frank

22  relative to the fake target letters?

23       A.   I don't recall having any, but I could have.

24  It was John Wilke that was working with Dennis, so not

25  that I recall, no.

Yates Court Reporters    800.669.1866

**WCP00554**

Edra D. Blixseth  -  December 17, 2009

Page 46

1    Q.   You don't specifically recall, but you may have

2  discussed the fake target letters with Robert Franks

3  [sic]; is that your testimony?

4    A.   You keep saying "fake target letters."  At the

5  time and to this day I don't know if they're fake, but

6  the letter I was shown that was a target letter.

7    Q.   What letter were you shown, Ms. Blixseth?

8    A.   It was a letter addressed to Tim saying --

9  informing him he was the target of investigation.  It

10 came about the same time that I had gotten calls from an

11 investigation to the death of Denise Touhey and to the

12 investigation of IRS, both of which told I didn't

13 believe Tim had anything to do with it and I had no

14 information for them.

15   Q.   When did you first speak to Sam Byrne about the

16 fake target letters?

17   A.   I told him about them -- it was during the same

18 time that we all heard about the investigation on Denise

19 Touhey and the IRS.  I don't recall the exact date.  It

20 was within that same time frame.

21   Q.   Yeah.  Who is "them" in your last answer?

22   A.   You'll have -- I don't --

23   Q.   Did you have any conversations with any state

24 or federal agency when you first learned about the fake

25 target letters regarding any investigation of

WCP00555

Edra D. Blixseth  -  December 17, 2009

Page 47

1   Mr. Blixseth?

2          MR. HOLAHAN:   I'm going to start objecting to

3   every question that you ask using the phrase "fake

4   target letters."   We don't know what you're talking

5   about.   I don't know what you're talking about.

6          The deponent has said she doesn't know what

7   you're talking about, so we object to the phrase "fake

8   target letters" because we don't know that there are any

9   fake target letters and every time you ask that question

10  I'm going to be object to it.

11         If you know how to answer, if you want to read

12  back that question and you can figure out how to answer

13  it, you can.

14         THE WITNESS:   Okay.

15  BY MR. FLYNN:

16     Q.   With regard to the letter that you acknowledged

17  you were shown by Dennis Montgomery --

18     A.   Uh-huh.

19     Q.   -- that letter, referencing that letter, when

20  did you first speak to Sam Byrne about that letter?

21     A.   I don't remember the date.   I just said -- we

22  were talking about things and I said, "Just for your

23  knowledge" -- this came about the same time as the

24  Denise Touhey investigation was going on and the IRS

25  investigation and now I've got a copy of a letter.

Yates Court Reporters   800.669.1866

WCP00556

Edra D. Blixseth  -  December 17, 2009

Page 48

1          And I don't know -- I didn't do anything with

2     it.  I didn't even keep it.  I didn't know if there was

3     any truth to it.  I said that when I said about -- when

4     I told him about the letter, but I said, "I don't

5     want -- if there's something of this, then I didn't say

6     anything.  I want you to know."

7          Q.   How did Dennis Montgomery come about to have

8     possession of this letter?

9          A.   I don't know.

10         Q.   Well, he was your employee.  Did you ask him?

11         A.   I asked him and he said it came across on a fax

12    machine.

13         Q.   From where?

14         A.   I didn't ask him that.

15         Q.   Did it come across on a fax machine from Boston

16    with a Kinko's cover sheet?

17         A.   That's what I was told when Tim got the

18    letters, but I wasn't aware of that.  I didn't even look

19    at that.

20         Q.   Did it come from Sam Byrne on a Kinko's cover

21    sheet in February of 2008 just before Mr. Byrne

22    terminated the sale of the Yellowstone Club?

23         A.   How can I answer question about did it come

24    from Mr. Byrne when I just said I don't know where the

25    letter came from?

WCP00557

Edra D. Blixseth  -  December 17, 2009

Page 49

1      Q.   Did you talk to Steve Crisman about this

2  letter?

3      A.   May have.  Steve and Nick and everybody was

4  around then at the time of this.

5      Q.   In the first week of March 2008 did you fly to

6  Cabo San Lucas with Mr. Crisman and Mr. Rhodes and did

7  you have possession of the letter and discuss it with

8  them?

9      A.   I don't recall if I had possession, because I

10  ended up not keeping the letter.  So there could have

11  been discussion about it.

12      Q.   How do you know you didn't keep the letter?

13      A.   Because I don't have it.

14      Q.   Did you throw it away?

15      A.   I think I gave it back to Dennis.  I said,

16  "There's nothing I would do with any of this.  There's

17  all kinds of all those things going on.  I don't want

18  anything to do with it.  I just want to try to get

19  things done the way we're getting done," and didn't do

20  any more with it.

21      Q.   Did you discuss the letter with Deborah Klar

22  and give her a copy of it?

23      A.   I did not.  Whether it was discussed with her,

24  it could have been discussed within the Liner firm,

25  because when I found out Tim was being investigated by

Yates Court Reporters   800.669.1866

**WCP00558**

Edra D. Blixseth  -  December 17, 2009

Page 50

1    the IRS, I wanted to find out if that included me, and

2    Ellyn Garofalo -- I can't remember her last name, starts

3    with a G -- she investigated.  She made some calls to

4    find out if I was also being investigated along with Tim

5    and the IRS.

6        Q.   Did you give a copy this letter to the Lemond

7    parties or the Lemond lawyers?

8        A.   Absolutely not.

9        Q.   Did you discuss it with them?

10       A.   Absolutely not.

11       Q.   Did you discuss it with Conrad Burns or give

12   him a copy, the former senator from Montana?

13       A.   No, I did not.

14       Q.   Did you discuss it or give a copy to Mary Bono?

15       A.   No, I did not.

16       Q.   Did you discuss or give a copy to Robert

17   Bennett of the Skadden Arps firm?

18       A.   No, I did not.

19       Q.   Does the Skadden Arps firm currently represent

20   you?

21       A.   They're not representing me for anything going

22   on, no.  I haven't terminated them, but they're not

23   representing anything.

24            They were representing Dennis Montgomery and

25   Blxware in connection with things that you had been

WCP00559

Edra D. Blixseth   -   December 17, 2009

Page 51

1    representing him for and they stepped into your shoes.

2        Q.   How much did you pay Robert Bennett of the

3    Skadden Arps firm to represent you and Montgomery?

4        A.   I don't recall.  They're on my list of

5    schedules for bills still outstanding, but I don't

6    recall what the total was paid to them, what the

7    retainer was and what the total was paid.

8        Q.   Did you pay them over $300,000, Ms. Blixseth?

9        A.   I don't recall.

10        Q.   Was that paid on your behalf or on behalf of

11   Mr. Montgomery?

12        A.   I think it was paid on behalf of the company

13   and Mr. Montgomery.

14        Q.   At that time was the Skadden Arps firm

15   representing Credit Suisse?

16        A.   I wasn't aware of them representing Credit

17   Suisse.

18        Q.   Did Robert Bennett disclose to you that they

19   were representing Credit Suisse at that period of time?

20        A.   No, he did not.

21        Q.   At any time during this case has the Skadden

22   Arps firm asked you to sign a waiver of a conflict of

23   interest --

24        A.   No, they have --

25        Q.   -- between the representation of Credit Suisse

WCP00560

Edra D. Blixseth  -  December 17, 2009

Page 52

1    and the representation of you?

2        A.    No.

3        Q.    Okay.

4            MR. HOLAHAN:  Can we take a quick break?

5            MR. FLYNN:  One more question.

6        Q.    Do you recall executing three declarations in

7    the summer of '07 in an effort to stop the Yellowstone

8    Club sale to CrossHarbor Capital?

9        A.    In an effort to stop the sale?

10       Q.    Stop the sale.

11       A.    No, I do not.

12       Q.    Do you recall executing three declarations

13   relative to your motion to seek an injunction or

14   restraining order to stop the sale?

15       A.    I didn't file a motion for that.

16       Q.    What did you file a motion for?

17       A.    You'll have to ask me -- there was so much

18   going on in family court and other things, you're going

19   to have to ask me specifically.

20       Q.    Did you file three declarations in the summer

21   of '07 in connection with the Yellowstone Club sale to

22   CrossHarbor in which you claimed that the Yellowstone

23   Club was valued at $1.3 million?

24       A.    Was that in family court?

25           MR. HOLAHAN:  What?

Yates Court Reporters    800.669.1866

WCP00561

Edra D. Blixseth  -  December 17, 2009

Page 53

1          MR. FLYNN:  Based on?

2          MR. HOLAHAN:  You mean 1.3 billion.

3          MR. FLYNN:  1.3 billion.

4          MR. HOLAHAN:  You said million, did you mean

5    billion?

6          MR. FLYNN:  Thank you.  Thank you, Dennis.

7          MR. HOLAHAN:  Glad to help.

8          MR. FLYNN:  Always appreciate it.

9      Q.   -- $1.3 billion based on the total net value

10   appraisal methodology of Credit Suisse?

11     A.   In what court are you referring to?

12     Q.   Family court.

13     A.   Family court.  There's been so many things

14   filed.  I don't recall my exact declaration then, but I

15   was under the impression at that time that the Credit

16   Suisse things were valid, so it could be.

17     Q.   How long did you maintain the view that the

18   Credit Suisse things were valid on your personal

19   financial statements, Ms. Blixseth?

20     A.   As long as that's what I was being told.

21     Q.   Who told you that?

22     A.   The reports from the audits from Credit Suisse

23   and the Yellowstone Club, things that Tim had given me

24   from the companies.

25     Q.   When you were borrowing approximately

Yates Court Reporters    800.669.1866

WCP00562

Edra D. Blixseth  -  December 17, 2009

Page 54

1    $40 million from various lenders, were you holding

2    yourself out to having a net worth of approximately 800-

3    to $900 million based on the Credit Suisse total net

4    value appraisal system?

5              MR. HOLAHAN:  Objection.  Vague as to time

6    frame.  Vague in general.  If you want to be a little

7    bit more specific, maybe that would help.

8    BY MR. FLYNN:

9        Q.   Can you answer the question?

10       A.   No, I cannot.

11             MR. HOLAHAN:  We need to take a quick break,

12   sorry.

13             MR. FLYNN:  Go ahead.

14             (Recess taken.)

15             MR. FLYNN:  Let me show you what has been

16   marked as Exhibits 8 and 9, Ms. Blixseth, and these

17   purport to be documents from the US Department of

18   Justice Criminal Division and the US Department of

19   Justice Environment and Natural Resources Division.

20      (Exhibits 8 and 9 were marked for identification.)

21             MR. FLYNN:  Exhibit 8 is purportedly signed by

22   Ronald Sharpe, Assistant United States Attorney,

23   addressed to Mr. Timothy Blixseth, dated December 12,

24   2007.  Let's start with that one.

25             MR. HOLAHAN:  Are Exhibits 1 through 7 here

WCP00563

Edra D. Blixseth  -  December 17, 2009

Page 55

1    today but you haven't used them yet or they're from the

2    previous deposition?

3         MR. FLYNN:  Have not been used.  They're in

4    that pile.  Unfortunately, Kinko's didn't collate them

5    so you'll have to find them on your own.

6         Q.   Do you recognize Exhibit 8, Ms. Blixseth?

7         A.   I'm not sure.  It seems familiar, but you guys

8    keep referring to two and I think I only saw one, so I

9    don't know if it's this one or the other one.

10        MR. HOLAHAN:  What is this a pile of you put in

11   front of me, Mr. Flynn?

12        MR. FLYNN:  It's a -- it's the exhibits we're

13   addressing now.

14        MR. HOLAHAN:  Yeah, but it's not in any order.

15        MR. FLYNN:  It's in order; it's not collated,

16   as I just said.

17        MR. HOARD:  When you say collated, you mean the

18   individual documents are not stapled together?

19        MR. FLYNN:  Correct.

20        MR. HOARD:  You just have to thumb through it

21   until you get to -- you want to see what it looks like?

22   It's a letter.

23        MR. HOLAHAN:  Okay.

24        MR. FLYNN:  You have to thumb through it until

25   you find it.

WCP00564

Edra D. Blixseth  -  December 17, 2009

Page 56

1   BY MR. FLYNN:

2       Q.   That document, Ms. Blixseth, purportedly signed

3   by Ronald Sharpe --

4            MR. HOLAHAN:  You'll have to wait a minute,

5   Mr. Flynn.  I want to see the document before you ask

6   her any questions about it.  So if you can tell me how

7   many pages in, is it after -- where is it in the pile?

8            MR. FLYNN:  You want to hand me the pile and

9   I'll find it for you?

10           MR. HOLAHAN:  Yeah.  That's good.

11           MR. FLYNN:  This is the first part of your

12   file.

13           MR. HOLAHAN:  Okay.

14           MR. FLYNN:  These are the two documents --

15           MR. HOLAHAN:  Thank you.

16           MR. FLYNN:  -- 8 and 9.  That's the second part

17   of your file.

18           MR. HOLAHAN:  Okay.

19   BY MR. FLYNN:

20       Q.   Now Ms. Blixseth, how many conversations did

21   you have with Mr. Montgomery about either one of these

22   documents?

23           MR. GLASSER:  Is the second one 9, Mr. --

24           MR. FLYNN:  The second one is Exhibit 9.

25           THE WITNESS:  Can I see both so I can tell you

Yates Court Reporters   800.669.1866

**WCP00565**

Edra D. Blixseth  -  December 17, 2009

Page 57

1    which one I know I saw for sure?  I mean I don't know if

2    I'll be able to tell you for sure, but is this the same

3    one?

4           MR. HOLAHAN:  Can you, please, explain what is

5    redacted and why on Exhibit 9, Mr. Flynn?

6           MR. FLYNN:  No, I cannot.

7           MR. HOLAHAN:  Who redacted it?

8           MR. FLYNN:  We're going to find out whether it

9    was Blixseth or Montgomery.

10          MR. HOLAHAN:  You did not?

11          MR. FLYNN:  Oh, I absolutely have not.

12          MR. HOLAHAN:  I'm talking about the redactions

13   here.  You did not do these redactions?

14          MR. FLYNN:  Don't cross-examine me, I just told

15   you I didn't do them.

16          MR. HOLAHAN:  You put an exhibit in front of my

17   client, I'm entitled to ask you questions about it.

18          MR. FLYNN:  Do whatever you want, we're moving

19   on.

20      Q.   Ms. Blixseth, when did you first see either one

21   of these documents?

22      A.   I think this is the one I saw, because I don't

23   remember seeing -- the one I saw had everything on

24   there.

25      Q.   So you pointed to Exhibit 8?

Yates Court Reporters   800.669.1866

WCP00566

Edra D. Blixseth   -   December 17, 2009

Page 58

1    A.    Correct.

2    Q.    And you said that's the one you saw, which is a

3    document -- purportedly dated December 12, 2007, from a

4    Ronald Sharpe, Assistant United States Attorney; is that

5    correct?

6    A.    That's correct.

7    Q.    And the other one, as your counsel points out,

8    has some redactions on it.

9          Did you do those redactions?

10   A.    No, I did not.

11   Q.    Have you ever seen Exhibit 9, the one with the

12   redactions?

13   A.    I don't think so.

14   Q.    How many occasions have you had to discuss

15   either one of these documents with Dennis Montgomery?

16   A.    On several occasions, because when you first

17   showed it to me I was surprised and then it kind of fell

18   into the other things that I had gotten calls about.

19   Q.    Ms. Blixseth, I'm not interested in the other

20   things you got calls about.  I'm interested in this

21   document.  Please restrict your answers to this

22   document, ma'am.

23   A.    I don't know how many times I talked to Robert.

24   Q.    At this point in December of '07, your divorce

25   had not become final; is that correct, Ms. Blixseth?

Yates Court Reporters   800.669.1866

**WCP00567**

Edra D. Blixseth  -  December 17, 2009

Page 59

1      A.   No.  It didn't become final until October of

2    '08.

3      Q.   And you were in a vigorously contested divorce

4    proceeding with Mr. Blixseth; is that fair to say?

5      A.   It was on and off okay and not okay, yes.

6      Q.   And sometime in late '07, according to your

7    testimony, you were given possession of a document that

8    indicated your ex-husband or then husband was the

9    subject of a grand jury investigation into possible

10    violations of federal criminal laws involving, but not

11    necessarily limited to 18 USC 1959, 1344 bank fraud and

12    201 bribery of public officials and witnesses?

13      A.   Yeah.

14      Q.   Is that your testimony?

15      A.   Well, I'm not sure what you just asked me, but

16    I don't think I saw this in December.  I think I saw it

17    in early '08, but I don't actually recall when I first

18    saw it.

19      Q.   In fact, Ms. Blixseth, you began emailing about

20    this in late January, early February '08; isn't that

21    correct, ma'am?

22      A.   I don't remember email -- I don't remember when

23    I started emailing about it, but I don't think I saw it

24    until early '08.

25      Q.   Who did you email about this document in early

Yates Court Reporters    800.669.1866

WCP00568

Edra D. Blixseth  -  December 17, 2009

Page 60

1    '08 after Mr. Blixseth and Mr. Byrne signed the

2    agreement to purchase the Yellowstone Club?

3        A.    I believe the purchase -- I believe the

4    document to purchase the Yellowstone Club was signed in

5    the springtime of '07, is what I was told in family

6    court, so I don't know how long after that.

7            But when I became aware of this, then I was

8    asking some questions about it just like I was some

9    other things that you don't want me to state.

10       Q.    Ms. Blixseth, isn't it a fact that the letter

11   of intent to sell the Yellowstone Club for $510 million

12   was signed on June 28th, '07, and the purchase and sale

13   was actually signed on January 15, '08; isn't that true?

14       A.    I don't know the dates.  I was frozen out at

15   that time and only given information through family

16   court.

17       Q.    As of January 15, '08, were you frozen out?

18       A.    Yeah.  Some of the things that -- some of the

19   things that we were asking through family court started

20   to be answered in '08 and, in fact, Tim and I had some

21   conversations directly.

22           I don't remember when they were in '08 from

23   some information whether it was true or not that I was

24   given, so -- I don't recall the exact dates, though, but

25   it was in early '08, mid to early '08.

Yates Court Reporters    800.669.1866

WCP00569

Edra D. Blixseth  -  December 17, 2009

Page 61

1      Q.   The written contract was mid '08 in which

2   Mr. Byrne agreed to purchase a bulk sale of the

3   Yellowstone Club assets; isn't that true?

4      A.   I can't answer that question.

5      Q.   Shortly thereafter Exhibit 8 surfaced with you

6   and Mr. Montgomery; isn't that correct, ma'am?

7      A.   There was no correlation to me on that, so I

8   can't recall.

9      Q.   How long after you saw Exhibit 8, according to

10  your previous testimony, did you call Sam Byrne and read

11  Exhibit 8 to him?

12     A.   Actually, I don't think I read it to him.  I

13  think that I paraphrased what it was about and it was

14  during the same time frame.

15          And you keep telling me only reference this,

16  but there was a time frame of certain things coming to

17  light that this -- I felt like if I had this information

18  and it was accurate and I didn't say when these other

19  things had come to light during the same time frame,

20  that I didn't want to feel responsible for having this

21  information and not talking about it.

22          And it was the same time frame as the

23  investigation on Tim on the death of Denise Touhey and

24  the IRS.

25     Q.   Ms. Blixseth, when you first saw Exhibit 8, how

Yates Court Reporters    800.669.1866

**WCP00570**

Edra D. Blixseth  -  December 17, 2009

Page 62

1   much time elapsed between the time you saw it and the

2   time you called Robert Franks and read it to him, from

3   the Wall Street Journal?

4        A.   I don't recall if I called Robert Frank and

5   read it to him.

6        Q.   You may have, but you don't recall?

7        A.   You ask me questions in such a way that -- that

8   I can't really answer them.

9        Q.   When did you first give or read Exhibit 8 to

10  the media, Ms. Blixseth?

11       A.   I've testified that I didn't give this letter

12  to the media.

13       Q.   When did you first read it to someone in the

14  media?

15       A.   I'm not aware that I did.

16       Q.   You don't remember doing it?

17       A.   I don't.

18       Q.   When did you first email Mr. Franks about

19  Exhibit 8?

20       A.   I don't -- I don't recall if I did or not.

21  That's something that -- I'm not sure if I did that

22  since he had put -- put Dennis Montgomery in touch with

23  John Wilke on -- on things.

24            I'm not sure if this was ever -- this was never

25  used by me for anything in reference to Tim Blixseth,

WCP00571

Edra D. Blixseth  -  December 17, 2009

Page 63

1    other than it was given -- it was given to me.

2        Q.    Now your testimony earlier was that you have

3    not been notified by any state or federal agency as to

4    whether you're a subject of a grand jury investigation;

5    is that correct?

6        A.    That's correct.

7        Q.    Do you know who -- have you spoken to any FBI

8    agents at any time relative to Mr. Blixseth.

9        A.    Only when they've called me.

10       Q.    When did they call you, Ms. Blixseth?

11       A.    I've been emailed and called earlier this year.

12       Q.    By who?

13       A.    FBI agents.

14       Q.    Who?

15       A.    I don't recall the names.  I don't recall the

16   names.

17       Q.    Greg Rice?

18       A.    I'm sorry?

19       Q.    Greg Rice.

20       A.    Greg Rice emailed me and he called me.

21       Q.    About what?

22       A.    Investigations that were ongoing about Tim.

23       Q.    So your testimony -- what were those

24   investigations about about Tim when Mr. Rice called you?

25             MR. HOLAHAN:  If she knows.

Yates Court Reporters    800.669.1866

**WCP00572**

Edra D. Blixseth   -   December 17, 2009

Page 64

1   BY MR. FLYNN:

2       Q.   Well, whatever he said to you.

3            MR. HOLAHAN:  If you know.

4            THE WITNESS:  He first emailed me and said he

5   had some questions and could I call him.  I emailed him

6   back saying, "What is this in reference to?  This is a

7   scary thing to see and open up and says FBI."

8            When I did call him he said it was in reference

9   to some investigations going on about Tim and that --

10  that the FBI -- they weren't in his region and that the

11  FBI thought I could be some help.

12           Do you want me to keep going?

13      Q.   Yes.

14      A.   Well, you told me to limit it, so I'm trying

15  limit it to your question.

16      Q.   No, don't limit it.

17      A.   I said that I didn't think that I had any

18  information.  I wasn't aware of anything that I had

19  information or that I thought Tim had ever done anything

20  criminally, so I didn't think I could be of help to

21  them.

22           He said he felt that I could be and stuff that

23  I may not have known about.  And I said I was aware both

24  you and Tim had been calling them and he acknowledged

25  that you guys had been calling him on -- trying to say

Yates Court Reporters   800.669.1866

WCP00573

Edra D. Blixseth  -  December 17, 2009

Page 65

1    there was information that they should be investigating

2    on me and that there was no investigation going on on

3    me.

4        Q.   He told you that?

5        A.   Yes, he did.

6        Q.   At that time did he have possession -- what is

7    your best memory of when earlier this year that took

8    place?

9        A.   There was something going on within the --

10   either the Yellowstone Club or Yellowstone Club World

11   bankruptcy proceedings, because I was driving to Butte

12   and so I don't really recall but it would be sometime in

13   spring, I think, of this year.

14       Q.   Now you mentioned that he said there were other

15   regions that were interested?

16       A.   Correct.

17       Q.   What other regions?

18       A.   He didn't give me all the specifics.  He told

19   me that there was one specifically out of Florida

20   regarding Turks and Caicos and that's the ones that they

21   wanted me to -- they were willing to fly in and meet

22   with me.

23       Q.   Now prior to Mr. Rice calling you, when you

24   were still married to Mr. Blixseth and had community

25   obligations, did you make any effort in any way to

WCP00574

Edra D. Blixseth  -  December 17, 2009

Page 66

1    initiate state or federal investigations against

2    Mr. Blixseth?

3        A.   Absolutely not.  I haven't subsequently.

4        Q.   During the summer of 2007 did you or your

5    lawyer contact Mr. Lemond and assist the Lemond parties

6    in initiating state or federal investigations --

7        A.   Absolutely not.

8        Q.   -- against Mr. Blixseth?

9        A.   Absolutely not.

10       Q.   Now in connection with Exhibit 8 that your

11   employee you were paying a hundred thousand dollars a

12   month to, did you question him at the time he gave this

13   to you as to where he got it?

14       A.   Yes, I did.

15       Q.   What did he say?

16       A.   He said it was on a fax machine, came in on a

17   fax machine.

18       Q.   And a fax machine from where?

19       A.   I didn't actually ask him from where.  If

20   you'll notice -- that's why when you asked me on the

21   Kinko's -- there was nothing on top.  I mean I had no

22   idea where this came from.

23       Q.   Oh, you noticed at the time there was no fax

24   header on Exhibit 8?

25       A.   He said, "It came on a fax machine," and when

Yates Court Reporters    800.669.1866

WCP00575

Edra D. Blixseth  -  December 17, 2009

Page 67

1   he said it came on a fax machine, I noticed there was

2   nothing on top where normally there would be numbers on

3   top of a fax machine.

4       Q.   So then what did you say to him?

5       A.   He said, "How did you get it on a fax machine?"

6   He just said, It came on a fax machine."

7       Q.   Now at the time you knew that Mr. Montgomery --

8   the Trepp parties were claiming that he had fabricated

9   the Gibbons bribery emails.

10      A.   I don't remember --

11      Q.   Having that in mind --

12      A.   Wait, you can't -- you made a statement.

13           MR. HOLAHAN:  Let him.

14  BY MR. FLYNN:

15      Q.   -- that your employee was being challenged as

16  having fabricated emails that were the subject of a

17  Washington, DC, grand jury, did you question

18  Mr. Montgomery whether he fabricated Exhibit 8?

19           MR. HOLAHAN:  So the objection to that question

20  is that it assumes facts not in evidence and I'll let

21  her answer it if she can separate what is true and what

22  isn't in your question.

23           MR. FLYNN:  We'll get into it in spades.

24      Q.   Ms. Blixseth, you knew Mr. Montgomery

25  throughout 2007 and 2008 was being challenged in the

Yates Court Reporters    800.669.1866

WCP00576

Edra D. Blixseth  -  December 17, 2009

Page 68

1    eTreppid litigation on the basis that he had fabricated

2    two emails; isn't that correct?

3        A.   I can't say 2007 to 2008.  I don't remember

4    when that allegation was brought up.  When that

5    allegation was brought up in the eTreppid I asked Dennis

6    if he fabricated them and he said no.

7            I don't recall asking him, I don't think I did,

8    because I don't think it even entered my mind that he

9    fabricated this.

10       Q.   Now when the issue of his fabrication came up

11   between April and June 2007 when you hired Mr. Bennett,

12   when you hired Mr. Bennett and paid Mr. Bennett from

13   Skadden Arps, did you have a conversation with

14   Mr. Bennett about what evidence existed that

15   Mr. Montgomery had fabricated the two bribery emails?

16       A.   I don't remember.

17           MR. HOLAHAN:  Wait a minute.  Can you read that

18   question back, please.

19           MR. FLYNN:  I'll withdraw it.

20       Q.   I want to know whether you talked to Bennett

21   about whether or not Montgomery fabricated the emails.

22           MR. HOLAHAN:  If this question relates to

23   Mr. Bennett being retained by Ms. Blixseth on this

24   matter, I'm going to object to any questions about

25   communications between Ms. Blixseth and Mr. Bennett on

WCP00577

Edra D. Blixseth  -  December 17, 2009

Page 69

1    attorney-client privilege.

2    BY MR. FLYNN:

3        Q.   Was Bennett your lawyer?

4        A.   Yes, he was.

5        Q.   Did you, in fact, pay Bennett over a million

6    dollars in connection with the charges against

7    Mr. Montgomery?

8        A.   You asked me earlier if I paid 300,000,

9    500,000; now you're asking me a million.  I don't know

10   how much.  I don't remember how much was paid.  I don't

11   know how much the retainer was or how much was paid.

12       Q.   Was paid for you or was it paid for Montgomery?

13       A.   It was paid for the company to represent me as

14   the majority shareholder of the company and Dennis

15   Montgomery as the chief scientist.

16       Q.   Now Ms. Blixseth, your testimony is that you

17   saw Exhibit 8 but you did not see Exhibit 9; is that

18   correct?

19       A.   I don't recall ever seeing Exhibit 9.

20       Q.   When you saw Exhibit 8 -- and I believe the

21   state of the record is the only person you recall

22   speaking to about it is Montgomery and Byrne; is that

23   your testimony under oath, Ms.?

24       A.   Conrad Burn?

25       Q.   No, Mr. Byrne, Sam Byrne.

WCP00578

Edra D. Blixseth  -  December 17, 2009

Page 70

1      A.    Sam.  No, I don't think -- I don't think I

2   testified that they were the only people.  I mean,

3   obviously, this got my attention and -- when I first saw

4   it and I was concerned.

5          So I may have talked to -- I mean I know that

6   Dennis was there when Crisman and Rhodes were there for

7   some Blxware meetings, but I don't really recall who

8   else I talked to about it.  It concerned me, especially

9   in light of the other information.

10     Q.    Did you call Mr. Blixseth?

11     A.    I doubt I would have done that.  We weren't

12  speaking at the time.

13     Q.    Did you have your lawyer call Mr. Blixseth's

14  lawyer?

15     A.    I don't -- I don't recall having that happen.

16     Q.    As of a month ago did you tell Mr. Blixseth or

17  text him that you believed and you still believe that

18  the letters were accurate?

19     A.    I had no reason not to believe they weren't.

20     Q.    So when you spoke to Mr. Rice in May, June, of

21  this year from the FBI, did you tell him about these

22  letters, Ms. Blixseth?

23     A.    I don't think so.  I told -- when he first

24  started asking me questions I said, "If this has to do

25  with the Denise Touhey investigation or the IRS, I think

Yates Court Reporters    800.669.1866

**WCP00579**

Edra D. Blixseth  -  December 17, 2009

Page 71

1    I've already answered those questions, that I don't

2    think he had anything to do with it and I don't have any

3    information that he did, so I don't think there's any

4    information."

5            In fact, I don't think I talked about the

6    letters, but I did specifically say to him that I'm not

7    aware of -- I'm aware of a lot of things that I don't

8    like how he's done or how he's treated me, but I'm not

9    aware of any criminal wrongdoings on his behalf.

10       Q.   The question, aside from all the verbiage,

11   Ms. Blixseth, is real simple.

12       A.   Well, sometimes you want me to expand --

13       Q.   Did you tell Rice that you had possession of a

14   grand jury target letter relating to your then

15   ex-husband?

16       A.   I don't believe I said I had possession,

17   because I don't have it any longer and I don't think

18   that the target letter was brought up.

19       Q.   When you were discussing the matter with Rice

20   as to whether Mr. Blixseth was under some type of a

21   federal criminal investigation, did you bring up or

22   discuss with him that, "Oh, is this related to a prior

23   investigation of Mr. Blixseth?"

24       A.   No.  I brought -- I asked if it was related to

25   things that I had heard about in the past and the only

Yates Court Reporters   800.669.1866

**WCP00580**

Edra D. Blixseth  -  December 17, 2009

Page 72

1    two specifics that I had heard -- that I expressed to

2    him that I heard about in the past were Denise Touhey

3    and the IRS.  I did not bring up any other specifics.

4         Q.   Just so we have this clear on the record,

5    Denise Touhey and the IRS, who went to the FBI and

6    complained Mr. Blixseth had murdered Ms. Touhey?

7         A.   I have no idea.  The only person that told me

8    who he thought had gone to it is Tim Blixseth and that

9    was just recently.  And he told me that Greg Lemond

10   and -- I can't remember who else he said.

11        Oh, John Reveal had gone to them and that's the

12   first I heard of who had gone to them.  I was surprised

13   to hear that.  And that was just this year I heard that.

14        Q.   So during the fall of '07, based on your prior

15   testimony, did you know that Reveal and Lemond had gone

16   to the FBI and accused Mr. Blixseth of committing

17   murder?

18        A.   Absolutely not.  I told you the first time I

19   heard about it was from Tim and I was surprised when he

20   told me that and expressed my surprise and said I had

21   been contacted about that and I had always said that I

22   didn't believe he had anything to do with it.

23        Q.   So when Mr. Rice contacted you earlier this

24   year in May, June, did you talk to him about the alleged

25   murder -- strike that, Mr. Blixseth's alleged

Yates Court Reporters    800.669.1866

WCP00581

Edra D. Blixseth  -  December 17, 2009

Page 73

1    involvement in the murder of Denise Touhey?

2         MR. HOLAHAN:  She's already answered that.  She

3    can answer it again.

4         THE WITNESS:  I said if this has to do with the

5    two investigations that I was aware of, that I didn't

6    believe -- I never believed he had anything to do with

7    it and I didn't have any information that would help

8    them if that's what they were investigating.

9         And he said that was not the investigations

10   that they wanted to talk to me about.

11   BY MR. FLYNN:

12        Q.   I believe it's on the record already, but wc'll

13   try to pin it down here.  As I understand your testimony

14   you became aware of the IRS and Touhey investigations in

15   the fall of 2007; is that correct, ma'am?

16        A.   I don't remember when it was.

17        Q.   Was it in 2007, ma'am?

18        A.   I believe so.  I can't -- I kind of really

19   associate things with things that were going on in

20   family court and when --

21        Q.   I don't care what you associate with.  Was it

22   in the fall of 2007 as you --

23        A.   Well, I'm trying to think out loud --

24        Q.   -- as you previous testified?

25        A.   -- so I can answer your question.  If you want

WCP00582

Edra D. Blixseth  -  December 17, 2009

Page 74

1    me to say I don't recall, I don't recall.  I was trying

2    to recall.

3         MR. HOLAHAN:  Mr. Flynn.  Mr. Flynn, don't

4    interrupt my client until she's through answering your

5    questions.

6         MR. FLYNN:  Thank you, Mr. Holahan.  I'll ask

7    another question now?

8         MR. HOLAHAN:  Okay.

9    BY MR. FLYNN:

10        Q.  Ms. Blixseth, did you previously testify you

11   became aware of the Touhey and IRS investigations in the

12   fall of 2007?  Just yes or no, ma'am.

13        A.  If you're asking me the exact date, I don't

14   recall the exact date.

15        Q.  No, I'm asking about the fall of 2007 based on

16   your prior testimony.  Did you so testify?

17        A.  I don't remember if I said a date.  I just

18   remember that I was notified of them.

19        Q.  Now with regard to the Denice Touhey

20   investigation, when did you first discuss with anyone

21   the fact that your ex-husband was being accused by

22   anyone -- Lemond, Reveal, anyone -- of having murdered

23   Denise Touhey?

24        A.  The first time I ever heard even about an

25   investigation I didn't hear about it.  I saw it in the

Yates Court Reporters   800.669.1866

**WCP00583**

Edra D. Blixseth  -  December 17, 2009

Page 75

1    paper.  And I picked up the phone and called and said,

2    "What's this about?"

3           I thought it was horrible, thought it was

4    horrible for the memory of Denise, didn't believe it,

5    and didn't know if it was true.

6           I don't, thank God, believe everything is

7    written by the press and I didn't know if it was true

8    there was an investigation.

9      Q.    Did you discuss that with Lemond or any of the

10   B shareholders?

11     A.    I absolutely did not.

12     Q.    That was during the due diligence period of

13   Mr. Byrne, the fall of 2007; is that correct?

14     A.    When it came out in the paper?

15     Q.    When what came out in the paper?

16     A.    What you just asked me about, the investigation

17   of the death of Denise Touhey.

18     Q.    When did it come out in the paper,

19   Ms. Blixseth?

20     A.    Sometime in that period, I don't really recall,

21   but that was the first I'd heard of it.  I hadn't been

22   approached by anyone until I saw it in the paper.

23     Q.    When did you see it in the paper?

24     A.    I don't recall the date.

25     Q.    Roughly?

WCP00584

Edra D. Blixseth  -  December 17, 2009

Page 76

1    A.    Sometime in '07.

2    Q.    That Mr. Blixseth was being associated with the

3  alleged murder of Denise Touhey -- I'm sorry --

4    A.    No, that there was an investigation.

5    Q.    Did you spawn that investigation?

6    A.    I've answered that now about five times.  I

7  absolutely had nothing to do with it.  I didn't know who

8  did until Tim Blixseth told me just a few weeks ago and

9  he told me and it was Greg Lemond and John Reveal.

10   Q.    We're going to get into what you do with the

11  media, Ms. Blixseth, believe me.

12          Did you report an alleged investigation of your

13  then husband to the media?

14   A.    I absolutely did not.

15   Q.    IRS investigation, in the fall of '07 what did

16  you know about the IRS investigation, Ms. Blixseth?

17   A.    I just knew that there was one and it concerned

18  me because if there was an investigation by the IRS we

19  were still married and I wanted to find out if I was

20  also being investigated.

21   Q.    How did you find out about it?

22   A.    I don't recall.

23   Q.    Who told you?

24   A.    I don't recall.

25   Q.    Was it Lemond?

Yates Court Reporters    800.669.1866

WCP00585

Edra D. Blixseth  -  December 17, 2009

Page 77

1    A.   I'm sure it wasn't.  I didn't speak to Lemond.

2    Q.   Was it Lemond's lawyers?

3    A.   I didn't speak to Lemond's lawyers.

4    Q.   Was it Montgomery hacking into computers?

5    A.   I'm not aware of Montgomery hacking into

6  computers.

7    Q.   So as you sit here today you have no idea --

8  strike that.

9         Was there a grand jury investigation in

10  connection with the IRS investigation?

11    A.   I believe -- when I heard that there was --

12  there was an investigation with the IRS, that's when I

13  talked to Ellyn at Liner and said I'd like to find out

14  if I'm under investigation as well.

15    Q.   After those two investigations flopped, did you

16  and Montgomery manufacture Exhibits 8 and 9?

17    A.   I had nothing to do with these two letters.

18    Q.   When did you find out that the Touhey

19  investigation was basically shelved by the FBI?

20    A.   I thought it was -- I didn't -- I didn't know

21  and I can't remember why I thought this, but I thought

22  that was something that was over with and when I talked

23  to Greg Rice earlier this year he said it was still an

24  open investigation, but that's not what they wanted to

25  talk to me about.

Yates Court Reporters    800.669.1866

WCP00586

Edra D. Blixseth  -  December 17, 2009

Page 78

1        Q.    What did they want to talk to you about?

2        A.    He said there was several other investigations

3    going on and the primary one that they wanted to talk

4    about first was people out of Florida.

5        Q.    People out of Florida.

6              Were you and your ex-husband Matthew Crocker

7    drug dealers?

8              MR. HOLAHAN:  Object to the question as

9    argumentative.

10              THE WITNESS:  My ex-husband?

11              MR. FLYNN:  Yes.

12              MR. HOLAHAN:  Object to the question as

13    argumentative and beyond the scope of this --

14              MR. FLYNN:  I'll withdraw.

15        Q.    When you ran Choo-Choo Willy's --

16              MR. HOLAHAN:  Are we assuming during this line

17    of questioning that Mr. Blixseth did not, in fact,

18    murderer Ms. Touhey?  Is that the assumption behind all

19    these questions?

20    BY MR. FLYNN:

21        Q.    Ms. Blixseth, when you and your husband were

22    running Choo-Choo Willy's, did you deal drugs?

23        A.    Absolutely not.

24        Q.    Now what did you understand the IRS

25    investigation to be about?

Yates Court Reporters    800.669.1866

WCP00587

Edra D. Blixseth  -  December 17, 2009

Page 79

1     A.   I actually didn't know.  I just knew that there

2   was something to do with -- I don't know.  I just knew

3   that there was an investigation.

4     Q.   Did --

5     A.   She found out there was an investigation.

6     Q.   Did it have to do with whether the Credit

7   Suisse loan was a dividend or a loan as alleged by the

8   Lemond parties?

9     A.   My recall, it didn't have anything at all to do

10  with Credit Suisse.  It had to do with our tax returns.

11    Q.   In connection with whether or not the monies

12  received from Credit Suisse were a loan or dividend?

13    A.   I didn't have any more information than what I

14  just said.  I don't know.

15    Q.   Do you know how the IRS concluded, as to

16  whether it was a loan or dividend?

17    A.   I have no idea.

18    Q.   As you sit here today, do you know when the IRS

19  concluded their investigation that it was, in fact, a

20  loan?

21    A.   I do not.

22    Q.   Are you in the habit of lying on financial

23  statements and loan documents to get money?

24    A.   No, I'm not.

25    Q.   Would you look at Exhibit 10, please.

Yates Court Reporters   800.669.1866

Edra D. Blixseth  -  December 17, 2009

Page 80

1              (Exhibit 10 was marked for identification.)

2              MR. FLYNN:  That's it right there (indicating).

3              MR. HOLAHAN:  Yeah.

4    BY MR. FLYNN:

5         Q.   Now if you turn to --

6              MR. HOLAHAN:  Hold it, Mr. Flynn.

7    BY MR. FLYNN:

8         Q.   Turn to the 8th page down at the bottom,

9    Ms. Blixseth.  Is that your signature, ma'am?

10        A.   Hang on a second.

11        Q.   Pages of Exhibit 10 are numbered.

12        A.   Yeah, it looks like my signature.

13        Q.   Okay.  And did you sign that guarantee in order

14   to get $13 million from Western Capital Partners?

15        A.   I didn't get any money from Western Capital

16   Partners.  It was a project my son was doing and he was

17   borrowing the money for the project.

18        Q.   Yes.  How much money, after the $13 million was

19   paid, did your son give to you from the loan proceeds?

20        A.   None.

21        Q.   You recognize you're under oath, Ms. Blixseth?

22        A.   Yes, I do, Mr. Flynn.

23        Q.   Is it your testimony that your son never issued

24   any checks to you from any accounts he had control of

25   after June 15th of 2007; is that your testimony?

WCP00589

Edra D. Blixseth   -   December 17, 2009

Page 81

1    A.   In association with this loan?

2    Q.   After the money went into the Story Mill's bank

3  accounts, was any money paid to you after June 15, 2007,

4  Ms. Blixseth?

5    A.   From the proceeds of this loan?

6    Q.   No, from bank accounts under control of your

7  son.

8    A.   We had -- we had spec homes and we had other

9  things going on there, so there could have been monies

10 paid back to me from those kind of things, but I

11 received no money from this loan.

12   Q.   I'm not talking about proceeds from the loan.

13 I'm talking about once the money from Western Capital

14 went into bank accounts controlled by your son, how much

15 over the ensuing three months did he pay you?

16        MR. HOLAHAN:  She's already asked and answered

17 that question.

18        MR. FLYNN:  No, she hasn't.

19   Q.   How much money did you get three months after

20 this loan from your son, Matthew?

21   A.   I'm not aware of getting any, but if I did it

22 would have been something not associated with this loan.

23 It would have been associated with spec houses that we

24 did at Yellowstone Club or other things.  It had nothing

25 to do with this loan.

Yates Court Reporters    800.669.1866

WCP00590

Edra D. Blixseth  -  December 17, 2009

Page 82

1     Q.   More than a million or less than a million,

2  Ms. Blixseth?

3     A.   I'm not aware of getting any, but if I got some

4  it would have nothing to do with this loan.

5     Q.   More than 2 million or less than 2 million?

6     A.   I just said I'm not aware of getting anything

7  from this loan.

8          MR. HOLAHAN:  That's fine.

9  BY MR. FLYNN:

10    Q.   More than 3 million or less than 3 million?

11         MR. HOLAHAN:  Mr. Flynn, she's not aware of

12  getting any money.

13  BY MR. FLYNN:

14    Q.   Let's go to the first page of Exhibit 10.

15  No. 2 says, "None of the Borrowers nor Guarantors,"

16  that's you, Ms. Blixseth, "have ever filed for relief

17  under the US Bankruptcy Code"; is that a true statement?

18    A.   No, Tim and I filed for bankruptcy in the early

19  '80s --

20    Q.   First, I want an answer, yes or no.  Is it a

21  true statement, Ms. Blixseth?

22    A.   That would not be a true statement.

23    Q.   So it was a falsehood in connection with a

24  document signed by you to induce payment of $13 million;

25  is that correct?

Yates Court Reporters    800.669.1866

WCP00591

Edra D. Blixseth  -  December 17, 2009

Page 83

1      A.   That line -- this whole thing -- I didn't read

2   the whole thing.  I didn't have a lawyer on my behalf

3   read this whole thing.

4           Western Capital had asked Matthew if I would

5   consider guaranteeing the loan.  Matthew called me.

6      Q.   Ms. Blixseth, is that a false statement?

7      A.   I already answered that question.

8      Q.   What's the answer?

9      A.   The answer is that is a false statement.

10          That wasn't your question by the way.

11     Q.   You were the chief financial officer and,

12   according to your declarations, basically running

13   Yellowstone Club for how many years?

14     A.   I wasn't running Yellowstone Club.  There were

15   certain parts as chief operating officer of the

16   operations that I ran for several years.

17     Q.   So as chief operating officer -- as of June 15,

18   2007, did you consider yourself to be a knowledgeable

19   and experienced businesswoman?

20     A.   Yes.

21     Q.   You had owned your own restaurants in the past;

22   is that correct?

23     A.   Yes.

24     Q.   And you had been the chief operating officer

25   for Yellowstone Club at that point in time for how many

WCP00592

Edra D. Blixseth  -  December 17, 2009

Page 84

1   years?

2       A.   I can't remember exactly when we switched to

3   the title of that, but I had been operating the

4   operations of Yellowstone Club for quite a while.

5       Q.   You knew the significance of signing loan

6   documents with a bank relating to the procurement of

7   $13 million, did you not?

8       A.   I would say yes.

9       Q.   And is it your testimony today that you didn't

10  read the documents, Ms. Blixseth?

11      A.   I have to say that at the time it was my

12  consideration that it was Matthew's loan for the Story

13  Mill project; that they had had a long time to do

14  diligence.  They had done an appraisal on it.

15          There was plenty of collateral to support the

16  $13 million loan.  They wanted additional just guarantee

17  for it and I agreed to do that.  I didn't do what I

18  would normally do if it were my loan and I should have.

19      Q.   We're going to get into your loans,

20  Ms. Blixseth.

21      A.   I'm sure we will.

22      Q.   Yes, we will.

23          But with regard to what you're calling

24  Matthew's loan, were you desperate for money June of

25  '07?

Yates Court Reporters    800.669.1866

WCP00593

Edra D. Blixseth   -   December 17, 2009

Page 85

1      A.    I wasn't going to get any money out of this

2   loan.

3      Q.    The question is:  Were you desperate for money,

4   Ms. Blixseth?

5      A.    During all of '07 because I received no

6   temporary or long-term spousal support and Tim Blixseth

7   continually testified in court that there was no

8   community cash flow, I was having to borrow to live and

9   support my companies.

10     Q.    So you were desperate for money --

11     A.    I'm not going to say I was desperate at this

12   time, but I was always looking to how I was going to

13   support myself during the time that I was frozen out of

14   everything.

15     Q.    By borrowing money?

16     A.    I borrowed money based on the fact that I was

17   getting assets I could pay the money back.

18     Q.    In '07 who else did you borrow money from?

19     A.    In '07?

20     Q.    Strike that.

21           Prior to July '07 who else did you borrow money

22   from?

23     A.    I had an ongoing line of credit with Palm

24   Desert National Bank.  I had, I believe, before that

25   time a line of credit at American Bank.

Yates Court Reporters    800.669.1866

WCP00594

Edra D. Blixseth  -  December 17, 2009

Page 86

1     Q.   How much were you in arrears?  As of June 15,

2  '07, how much were you arrears in paying your creditors?

3     A.   I don't know.

4     Q.   How long had you been in arrears in paying your

5  creditors when you got this $13 million for your son?

6     A.   I don't know.

7     Q.   Was it over a million dollars?

8     A.   I don't know.

9     Q.   Was it over $2 million?

10        MR. HOLAHAN:  She doesn't know, Counsel.

11        MR. FLYNN:  Okay.  We'll see, based on her

12  declarations, Mr. Holahan.

13     Q.   Let's go to the next one.  3, "As of the date

14  hereof, none of the Borrowers nor Guarantors, one, are

15  currently insolvent on a balance sheet basis."

16        Was that true?

17     A.   I believe that to be true.

18     Q.   Two, "Currently able to pay their debts as they

19  come due"; is that true?

20        MR. HOLAHAN:  Where are you reading from?

21        MR. FLYNN:  No. 2 -- strike that.

22        No. 3 on Exhibit 10.

23     Q.   Is that true?

24     A.   I don't know the date this was signed and,

25  again, I told you I didn't read this, so I don't know.

Yates Court Reporters    800.669.1866

WCP00595

Edra D. Blixseth   -   December 17, 2009

Page 87

1     Q.   Were you able to pay your debts as they came

2   due on June 15th of 2007?

3     A.   I think I was intermittently able to based on

4   how I was making loans and how cash flow came in.

5     Q.   Who referred you to Western Capital Partners to

6   get this loan?

7     A.   I was never referred to it.  It wasn't my loan.

8   It was Matthew's.

9     Q.   How did you find out about the loan?

10    A.   When Matthew called me and asked if I would be

11   willing to guarantee it.

12    Q.   Did Jon Stack call you and speak to you about

13   this loan?

14    A.   I don't recall.

15    Q.   He may have?

16    A.   Jon Stack would call about a lot of different

17   people and loans.

18    Q.   Did you discuss with Jon Stack that you needed

19   the money and you were desperate for money?

20    A.   No, I did not.  The Western Capital loan -- I

21   had loaned Matthew money.  The Western Capital loan

22   originally when they were going to do it was going to

23   pay me back, but the way it all turned out and the way

24   it was done there was no monies to pay back to me.

25    Q.   So the plan was for you to be paid back money

**WCP00596**

Edra D. Blixseth  -  December 17, 2009

Page 88

1    from this loan; is that correct, Ms. Blixseth?

2        A.   Originally, but not by the time it went to

3    final paperwork.

4        Q.   At the time the loan was entered into, did you

5    have discussions with anyone at Western Capital about

6    your divorce proceedings?

7        A.   I think they asked me how it was going along.

8    They asked me about Yellowstone Club World.  They were

9    concerned about that if I was guaranteeing this.

10            I met with them one time -- it was in Bozeman,

11   downtown Bozeman -- when they were there meeting with

12   Matthew.

13       Q.   That was before the $13 million check was paid?

14       A.   Oh, yes.

15       Q.   What did you say in that meeting in Bozeman?

16       A.   I don't remember.  There was a lot of people

17   there.  It was at a restaurant.  I don't recall.

18       Q.   Did anyone ask you whether you were getting any

19   part of the loan proceeds?

20       A.   I don't recall.

21       Q.   Did anyone inquire from Western Capital what

22   accounts the monies were going into and what controls

23   were over those accounts?

24       A.   I had nothing to do with the sources and uses

25   of the loan or any of those kind of discussions with

**WCP00597**

Edra D. Blixseth  -  December 17, 2009

Page 89

1  that, so I was not there and privy to those kind of

2  meetings that I assume they had with this loan.

3      Q.   Then why did your divorce proceedings come up?

4      A.   I think that they asked me -- I think that they

5  asked me since I was going to agree to guarantee it if

6  it would have any impact on it and they were concerned

7  about the Yellowstone Club World, the new launching of

8  Yellowstone Club World.

9      Q.   The next statement is four, "Borrowers and

10  Guarantors are not contemplating filing for relief under

11  the US Bankruptcy Code"; is that true?

12      A.   That is true.

13      Q.   So as of June '07 you weren't contemplating

14  filing for relief under the US Bankruptcy Code; is that

15  correct?

16      A.   That's absolutely correct.

17      Q.   Let's go down to No. 7, "Borrowers and

18  Guarantors have no judgments pending against them

19  jointly or severally"; was that true?

20      A.   I believe so.

21      Q.   No. 8, "Borrowers and Guarantors have no

22  delinquent tax obligations including, without

23  limitation, federal income tax, state income tax,

24  withholding tax, sales tax or personal property tax

25  obligations"; was that true?

WCP00598

Edra D. Blixseth  -  December 17, 2009

Page 90

1       A.   I believe that would be true.

2       Q.   At the time did you and community owe state or

3   federal taxes, Ms. Blixseth?

4       A.   I don't recall that we did.

5       Q.   Nine, "Borrowers and Guarantors are not to

6   subject to restraining order of any type"; was that

7   true?

8       A.   I believe that to be true.

9       Q.   Ten, "Borrowers and Guarantors are not subject

10  to alimony or child support orders"; was that true?

11      A.   To the best of my knowledge I didn't have any

12  child support or alimony obligations.

13      Q.   Now Ms. Blixseth, is there any other document

14  that you have signed for anybody guaranteeing any loan?

15           MR. HOLAHAN:  Ever?  What time frame?  Ever?

16           MR. FLYNN:  Let's take it since the Credit

17  Suisse loan, September of 2005.

18           THE WITNESS:  I don't recall except that maybe

19  it may be with American Bank in relationship to the

20  construction loan, I can't remember who that was with,

21  for the building of Lot 176, but I can't really recall.

22  BY MR. FLYNN:

23      Q.   Before June of 2006 did you tell Nick Rhodes or

24  Steve Crisman that you were expecting over a million

25  dollars from a transaction you had in place in

WCP00599

Edra D. Blixseth   -   December 17, 2009

Page 91

1    connection with financing Blxware or Opspring?

2       A.   I never tried to finance Blxware or Opspring.

3            MR. GLASSER:  Mr. Flynn, just because I'm late

4    to the case, who are those two guys, Western Capital

5    guys?

6            MR. FLYNN:  They're a Denver lender.

7            THE WITNESS:  Who's a Denver lender?

8    BY MR. FLYNN:

9       Q.   Let me try it this way.

10           THE WITNESS:  Wait a minute.  That's not

11   correct.

12           Nick Rhodes and Steve Crisman, I think that's

13   who you're asking about?

14           MR. FLYNN:  No, we said Western Capital.

15           THE WITNESS:  No, he didn't, he said Nick

16   Rhodes --

17           MR. GLASSER:  No.  I wanted to know who those

18   two people were.

19           MR. FLYNN:  Oh.  They're two codirectors of

20   Blxware and Opspring.

21           MR. GLASSER:  Thank you.

22   BY MR. FLYNN:

23      Q.   Now did you have conversations with Crisman

24   prior to June of '07 about where you were getting money

25   to fund Opspring or Blxware?

Yates Court Reporters    800.669.1866

**WCP00600**

Edra D. Blixseth  -  December 17, 2009

Page 92

1      A.   In general we may have had conversations based

2    on the fact that I wasn't getting supposal support and

3    things were dragging on in the courts of how I was going

4    to go about continuing to support the burn rate of

5    Blxware, but I don't have any specific recollection.

6      Q.   Did you tell him you were borrowing money,

7    Crisman?

8      A.   I think in general everyone knew in our little

9    group that's how I was surviving.

10     Q.   During that time frame, June of '07, who else

11   were you borrowing money from to support your little

12   group?

13     A.   June of '07.  I think anybody else that I

14   mentioned was after June '07, but I could be mistaken

15   exactly on the dates.

16     Q.   Prior to June '07, what were you telling

17   Crisman as to where you were getting funds to fund

18   Blxware and Opspring?

19     A.   I don't recall.

20     Q.   Did you tell him you were borrowing money?

21     A.   I think I've answered that.  In general

22   everyone knew that's how I was surviving at the time,

23   because Tim wasn't giving any cash flow to me from our

24   community cash flow, stating there was none and the way

25   I was surviving was to borrow money.

Yates Court Reporters    800.669.1866

WCP00601

Edra D. Blixseth  -  December 17, 2009

Page 93

1      Q.   Did Mr. Blixseth object to giving

2  Mr. Montgomery, who is about to go to prison, a hundred

3  thousand dollars a month community funds?

4      A.   He had nothing to do with that.

5      Q.   No.  Did he object?

6      A.   I haven't had any conversation with him about

7  that.

8      Q.   Back in the summer of '07 did Mr. Blixseth

9  object to putting any money in Opspring or Blxware

10  because it was a total con?

11      A.   No.  In fact, I have a note saying, "Give me

12  three days' notice when you need the next 5 million and

13  I'll make sure it gets done."

14      Q.   What is the date of that note?

15      A.   I'd have to go back and look.

16      Q.   Was it in '06?

17      A.   You might be right.  That might have been in

18  '06.

19      Q.   When you misrepresented what the technology was

20  to Mr. Blixseth?

21      A.   Is that a question?

22      Q.   Yeah.  Did you misrepresent what the technology

23  was worth?

24      A.   No, I did not.  You did.

25      Q.   We'll see.

Yates Court Reporters    800.669.1866

WCP00602

Edra D. Blixseth  -  December 17, 2009

Page 94

1          Let's go to the third page of Exhibit 10.

2          MR. HOLAHAN:  Who did he represent?

3          THE WITNESS:  Dennis Montgomery.  He's the one

4  who told me there were no objections or anything.

5  BY MR. FLYNN:

6     Q.   Ms. Blixseth, do you know what representations

7  and warrantees are in loan agreements?

8     A.   I think I have a general knowledge.

9     Q.   How many loan agreements have you signed?

10    A.   I don't know.

11    Q.   Over the years?

12    A.   I don't know.

13    Q.   Have you been borrowing money back since your

14  restaurant days 25 years ago?

15    A.   We've been in business for a lot of years and

16  had -- Tim had a lot of different things that we've done

17  over the years that had loan agreements, yes.

18    Q.   You know what reps and warrantees are in loans

19  agreements, don't you?

20    A.   I just answered that, that I have a general

21  knowledge, yes.

22    Q.   Let's go to No. 51, "All representations and

23  disclosures made by Borrowers and Guarantors including,

24  without limitation, Borrowers' and Guarantors' financial

25  condition and information concerning the property and

WCP00603

Edra D. Blixseth  -  December 17, 2009

Page 95

1   improvements located thereon or any other collateral

2   pledged to secure the repayment of the loan collateral

3   are to the best of the Borrowers' and Guarantors'

4   knowledge accurate in all respects.

5          "Borrowers and Guarantors have not concealed or

6   withheld any material information concerning borrowers'

7   and guarantors' financial condition or the collateral."

8          Did you provide a financial statement to

9   Western Capital Partners?

10     A.   I don't recall if I did at this time.

11     Q.   Did you provide a cash-flow analysis to Western

12   Capital Partners?

13     A.   I don't think I would have done that with

14   Western Capital, because, again, I didn't consider this

15   my loan.

16     Q.   Then No. 55 reads, "This loan is for strictly

17   business purposes.  No portion of the loan will be used

18   for consumer, family or household purposes.  Borrowers

19   will not use any portion for personal, family or

20   household purposes.  Instead the proceeds will be used

21   exclusively for Borrowers'" -- purposes -- "for

22   Borrowers' business."

23          Did you read that?

24     A.   I'm telling you I don't recall if I read any of

25   this, but I would say that that was adhered to.

WCP00604

Edra D. Blixseth  -  December 17, 2009

Page 96

1      Q.   Did the Story Mill project make any money in
2  2007 and 2008?
3      A.   I wasn't involved in the operation or the how
4  the Story Mill project was going.
5      Q.   So if any funds were paid in 2007 or 2008 by
6  your son Matthew from Story Mill bank accounts, where
7  else would that money have come from other than this
8  loan, Ms. Blixseth?
9      A.   I can't answer questions about Story Mill and
10  their cash flow.
11      Q.   Did they have any cash flow?
12      A.   I can't answer questions about that.  I don't
13  know.
14      Q.   What was Story Mill?
15      A.   Story Mill was a project that Matthew had put
16  together to develop and it may have had some other
17  things in it besides just the land at Story Mill, but
18  I'm not aware of it.
19      Q.   Let's go to 58, "Borrowers and Guarantors have
20  had an opportunity to consult with their own legal
21  counsel concerning the loan and each of the anticipated
22  loan documents."
23           Did you consult with legal counsel?
24      A.   I did not.
25      Q.   61, "Borrowers and Guarantors understand that

WCP00605

Edra D. Blixseth  -  December 17, 2009

1    the lender is relying on these representations and that

2    it would not advance the contemplated loan," in italics,

3    "if any one of the representations were inaccurate or

4    misleading in any way."

5        A.   I'm sorry, which one are you reading?

6        Q.   61.

7             You knew, Ms. Blixseth, when banks or lenders

8    loan money they rely on your statements in loan

9    applications.

10            You knew that at the time, did you not, Ms.?

11       A.   They rely on the information you give them, of

12   course.

13       Q.   At the time did you disclose to Western Capital

14   Partners that you were involved in any litigation?

15       A.   Not that I recall.

16            MR. FLYNN:  Okay.  Put that aside.  Let's go to

17   the loan agreement.

18            (Exhibit 11 was marked for identification.)

19   BY MR. FLYNN:

20       Q.   In the interests of saving time, I believe

21   you've already testified when you were deposed by the

22   Western Capital folks that that signature on page 13 is

23   yours.

24       A.   Yes.

25       Q.   Let's go over to page 5.  This is the

Yates Court Reporters    800.669.1866

**WCP00606**

Edra D. Blixseth   -   December 17, 2009

Page 98

1    representations and warrantees in the loan agreement and

2    it reads:  "To induce Lender to execute this agreement

3    and perform the obligations of Lender hereunder" --

4         A.   Can I stop you just a second?  I didn't bring

5    my reading glasses in and this font is kind of blurry.

6    Do you have any?

7              MR. HOLAHAN:  Reading glasses?

8              THE WITNESS:  No?

9    BY MR. FLYNN:

10        Q.   -- "hereby represents and warrants the Lender

11   as follows."

12             Your counsel can follow along and you can

13   listen to the question, Ms. Blixseth.

14        A.   Can you tell me where you're reading from,

15   because I can kind of see it.

16        Q.   Page 5, No. 6, and I'm going to B, "No

17   litigation."

18        A.   Okay.

19        Q.   "Except as disclosed in writing to Lender prior

20   to the date hereof, there is no pending litigation or

21   unsatisfied judgment entered of record against Borrower

22   or the property.

23             "No litigation or proceedings are pending or,

24   to Borrowers' knowledge, are threatened against Borrower

25   or any Guarantor which might affect the validity or

Yates Court Reporters    800.669.1866

**WCP00607**

Edra D. Blixseth  -  December 17, 2009

Page 99

1   priority of the lien of the deed of trust which might

2   affect the Borrower or any Guarantor to perform their

3   respective obligations."

4           MR. HOLAHAN:  You're not reading correctly.

5   You're missing words.

6   BY MR. FLYNN:

7       Q.   -- "to perform their respective obligations

8   pursuant to and as contemplated by the terms and

9   provisions of the agreement and the other loan

10  documents --

11          (Mr. Blixseth hands reading glasses to the

12  witness.)

13          THE WITNESS:  Thank you.

14  BY MR. FLYNN:

15      Q.   -- "or which could materially affect the

16  operations or financial condition of the property.

17          THE WITNESS:  Better.

18  BY MR. FLYNN:

19      Q.   -- "borrower or any guarantor."

20          Well, at the time, Ms. Blixseth, that wasn't

21  true, was it?

22      A.   I wouldn't know at the time.

23      Q.   June of '07 you were paying -- you were paying

24  millions of dollars for Montgomery in connection with

25  your claim that you owned the software --

WCP00608

Edra D. Blixseth  -  December 17, 2009

Page 100

1      A.   That wasn't my claim.

2      Q.   -- that Montgomery allegedly possessed?

3      A.   That wasn't my claim.  That was eTreppid versus

4  Montgomery and Montgomery versus eTreppid.

5      Q.   Montgomery was suing eTreppid.  You knew that?

6      A.   I was aware Montgomery was suing eTreppid.

7      Q.   And you were paying for that?

8      A.   Part of our agreement, you know that --

9      Q.   Just yes or no, Ms. Blixseth.  I don't need an

10  explanation.

11          Were you paying for it?

12     A.   Can we get something clear?  Sometimes you want

13  me to give an explanation and sometimes you don't.

14     Q.   When I do, I'll ask for it.

15          Were you paying millions of dollars for the

16  defense of the technology in the Montgomery eTreppid

17  litigation?

18     A.   You're aware of that.  I was paying it to you.

19     Q.   And on June 15 were you aware of it?

20     A.   It was still ongoing, but that wasn't my

21  litigation.

22     Q.   It wasn't.

23          Were you subsequently sued?

24     A.   I think after this I was brought into it.

25     Q.   We'll go there next, when you modified this

Yates Court Reporters    800.669.1866

WCP00609

Edra D. Blixseth  -  December 17, 2009

Page 101

1   agreement.

2         So you knew there was litigation pending that

3   did materially affect your financial situation, did you

4   not?

5       A.   I will answer the same -- I will answer the

6   question that's worded in a different way, that at that

7   time that was not my litigation and that that was part

8   of the agreement within the contract with Dennis

9   Montgomery that I was paying your legal fees.

10      Q.   Now you were paying the Liner legal fees as of

11  June '07, were you not?

12      A.   I think that when you were -- when -- I can't

13  remember if Skadden came on before Liner or Liner came

14  on before Skadden to take some of the things off what

15  you were doing.

16      Q.   Let's put some context to this.  After

17  April 13th, 2007, at the Porcupine Creek meeting when

18  the judge had just released the FBI reports and you and

19  Mr. Kemp and myself and Mr. Montgomery met, I withdrew

20  from the litigation, did I not?

21      A.   That's not when you withdrew, no.  You withdrew

22  after.

23      Q.   Shortly thereafter?

24      A.   Because you tried to take over the company.

25      Q.   Shortly thereafter I withdrew; correct, Ms.?

**WCP00610**

Edra D. Blixseth  -  December 17, 2009

Page 102

1      A.   You were so convinced the technology wasn't

2  good that you wanted the technology instead of having

3  your legal fees paid.

4      Q.   Ms. Blixseth, when you signed this document did

5  you have any understanding as to whether or not the

6  pending Trepp litigation materially adversely affected

7  your financial situation?

8      A.   Not when I signed this.

9      Q.   When did you confess a $26.5 million judgment

10  to Trepp?

11      A.   The -- the agreement -- it's hard to answer

12  your question the way you worded it.

13      Q.   When did you confess a $26.5 million judgment

14  to Trepp?

15      A.   I don't recall.

16      Q.   Let's go --

17           MR. HOLAHAN:  Do you have some, Madam Court

18  Reporter, paperclips?

19           Discussion off the record.

20           MR. FLYNN:  Let's go to this document.

21           (Exhibit 14 was marked for identification.)

22  BY MR. FLYNN:

23      Q.   Did you have your lawyer, Mr. Ryden, send the

24  letter dated May 24, 2007, to Hatch Jacobs in connection

25  with this loan?

Yates Court Reporters    800.669.1866

**WCP00611**

Edra D. Blixseth  -  December 17, 2009

Page 103

1          MR. GLASSER:  What exhibit are you on?  I'm

2    sorry.

3    BY MR. FLYNN:

4        Q.   What exhibit number is that, Ms. Blixseth?

5        A.   It's 14.

6          MR. HOLAHAN:  14.

7          MR. GLASSER:  Thank you.

8          THE WITNESS:  This looks like something that I

9    would have called -- that Western was requesting and I

10   would have called and asked Bill to do.

11   BY MR. FLYNN:

12       Q.   Now is it your testimony, Ms., that you had

13   your divorce lawyers write Exhibit 14 when you were

14   desperately in need of money, you were binding yourself

15   to a $13 million loan, but you weren't getting anything

16   out of it; is that your testimony?

17       A.   That's such a compound question.  I can't

18   answer that yes or no.

19       Q.   When you had your divorce lawyers write this

20   letter with regard to your assets in excess of

21   $500 million, did you know that at that point in time on

22   your financial statement you'd be now liable potentially

23   for a $13 million obligation?

24         MR. HOLAHAN:  I'm sorry, I don't understand

25   that question.

Yates Court Reporters    800.669.1866

**WCP00612**

Edra D. Blixseth - December 17, 2009

Page 104

1        If you understand it --

2        THE WITNESS: I don't.

3    BY MR. FLYNN:

4        Q.   As a guarantor of the $13 million loan, what

5    was your understanding as to whether or not some day you

6    might be obligated to pay the $13 million?

7        A.   My understanding was based on the collateral

8    that Matthew was putting up for the $13 million, the

9    Story Mill project and the appraisal at the time and the

10   forecast of the final platting of this, that all the

11   worst-case scenarios would have to happen before I would

12   be obligated for this loan.

13       Q.   Are you currently obligated for the loan?

14       A.   I am.

15       Q.   How much money, if any, did the Story Mill

16   project ever make?

17       A.   I've answered that I was not involved with the

18   Story Mill project.

19       Q.   So you guaranteed $13 million and yet you had

20   no knowledge at the time that you guaranteed it --

21       A.   That's not what I said.

22       Q.   -- of whether the Story Mill project was even

23   viable; is that correct?

24       A.   That's not what I just said.  That's what you

25   just said.  That's not what I said.

Yates Court Reporters    800.669.1866

**WCP00613**

Edra D. Blixseth  -  December 17, 2009

Page 105

1      Q.   What knowledge did you have at the time of what

2   the Story Mill project was about?

3      A.   I had knowledge that the collateral for this

4   loan was two spec houses at Yellowstone Club, including

5   their lots; that they were in second position behind

6   American Bank -- which was, I think, 10 or 12 million, I

7   don't remember -- on a project that they had appraisals

8   that supported this loan, and the forecast looked bright

9   for getting the final platting for it, which definitely

10  supported this loan.

11        So my opinion, not of the Story Mill project

12  per se, of the ongoing operations and cash flow and

13  income and expense was -- was not part of it.  It was --

14  which is the actual collateral basis for a $13 million

15  loan based on the collateral that Western Pacific was

16  taking.

17     Q.   Then if that was the case and that was your

18  view at the time --

19     A.   That was my view at the time.

20     Q.   -- why did you ask your divorce lawyer to

21  certify what your assets were potentially worth?

22     A.   I don't actually recall except that they --

23  they may have wanted to know.  Like you said, they asked

24  about Yellowstone Club World and the divorce and how

25  that was going.  There had been a lot in the paper.

WCP00614

Edra D. Blixseth  -  December 17, 2009

Page 106

1          They may have asked to have somebody verify

2     that that's what they thought I was going to end up

3     with.

4          Q.   Where is there anything in this document,

5     Exhibit 14, relative to Yellowstone Club World,

6     Ms. Blixseth?

7          A.   I didn't say there was.  I said that was a

8     question they asked me.

9          Q.   So what exactly did they ask you?  This was in

10    the Bozeman meeting?

11         A.   Correct.

12         Q.   What exactly did they ask you about Yellowstone

13    Club World?

14         A.   If that was something that was going to

15    jeopardize the value of the Yellowstone Club, because --

16    I can't remember the gentleman's name at the time that

17    was there, questioned if that was going to take off or

18    not and it was a new concept and he questioned that, if

19    we were jeopardizing Yellowstone Club in any way for

20    that.

21         Q.   Who is "he"?

22         A.   I just said I can't remember his name.  They

23    were all new people to me.

24         Q.   How did they know about Yellowstone Club World?

25         A.   There had been tons of press on it.

Yates Court Reporters    800.669.1866

WCP00615

Edra D. Blixseth  -  December 17, 2009

Page 107

1     Q.   So when you had your lawyer send this document,

2   did you understand that they were checking into your

3   assets to determine whether or not the things you said

4   about your financial background was true?

5     A.   I understood them to know that a lot of things

6   can happen in divorces and that they wanted to verify

7   that what -- and California being a community property

8   state and what they had seen and saw in Forbes and that

9   kind of stuff that I was going to get 50 percent of what

10  our supposed assets were.

11    Q.   How long after the $13 million was paid did it

12  fall into default?

13    A.   I have no idea.

14    Q.   When did Western Capital Partners start

15  contacting you with regard to the default on the loan

16  looking to you for money?

17    A.   Well, I actually don't recall.  I know that I

18  loaned money to make the interest payments sometime

19  after the loan was made, but I don't really recall the

20  dates.

21    Q.   Let me see if I understand that testimony.

22  Sometime after the loan was made you began loaning

23  money.  Who did you loan the money to?

24    A.   Story Mill.

25    Q.   To your son, Matthew --

WCP00616

Edra D. Blixseth  -  December 17, 2009

Page 108

1    A.   To the Story Mill project.

2    Q.   -- to pay the interest payments.

3         Was that within the first month, Ms. Blixseth?

4    A.   I don't remember.  I don't believe so.

5    Q.   The second?

6    A.   No, I don't recall when it started.

7    Q.   The third month?

8         MR. HOLAHAN:  Counselor, she said she doesn't

9    recall.

10   BY MR. FLYNN:

11   Q.   How much -- were you paying all of the interest

12   payments?

13   A.   I don't recall.

14   Q.   Was it an interest-only loan?

15   A.   I believe so.

16   Q.   How long after you started paying the interest

17   payments did you cease paying the interest payments?

18   A.   I don't recall, but when I couldn't -- I

19   couldn't afford to pay them with my cash flow.

20   Q.   Was it within six months?

21   A.   I don't recall.

22   Q.   So you took -- your son took $13 million.  So

23   we understand what happened here, you then began paying

24   the interest payments on it, then you no longer could

25   afford to pay them and the loan defaulted; is that your

WCP00617

Edra D. Blixseth  -  December 17, 2009

Page 109

1    testimony?

2         A.   I think that was your testimony, but --

3         Q.   Is that yours?

4         A.   No, but you -- if you ask me questions, I'll

5    try to give you testimony.

6         Q.   Is that what happened?  Can you answer that

7    question?

8         A.   I don't believe that's the order in which

9    things happened.

10        Q.   What is the order in which things happened?

11        A.   Well, first of all, the 13 million wasn't just

12   13 million to work the Story Mill project or do other

13   things with.  There was other things that had to be paid

14   off for the purchase of the contiguous hundred acres.

15            So most of that was -- and to finish the

16   project for getting the platting together and some of

17   those things and some of those expenses ran higher and

18   longer than they had anticipated.

19        Q.   Did you start borrowing money from other

20   lenders when you, as guarantor, were in default on the

21   Western Capital loan?

22        A.   I don't recall if that -- if there was other

23   lending done after that.

24        Q.   Isn't it true that the Western Capital loan,

25   according to their lawsuit, was in default at least as

Yates Court Reporters   800.669.1866

WCP00618

Edra D. Blixseth  -  December 17, 2009

Page 110

1   of December '07?  Do you know that?

2       A.   I know that we were on the phone and I was

3   doing conference calls with them trying to work out how

4   we were going to be able to handle things, but I don't

5   remember the date.

6       Q.   As of December '07 had you borrowed money from

7   First Bank & Trust?

8       A.   Of December '07?

9       Q.   Yes.

10      A.   I believe that I did.

11      Q.   Had you borrowed money from American Bank?

12      A.   I believe that I had, yes.

13      Q.   Did you tell First Bank & Trust or American

14  Bank that you were in default as a guarantor on the

15  Western Capital loan?

16          (Speakerphone emits loud static.)

17  BY MR. FLYNN:

18      Q.   Did you tell American Bank or First Bank &

19  Trust when you borrowed those monies in late '07 that

20  you were in default as a guarantor on the Western

21  Capital loan?

22      A.   I don't recall.

23      Q.   Did you give them any, those banks, any

24  financial statements disclosing the Western Capital

25  loan?

WCP00619

Edra D. Blixseth  -  December 17, 2009

Page 111

1     A.   I don't recall if they were on them or not.

2     Q.   Isn't it true, Ms. Blixseth, that you did not

3  notify either American Bank or First Bank & Trust that

4  you were in default of the Western Capital loan as a

5  guarantor when you began taking millions of dollars from

6  them?  Isn't that true?

7     A.   I just have to say I don't recall.  I don't

8  recall the dates.

9     Q.   Okay.  Let's get into the loan.  Do you

10  remember what the loan modification agreement was

11  with -- you may have it over there.

12         No, here it is.

13         We're a little bit out of order here.  Let's

14  take that first.

15         (Exhibit 16 was marked for identification.)

16  BY MR. FLYNN:

17     Q.   Do you remember entering into this loan

18  modification agreement a year later in June of --

19         MR. GLASSER:  Is this Exhibit 16?

20  BY MR. FLYNN:

21     Q.   -- '-08?

22         This is Exhibit 16, yes.  Thank you.

23         THE WITNESS:  Are yours marked?

24         MR. HOLAHAN:  No, mine are not marked.

25         THE WITNESS:  I think it's this one

WCP00620

Edra D. Blixseth  -  December 17, 2009

Page 112

1   (indicating).

2           MR. HOLAHAN:  Yeah, it is.

3   BY MR. FLYNN:

4       Q.   In June of '08 do you remember entering into

5   this loan agreement?

6       A.   Hang on just a second.  My lawyer is still

7   trying to --

8           Okay.  Now I'm ready.

9       Q.   Do you remember entering into this document?

10      A.   Barely.  June of '08 was when there was a whole

11  lot of things going on, trying to settle with Tim and

12  Yellowstone Club things and stuff that were, I felt, my

13  things.  This was, again, I still felt as Matthew's.

14      Q.   Did you sign this document?

15      A.   Sure I did, but why don't you tell me what

16  page.

17      Q.   If you're sure you did, I believe you testified

18  in your prior deposition --

19      A.   Yeah, I'm sure I did.

20          I did.  It's on page 8.

21      Q.   Let's go down to Release of Collateral under

22  this agreement in June '08.  At the time you signed this

23  document had you just borrowed $13 million from First

24  Bank & Trust and Wachovia?

25      A.   No.

Yates Court Reporters    800.669.1866

WCP00621

Edra D. Blixseth  -  December 17, 2009

Page 113

1        Q.   At the time you signed this document had you

2   borrowed $8 million from Wachovia?

3        A.   At the time?

4        Q.   Yeah.   Roughly at this time frame had you

5   borrowed $8 million from Wachovia?

6        A.   No.

7        Q.   The answer is no?

8        A.   No.

9        Q.   Between March and June '08 did you borrow

10  $8 million from Wachovia bank?

11       A.   Not $8 million, no.

12       Q.   Okay.   And did you execute a loan agreement in

13  both March and June '08 with Wachovia Bank first for

14  $5 million, then for $3 million?

15       A.   There were two separate loans and the time

16  frame for the first one was not the time frame you just

17  said and I believe the 3 million was.

18       Q.   Let's go down to the Release of Collateral.  We

19  have all those documents.  We'll get into them.

20            MR. HOLAHAN:  Hold on one second here.  I'm not

21  finding your signature here.

22            THE WITNESS:  Yeah, I found it.  It was on like

23  eight or something.

24  BY MR. FLYNN:

25       Q.   Let's go down to the document -- first page,

WCP00622

Edra D. Blixseth  -  December 17, 2009

```
                                                        Page 114
 1  Ms. Blixseth.

 2          MR. HOLAHAN:  Hold on, Mr. Flynn.

 3          THE WITNESS:  No?  Let me go back.

 4          MR. HOLAHAN:  These pages are out of order.

 5          THE WITNESS:  Yeah.  The pages are out of

 6  order, but I did find it.

 7          MR. FLYNN:  It's on page 8, Mr. Holahan.

 8          MR. HOLAHAN:  I don't have that.  That's not in

 9  my copy.

10          MR. FLYNN:  I believe it is.

11          THE WITNESS:  It is, they're just out of order.

12  It shows 8 and then it jumps to no page number, no page

13  number then it goes to 10 and it's behind it.

14  BY MR. FLYNN:

15      Q.  Ms. Blixseth, let's go down to No. 1, Release

16  of Collateral.

17      A.  What page?

18      Q.  First page.

19          MR. HOLAHAN:  I don't have it.

20  BY MR. FLYNN:

21      Q.  "Lender hereby agrees to release the security

22  interest in Edra D. Blixseth's ownership interest in and

23  to Blxware, LLC."

24          Do you see that, Ms.?

25      A.  Tell me where -- I'm sorry, no.
```

Yates Court Reporters   800.669.1866

WCP00623

Edra D. Blixseth  -  December 17, 2009

Page 115

1      Q.   No. 1, Release of Collateral.

2      A.   I gotcha.

3      Q.   Why did you have them release the collateral

4   involving Blxware?

5      A.   Oh, I remember this.  This is when we first --

6   this is when we first discovered that, I believe almost

7   a year before, that there had been a blanket UCC filed

8   on everything that we were not aware of.

9           So when they -- so when we were getting ready

10  to do the -- when we were getting ready to do the

11  Wachovia loan, I believe, it was discovered -- and I

12  believe Liner was involved at the time, because Liner is

13  the one that brought Wachovia to me -- and they

14  discovered it and part of the condition on redoing this

15  was to have them release that.

16     Q.   To release Blxware security?

17     A.   Yeah.

18     Q.   Let's go over to the second page.  In paragraph

19  No. 2, the next to last sentence reads, "Also that

20  certain loan affidavit, dated June 15, 2007," that's the

21  one we went over, "which is part of the loan documents,

22  is hereby amended to include the additional collateral

23  and the Borrower and Guarantor hereby reconfirm and

24  remake all the representations and warrantees made in

25  the affidavit and also make the same representations and

WCP00624

Edra D. Blixseth  -  December 17, 2009

Page 116

1    warrantees with respect to the additional collateral."

2         So did you know, Ms. Blixseth, that you were

3    reaffirming all of those representations and warrantees

4    that we had previously read?

5         A.   Yeah.  You know, again, this is during a time

6    where we were trying to get things finalized between --

7         Q.   The question is simple:  Did you know?

8         A.   The question is not as simple, maybe I'm

9    just --

10        Q.   Yes or no?

11        A.   It's not a yes-or-no question.

12             MR. HOLAHAN:  Mr. Flynn, you can let her answer

13   the question and if you have a follow-up question, you

14   can ask it.

15             MR. FLYNN:  I don't want dialogue, Mr. Holahan.

16             MR. HOLAHAN:  You're going to get an objection.

17             MR. FLYNN:  I'll withdraw the question.  Next

18   question.

19        Q.   At the time you signed these documents did you

20   read them?

21        A.   I don't recall if I read them or I had Liner

22   read them for me.

23        Q.   So you had your lawyer read them; is that

24   correct?

25        A.   I don't recall if I read them, because I

Yates Court Reporters    800.669.1866

Edra D. Blixseth  -  December 17, 2009

Page 117

1    believe when I talked to -- when Wachovia brought to the

2    attention of Liner, who was handling the Wachovia loan

3    for me, that the UCC was filed by Western Capital I was

4    surprised.  I had them look into it.

5           It was during the same time that this was being

6    renegotiated or reaffirmed or whatever and I -- I

7    believe that it was Liner that talked to them about -- I

8    think it was Jeff Adams, I can't remember -- about

9    releasing that.

10   Q.   Ms. Blixseth, when you signed this document,

11   you had advice of counsel from Liner; is that your

12   testimony?

13   A.   No.  My testimony is that I don't remember if

14   they actually read this.  I remember that they were

15   involved, because they were involved with Wachovia and

16   they were involved with when we found out about the UCC

17   and that we needed to have that removed on Blxware.

18   Q.   At the time you signed this document was the

19   Liner law firm representing you in the existing

20   litigation in which you were a defendant?

21          MR. HOLAHAN:  What litigation?

22          THE WITNESS:  What litigation?

23          MR. FLYNN:  ETreppid and Montgomery.

24          THE WITNESS:  What was the date?

25   ///

WCP00626

Edra D. Blixseth  -  December 17, 2009

Page 118

1  BY MR. FLYNN:

2      Q.    June '08.

3      A.    I think I was already brought into that at that

4  time.

5      Q.    Did you disclose to Western Capital Partners in

6  June '08 when they rewrote this loan that you were a

7  defendant in the Montgomery litigation?

8      A.    I had no communication with Western when this

9  was being done.

10     Q.    That was strictly done by Liner; is that your

11  testimony?

12     A.    It was strictly done by people telling me what

13  was going on and me saying, "Check it out," and -- yeah.

14     Q.    And Liner --

15     A.    I was in the middle of things I thought were

16  more important and that was getting the balance of --

17     Q.    Ms. Blixseth, please listen to the question.  I

18  do not want all of this verbiage.

19     A.    Okay.

20     Q.    The question is at the time were you

21  represented by Liner in June '08 in the eTreppid

22  Montgomery litigation?

23     A.    And my answer was I believe I was already added

24  to the litigation at the time.

25     Q.    The question is were you represented by Liner?

Yates Court Reporters    800.669.1866

WCP00627

Edra D. Blixseth  -  December 17, 2009

Page 119

1      A.    If I was added to the litigation at this time,

2   it would be Liner I was represented by.

3      Q.    Now Liner knew you were involved as a defendant

4   in litigation; isn't that true?

5      A.    If they were my lawyers, I hope so.

6      Q.    And Liner knew that the litigation involved

7   Blxware and the software technology that had been

8   pledged to Western Capital; isn't that true?

9      A.    The Western Capital pledge was a blanket UCC.

10  It wasn't specifically pledged to them.

11     Q.    Ms. Blixseth, please listen to the question.

12     A.    I did and I answered.

13     Q.    Did Liner know that the Blxware technology was

14  involved in the litigation in which you were a

15  defendant?  Did they know that, Ms.?

16     A.    I can't speak for Liner.  Liner was

17  representing me.

18     Q.    You were the client?

19     A.    I was the client.

20     Q.    And it's your testimony you don't know whether

21  or not they were defending you and your technology?

22     A.    My answer is I'm not going to speak for Liner.

23           MR. FLYNN:  Now get into Exhibit 15.

24           (Exhibit 15 was marked for identification.)

25  ///

Yates Court Reporters   800.669.1866

WCP00628

Edra D. Blixseth   -   December 17, 2009

Page 120

1    BY MR. FLYNN:

2         Q.   Go to the last page, the next to last page, the

3    Declaration of Edra Blixseth.

4         A.   Before I go to the last page, can I read what

5    this is?

6         Q.   All I'm interested in is the next to last page,

7    your declaration.

8         A.   I'd like to know what the declaration is for.

9    If you give me 30 seconds, I can look at the front and

10   tell what it's for before I go to the page.

11        Okay.

12        Q.   Now this declaration is dated July 27, '07,

13   roughly a month after you got the 13 million -- or Story

14   Mill got the $13 million from Western Capital Partners

15   and you guaranteed you were able to pay your bills as

16   they matured.

17        Paragraph 3 reads, "As a result I am presently

18   in arrears to creditors in the approximate amount of

19   $2 million.  Even after using all of the proceeds from

20   the sale of my real estate parcel, these debts are

21   primarily due to the ordinary expenses of Porcupine

22   Creek and they are increasing by hundreds of thousands

23   of dollars per month."

24        As of July 27 when you signed this,

25   Ms. Blixseth, how long had you been in arrears with

Yates Court Reporters    800.669.1866

Edra D. Blixseth  -  December 17, 2009

Page 121

1    creditors?

2        A.   I don't recall.

3        Q.   Were you in arrears with creditors as of

4    June 15, '07, when your son got the $13 million from

5    Western Capital?

6        A.   I don't recall.

7        Q.   When your son got the $13 million from Western

8    Capital, did you have any conversations with him about

9    how much of the loan proceeds you would get?

10           MR. HOLAHAN:  Asked and answered.  She's

11   already testified she didn't get any of the loan

12   proceeds.

13           MR. FLYNN:  Are you instructing her?

14           MR. HOLAHAN:  No, she can answer.  I'm just

15   objecting.

16   BY MR. FLYNN:

17       Q.   Did you have any conversations with your son,

18   Matthew, during June, July '07, about getting money from

19   Story Mill or from him?

20       A.   I knew with how the loan was going to now come

21   about from Western to Story Mill that what was

22   originally anticipated that I'd get paid back some of

23   money I'd been loaning for Story Mill was not going to

24   be able to happen and I would not get any money from it.

25       Q.   When you wrote this declaration were you

Yates Court Reporters    800.669.1866

Edra D. Blixseth   -   December 17, 2009

Page 122

1   cognizant and signed it under oath, were you cognizant

2   of the fact you had just represented as a guarantor to

3   Western Capital Partners that you could pay your bills

4   as they matured?

5        A.   I've answered that.  I've said I don't recall

6   exactly where I was at the time this was signed.

7        Q.   Let's move on.  We've got a lot of ground to

8   cover.

9             Put these over there, Tim.

10            (Exhibit 17 was marked for identification.)

11   BY MR. FLYNN:

12        Q.   Do you know what a preliminary injunction is,

13   Ms. Blixseth?

14        A.   I do now.

15            MR. HOARD:  Which exhibit?

16            MR. FLYNN:  That's Exhibit -- what, 17?

17            THE WITNESS:  Uh-huh.

18            MR. HOLAHAN:  How many pages?

19            THE WITNESS:  Five, I think.

20   BY MR. FLYNN:

21        Q.   Were you advised there was a preliminary

22   injunction in effect as of February 8, 2006, in

23   connection with the technology that you were paying a

24   hundred thousand dollars a month to Dennis Montgomery

25   for?

WCP00631

Edra D. Blixseth  -  December 17, 2009

Page 123

1          MR. GLASSER:  Are you on an exhibit, Mr. Flynn?

2          MR. FLYNN:  It's 17.  It starts Order in the

3    Second Judicial District.

4          MR. GLASSER:  Okay.

5          THE WITNESS:  Are you asking me what date was I

6    aware of this?

7    BY MR. FLYNN:

8    Q.   Let's start there.  What date were you aware of

9    this preliminary injunction?

10   A.   I don't recall, but I remember when I met with

11   you and Dennis before I -- when Michael Sandoval --

12   Michael Sandoval brought you guys to me, I remember

13   asking if the eTreppid litigation was going to stop us

14   from being able to move forward on commercial viability

15   of the technology.

16   Q.   So are you saying that you were aware of the

17   preliminary injunction as of that date?

18   A.   No.  I was aware there was none.  I was told

19   there was none.

20   Q.   When were you first given notice of the

21   preliminary injunction, Ms. Blixseth?

22   A.   Probably about a year later.  I found out

23   that -- actually, maybe sooner than that, but we got

24   things moving and started getting things together.

25          I was also told at the time that there was

Yates Court Reporters   800.669.1866

WCP00632

Edra D. Blixseth  -  December 17, 2009

Page 124

1    going to be a contract that -- coming along with Dennis.

2    In fact, you're the one that explained the contract and

3    how -Treppid screwed it up and that was going to be able

4    to come along with Dennis at the time of the agreement.

5              MR. FLYNN:  Move to strike.

6              Who first --

7              MR. HOLAHAN:  Are you striking your move to

8    strike or are you moving to strike?

9              MR. FLYNN:  Who first informed you --

10             MR. HOLAHAN:  Wait a minute.

11             MR. FLYNN:  Mr. Holahan, I'm withdrawing all

12   those questions.

13       Q.   Who first informed you of this preliminary

14   injunction?

15       A.   I'm confused.  What questions are you

16   withdrawing?

17       Q.   Who first informed you of the preliminary

18   injunction?

19       A.   I don't recall who first informed me.  I recall

20   being surprised by it, since I was told there wasn't one

21   by Montgomery's counsel which was you.

22       Q.   Were you aware when you signed the June '07

23   Western Capital loan that there was a preliminary

24   injunction in place?

25       A.   '07?

WCP00633

Edra D. Blixseth  -  December 17, 2009

Page 125

1     Q.    '07.

2     A.    Probably.

3     Q.    A year and a half later, Ms. Blixseth.

4     A.    I think I was by then.

5     Q.    You were aware there was a preliminary

6  injunction in place?

7     A.    I was aware of that.

8     Q.    Okay.  Let's move on.

9          At some point in time did you come to

10  understand that that preliminary injunction involved all

11  of Montgomery's purported technology?

12     A.    I discovered that all of what was under the

13  lawsuit with eTreppid.

14          MR. FLYNN:  Thank you.

15          And here's an order dated August 2, '07.

16          (Exhibit 18 was marked for identification.)

17          MR. GLASSER:  What exhibit are we on, do you

18  know?

19          MR. FLYNN:  Exhibit 18.

20          MR. GLASSER:  And at the end of this depo are

21  you going to give the court reporter these?

22          MR. FLYNN:  Yeah, she will take possession.

23     Q.    Here's an order dated August 2, '07, by Judge

24  Pro affirming the preliminary injunction when you were

25  represented by the Liner firm.

WCP00634

Edra D. Blixseth  -  December 17, 2009

Page 126

1          Did you know as of August 2, '07, that there

2     was a preliminary injunction in effect on Montgomery's

3     technology?

4          A.   Clearly I did.

5          Q.   And so as of June '07, did the Liner firm --

6     between June and August 2, '07, did the Liner firm

7     inform Western Capital Partners that there was, in fact,

8     a preliminary injunction on the Blxware technology

9     collateralized to them?

10         A.   I can't speak for the Liner firm.

11         Q.   And a year later in June '08 when you modified

12    the loan, did anyone notify Western Capital Partners

13    that there was a preliminary injunction in effect.

14         A.   I'm not aware of it.

15         Q.   Did you borrow any more money from any other

16    lending institutions?

17              That's all for now.

18              Did you borrow any more money from any other

19    lending institutions in which the Blxware collateral was

20    collateralize while subject to the injunction?

21         A.   Well, the way you worded that, I didn't put

22    Blxware up for Western Capital.  They filed a UCC.

23         Q.   No, any other lenders.  Please listen to the

24    question.

25         A.   I'm trying very hard.

WCP00635

Edra D. Blixseth  -  December 17, 2009

Page 127

1      Q.   Did you borrow any money from any other lender

2   to which you pledged Blxware as collateral?

3      A.   But you're saying any other as if I'd already

4   pledged to others.  That's the reason I'm having a hard

5   time answering your question.

6      Q.   Did you pledge Blxware to any lender, period,

7   during the period of the preliminary injunction?

8      A.   I pledged to the second Wachovia, which is what

9   we were referring to on the 3 million and the 5-.

10      Q.   So you got 8 million more on the Blxware

11   technology while there was a preliminary injunction; is

12   that correct?

13      A.   I got $3 million.

14           MR. FLYNN:  We'll get into that.

15           Let's deal with Exhibit 19, one of the FBI

16   reports indicating the technology was fraudulent.

17           (Exhibit 19 was marked for identification.)

18   BY MR. FLYNN:

19      Q.   Have you seen that FBI report, Ms. Blixseth?

20      A.   I'm confused with this, because when this --

21   when you're talking about this is after the --

22      Q.   The question is simple:  Have you seen --

23      A.   The question is not simple.

24      Q.   -- Exhibit 18?

25      A.   The question is not simple, because this report

WCP00636

Edra D. Blixseth  -  December 17, 2009

Page 128

1   was part of --

2            MR. HOLAHAN:  19 or 18?

3            THE WITNESS:  19.

4            MR. FLYNN:  19, I'm sorry.

5            THE WITNESS:  That this report was part of

6   something after an illegal raid by the FBI on Montgomery

7   on which you represented him and this was part of the

8   report to try to say that the technology was worthless

9   anyway.

10  BY MR. FLYNN:

11      Q.   Does that mean you've seen it?

12      A.   I don't know if I've seen this exact one.  I

13  just know this was part of what was in court.

14      Q.   When did you first learn that the FBI was

15  saying in written reports that the technology was

16  fraudulent?

17      A.   I believe I learned it from you stating that

18  that's what you guys were going to use in defense of

19  Dennis's rights as illegal FBI raid.

20           MR. FLYNN:  Thank you, Ms. Blixseth.

21           Here's another FBI report, Exhibit 20, also

22  indicating that the technology was fraudulent, and these

23  date back to early '06.  They were released on April 9,

24  2006, by Judge Pro.

25           (Exhibit 20 was marked for identification.)

Yates Court Reporters    800.669.1866

WCP00637

Edra D. Blixseth  -  December 17, 2009

Page 129

1   BY MR. FLYNN:

2       Q.   When did you get this part of the FBI report,

3   Ms. Blixseth?

4       A.   I really don't know.  I don't know if I ever

5   did.

6       Q.   Was it on April 12th or 13th, 2009 -- strike

7   that, 2007, at Porcupine Creek?

8       A.   I don't recall.  I recall you going over the

9   case and things that they had filed in court that were

10  going to substantiate the information that was given to

11  them to get the FBI search warrant wasn't credible and I

12  recall that, but I don't recall seeing documents.

13      Q.   Were the FBI reports given to you and Mr. Kemp

14  in April of 2007, Ms. Blixseth?

15      A.   I don't recall.

16      Q.   Did the Liner firm give you the FBI reports

17  that have been marked Exhibit 19 and 20?

18      A.   Not to the best of my knowledge.

19      Q.   Okay.  Let's go to the declaration of FBI agent

20  Mike West.

21      A.   21.

22           (Exhibit 21 was marked for identification.)

23           MR. FLYNN:  This will be Exhibit 21.

24      Q.   Ask you just simply yes or no, have you seen

25  this document?

WCP00638

Edra D. Blixseth  -  December 17, 2009

Page 130

1      A.   I think I have seen this one.

2      Q.   And when did you see it?

3      A.   I think was given to me when during discussions

4  of how you were going to handle the alleged legal raid

5  and make it an illegal raid of Dennis Montgomery's --

6      Q.   And now in July --

7           MR. HOLAHAN:  Were you through with that

8  answer?

9           THE WITNESS:  Just a run-on.

10  BY MR. FLYNN:

11     Q.   In July of '06 did you visit Vice President

12  Cheney's office trying to sell the technology to

13  Mr. Cheney knowing there was a preliminary injunction in

14  place?

15     A.   With your whole question in place just the way

16  it was, no.

17     Q.   Did you visit Vice President Cheney's office?

18     A.   Yes.

19     Q.   Did you try to sell the technology to him?

20     A.   No.

21     Q.   What did you do?

22     A.   We talked about the obstacles we were running

23  into of what we thought was technology that the DOD was

24  going to want to be using.

25     Q.   And what were the obstacles?

WCP00639

Edra D. Blixseth - December 17, 2009

Page 131

1          MR. HOLAHAN:  Are you -- are you free to

2     testify about this?

3          THE WITNESS:  That part I can.  That part's

4     common knowledge.

5          MR. HOLAHAN:  Uh-huh.

6     BY MR. FLYNN:

7     Q.   Ms. Blixseth, what were the obstacles?

8     A.   Of some within the people that had worked with

9     Warren Trepp were saying that the technology was not

10    valid and the people that had been using the technology

11    for tests and other things were saying it was valid.

12    Q.   Now in this -- on page 2 it reads, "Special

13    Agent Gunderson further related that Dennis L.

14    Montgomery was the Azimyth employee --

15         MR. HOLAHAN:  What line, Counsel?

16         MR. FLYNN:  Page 2, lines 19 to 21.

17    Q.   -- "who located the information.  Special Agent

18    Gunderson advised me in a subsequent conversation that

19    Mr. Montgomery had reported that he located increased

20    noise in recent Al-Jazeera video transmissions."

21         Did you represent or Sandoval represent to

22    anyone in Cheney's office that Montgomery had decoded

23    al-Qaida communications on Al-Jazeera transmissions?

24    A.   We showed them -- we showed them what we had

25    been -- the data that we had been processing.

Yates Court Reporters    800.669.1866

WCP00640

Edra D. Blixseth  -  December 17, 2009

Page 132

1      Q.   Did that purport to show that Montgomery was

2    intercepting al-Qaida communications on Al-Jazeera

3    transmissions?

4      A.   That I can't answer.

5      Q.   Ms. Blixseth, isn't it a fact that you have

6    told numerous people that there was a $100 million black

7    budget allocated from Montgomery's noise filtering

8    technology to filter out al-Qaida communications on

9    Al-Jazeera transmissions?

10          You've told that to numerous people, have you

11   not?

12     A.   No.  The first time I ever heard there was a

13   hundred million dollar contract came out of your mouth

14   that that's what Dennis Montgomery was bringing to the

15   new company that Warren Trepp screwed up.

16     Q.   When was that?

17     A.   That was when you were at my house with

18   Sandoval and Dennis the very first time I met you.

19          MR. HOLAHAN:  Now we're going to have to take

20   your deposition, you realize.

21   BY MR. FLYNN:

22     Q.   That would be in March of '06, Ms. Blixseth?

23     A.   You have a better memory of months and dates,

24   but I know it was in '06.

25     Q.   So when you went to see Cheney was it an effort

Yates Court Reporters    800.669.1866

**WCP00641**

Edra D. Blixseth  -  December 17, 2009

Page 133

1   to try to get the hundred million dollar contract?

2       A.   It was an effort to try to see what the

3   blockage was in order to see how we could go about

4   talking to them about the technology we had.

5       Q.   To sell it to them?

6       A.   No, to talk to them about it.

7       Q.   Did you want to get the hundred million

8   dollars, Ms. Blixseth?

9       A.   If the technology was something that they

10  wanted to use and it was something we could do.  I

11  wasn't trying to invest the money or have the burn rate

12  it was to not try to get money back out of it.

13      Q.   Were you paying a hundred thousand dollars a

14  month to Montgomery in order to try to get the hundred-

15  million-dollar contract, Ms. Blixseth?

16      A.   I was paying a hundred thousand dollars a month

17  for him to be the chief scientist for Blxware and

18  Opspring.

19      Q.   Were you paying him a hundred thousand dollars

20  a month, yes or no, to get the hundred-million-dollar

21  contract?

22           MR. HOLAHAN:  Asked and answered.

23           THE WITNESS:  It's not a yes-or-no question.

24           MR. HOLAHAN:  She answered that question.

25  ///

WCP00642

Edra D. Blixseth  -  December 17, 2009

Page 134

1   BY MR. FLYNN:

2       Q.   Now Cheney rejected you; is that correct?

3       A.   That is not correct.

4       Q.   What did Cheney's office say?

5       A.   They were going to investigate and check into

6   what the roadblocks were.

7       Q.   And what then happened?

8       A.   They did some investigations and found that

9   they were getting discrep- -- different discrepancies in

10  the reports and we ultimately did not put a contract

11  together through the Cheney office.

12      Q.   And then you went to Robert Franks at the Wall

13  Street Journal?

14      A.   No, that's not correct.

15      Q.   We'll look at your emails.

16      A.   Okay.

17      Q.   Now Ms. Montgomery --

18      A.   I'm Ms. Blixseth.

19      Q.   Ms. Blixseth, I get confused.

20           Did you testify a minute ago that you only got

21  $3 million from Wachovia for pledging the Blxware

22  security?

23      A.   I testified that the additional amount that I

24  got -- I already had a $5 million loan and the

25  additional amount I got was 3-.

Yates Court Reporters    800.669.1866

**WCP00643**

Edra D. Blixseth   -   December 17, 2009

Page 135

1      Q.   Did you pledge the Blxware security to first

2  get $5 million before you got the $3 million?

3      A.   I didn't -- I don't believe so but --

4      Q.   What exhibit do you have there in front of you,

5  Ms. Blixseth?

6      A.   22.

7      Q.   22.

8           (Exhibit 22 was marked for identification.)

9  BY MR. FLYNN:

10     Q.   Let me ask you a couple of questions:  As of

11  March 6, 2006, when you got this $5 million demand loan,

12  were you in default with Western Capital Partners?

13     A.   Tell me the date again.

14     Q.   The date on the document, March 6, 2008, were

15  you in default with Western Capital Partners?

16     A.   We may have been in technical default, but we

17  were working with them on trying to get things -- at

18  that time they were wanting to be cooperative and trying

19  to get things, so we got things together and Matthew was

20  work closely with Western.

21           So I can't answer if we were -- if they had

22  filed a default or if we were in technical default.

23     Q.   Were you paying them?

24     A.   Intermittently the interest was being paid.

25     Q.   As of March 6, 2008, when was the last time you

WCP00644

Edra D. Blixseth - December 17, 2009

Page 136

1   had paid Western Capital Partners?

2       A.   I can't recall.

3       Q.   As of March 6, 2008, were you in default with

4   American Bank?

5       A.   I believe so.

6       Q.   As of March 6, 2008, were you in default with

7   First Bank & Trust?

8       A.   I don't recall.

9       Q.   When you got the $5 million on or about

10  March 6, did you disclose to Wachovia Bank that you were

11  in default or technical default with either First Bank &

12  Trust, American Bank or Western Capital Partners?

13      A.   I don't recall, but the use of the funds from

14  Wachovia, they knew were to get some things --

15      Q.   Please, the answer is I don't recall?  Is that

16  your testimony?  You don't know whether you were in

17  default when you took $5 million from Wachovia Bank?

18          MR. HOLAHAN:  Counsel, if you don't let her

19  finish answering your questions, we're going to stop the

20  deposition, very simply.

21          MR. FLYNN:  Counselor, I'm not interested in

22  all the add-ons.  The simple question:  Do you know

23  whether you were in default as of August 2006?  It's yes

24  or no.  You either know or you don't know.

25          MR. HOLAHAN:  If you don't let her answer the

Yates Court Reporters    800.669.1866

WCP00645

Edra D. Blixseth  -  December 17, 2009

Page 137

1    questions you ask, we're going to stop.

2         MR. FLYNN:  Yeah.  You do whatever you're going

3    to do and I'll do what I'm going to do.

4         MR. HOLAHAN:  Okay.

5      Q.  Ms. Blixseth, as of March 6, 2008, were you in

6    constant email communication with Leon Royer from

7    American Bank with regard to trying to cure the default

8    that had been going on for months with American Bank?

9      A.  I can't tell you the exact dates.  There were

10   things that -- I can't tell you the exact dates.

11     Q.  Now as of this time, early March '08, is that

12   roughly the same period of time that you first found the

13   fake target letters?

14     A.  I'm not aware of target letters being fake or

15   not fake.  I told you when I think I first got them.

16        MR. HOLAHAN:  That's all right.

17   BY MR. FLYNN:

18     Q.  Now as of early March '08, were you

19   communicating with Sam Byrne about trying to make a

20   separate deal on the Yellowstone Club?

21     A.  Absolutely not.

22     Q.  As of March 21, '08, did you send Gary Peters

23   to Sam Byrne's office to make a separate deal on the

24   Yellowstone Club?

25     A.  That was not why Gary Peters went to Sam

WCP00646

Edra D. Blixseth  -  December 17, 2009

Page 138

1  Byrne's office.

2      Q.   Do you have numerous email communications with

3  respect to why Gary Peters went to Sam Byrne's office?

4      A.   There were a lot of emails going back and forth

5  between Gary Peters and me.

6      Q.   Was one them relating to your effort to get the

7  club in place of Mr. Blixseth?

8      A.   Absolutely not.

9      Q.   As of March 21, '08, were you subject to an

10  injunction by the family court about interfering with

11  the sale of the Yellowstone Club?

12      A.   I don't recall if there was an injunction or

13  not.  I recall that the judge said -- tell me the date

14  again.

15      Q.   Early March '08.  Were you subject to an

16  injunction from the family court prohibiting you from

17  interfering with the sale of the Yellowstone Club?

18      A.   I don't remember if it was an injunction.  I

19  remember that the judge said to -- there can only be one

20  of us negotiating with that and that would be Tim since

21  he had been doing that.

22      Q.   With respect to this $5 million loan, did you

23  know at the time that you were pledging Blxware security

24  that was subject to a preliminary injunction?

25          THE WITNESS:  I don't know how to answer that,

Yates Court Reporters    800.669.1866

**WCP00647**

Edra D. Blixseth  -  December 17, 2009

Page 139

1   because it wasn't -- we were doing things besides at the

2   same time.

3           MR. HOLAHAN:  You can say you don't understand.

4           THE WITNESS:  Yeah, I'm not sure how to answer

5   that question.

6   BY MR. FLYNN:

7       Q.   Let's go through the loan document.  In the

8   first paragraph it references a correct copy of a

9   certain license agreement between borrower and

10  guarantor.

11          MR. HOLAHAN:  Which document are you looking at

12  now?

13          THE WITNESS:  22.

14          MR. FLYNN:  Exhibit 22.

15      Q.   Did you issue -- who owned the technology as of

16  March 6, 2008, that was pledged as collateral to

17  Wachovia Bank for this $5 million?  Who owned it,

18  Ms. Blixseth?

19      A.   I don't recall if it was me, personally, or it

20  was Blxware.

21      Q.   Did you enter into a license agreement giving

22  it to Blxware, licensing it to Blxware?

23      A.   License it for use?

24      Q.   Yes.

25      A.   I believe so.

Yates Court Reporters    800.669.1866

WCP00648

Edra D. Blixseth  -  December 17, 2009

Page 140

1      Q.   Let's go over to page 3 of Exhibit 22,

2   Representations and Warrantees.  You know what they are,

3   don't you, Ms. Blixseth?

4      A.   My answer is the same as you've asked me now

5   five times.  I think I'm generally aware of what

6   representations and warrantees are.

7      Q.   This reads, "To induce the bank to enter into

8   this letter and make the loan hereunder, the Borrower

9   represents and warrants to the bank that, A, Litigation,

10  there are no legal or arbitration proceedings or any

11  proceedings by or before any governmental or regulatory

12  authority or agency now pending or to the knowledge of

13  the Borrower threatened against the Borrower, the

14  Guarantor or any of Guarantor's subsidiaries, which,

15  with respect to this agreement, the note, the guarantee,

16  the security agreement or any of the transactions

17  contemplated hereby or thereby or which could have a

18  material adverse effect on the financial condition or

19  operations or the prospects or business of, one, the

20  Borrowers or, two, the Guarantor and its subsidiaries."

21           Now that was false, wasn't it, Ms. Blixseth?

22      A.   If it -- if it says that they weren't aware of

23  the litigation when there was other ways to use the

24  technology, then what's part of -- that we were working

25  on at Bellevue, which is part of -- or excuse me,

Yates Court Reporters    800.669.1866

**WCP00649**

Edra D. Blixseth  -  December 17, 2009

Page 141

1   different than eTreppid.

2          Do you want me to wait so you can hear my

3   answer?

4          Wachovia was brought to me by Liner, so Liner

5   was the law firm representing me in the eTreppid

6   litigation.

7      Q.   So there was litigation pending relating to the

8   technology; is that correct, Ms. Blixseth?

9      A.   To some of the technology, but not to all of

10  the technology that Blxware was developing.

11     Q.   So this statement is false.  There was

12  litigation pending, wasn't there, Ms. Blixseth?

13     A.   I would say that there was litigation still

14  pending.

15     Q.   And your law firm, Liner, was representing you

16  and Montgomery in the litigation that was pending; isn't

17  that true, Ms. Blixseth?

18     A.   That is true.

19     Q.   Did you read this document before you signed

20  it?

21     A.   I don't recall.

22     Q.   Now did you know that the litigation in Nevada

23  involving Montgomery and eTreppid when you signed it

24  involved the preliminary injunction in connection with

25  the technology you were pledging as collateral?

Yates Court Reporters    800.669.1866

WCP00650

Edra D. Blixseth  -  December 17, 2009

Page 142

1      A.   With the technology that eTreppid and

2  Montgomery were suing over, I did know that by then.

3      Q.   What did you do with the $5 million?

4      A.   That's what I was trying to answer a few

5  minutes ago.  I paid -- I got things current.  I got

6  interest current.  I paid -- I paid things off.

7      Q.   Did you pay Western Capital Partners?

8      A.   They may have been -- they may have gotten some

9  interest then.  I'm not sure.

10      Q.   Did you pay American Bank and Leon Royer.

11      A.   I believe they got some interest current in

12  there, not paid the loans off.

13      Q.   Did you pay First Bank & Trust?

14      A.   You know, I should just say I don't recall.

15  The money was used to get things current and, hopefully,

16  have some stability until we got the other stuff

17  resolved with the marital.

18      Q.   Isn't it true that you didn't pay anybody but

19  gave $1.5 million to Tony Robbins of the $5 million?

20      A.   That's not true.

21      Q.   Did you give $1.5 million to Tony Robbins?

22      A.   No, I did not.

23      Q.   Did you give $1.5 million to any entity other

24  than Blxware?

25      A.   No I not.

Yates Court Reporters    800.669.1866

**WCP00651**

Edra D. Blixseth  -  December 17, 2009

Page 143

1     Q.   Where did the $1.5 million go?

2     A.   I don't know what 1.5 you're talking about.

3     Q.   Where did the $5 million go?  Give me your best

4  memory in general.

5          MR. HOLAHAN:  She already answered that

6  question, counsel.

7          THE WITNESS:  I can't.

8          MR. HOLAHAN:  She already answered that

9  question to the best of her recollection.

10  BY MR. FLYNN:

11     Q.   Can you give me any idea whether you paid any

12  kind of an approximate amount to Western Capital, a

13  dollar?  10,000?  A hundred thousand?

14     A.   I already answered that.  I believe some of

15  their interest was paid when I got this, but I'm not

16  positive.

17     Q.   Same with American Bank?

18          MR. HOLAHAN:  Asked and answered, Counsel.

19          MR. FLYNN:  Let's move on.

20     Q.   Is this your signature at the end,

21  Ms. Blixseth?

22     A.   Looks like it.

23          MR. GLASSER:  What exhibit are you on,

24  Mr. Flynn?

25          MR. FLYNN:  Same exhibit.

WCP00652

Edra D. Blixseth   -   December 17, 2009

Page 144

1          MR. HOLAHAN:  22.

2          MR. GLASSER:  22.

3  BY MR. FLYNN:

4     Q.   So it's your testimony that Liner represented

5  you in this transaction?

6          MR. HOLAHAN:  No, she did not say that.

7          THE WITNESS:  Yes, I did.  They represented me.

8  They brought Wachovia to me and that's how I met

9  Wachovia.

10 BY MR. FLYNN:

11    Q.   Thank you.  Thank you.

12         In fact, you had a meeting in Steve

13 Yankelevitz's office within two weeks before this loan

14 in which you and Yankelevitz and an individual named

15 Vijay Chandran were present; isn't that correct,

16 Ms. Blixseth?

17    A.   I had a meeting with those three at the Liner

18 firm.

19    Q.   Thank you.

20         What is your best memory of what was said at

21 that meeting?

22         MR. HOLAHAN:  Objection.  Attorney-client

23 privilege.

24         MR. FLYNN:  No.  Mr. Chandran is a

25 representative of -- he's a representative of Wachovia

WCP00653

Edra D. Blixseth  -  December 17, 2009

Page 145

1   Bank, Mr. Holahan.

2           MR. HOLAHAN:  That true?

3           THE WITNESS:  Yeah.

4   BY MR. FLYNN:

5       Q.   What was said at that meeting, Ms. Blixseth?

6       A.   It was an introduction.  I don't really recall.

7   It was an introduction.

8       Q.   Did you advise Mr. Chandran at that time about

9   the litigation in Nevada.

10      A.   Not to my best recollection.

11      Q.   Did Mr. Yankelevitz advise Mr. Chandran about

12  the litigation in Nevada?

13      A.   I don't recall.

14      Q.   Was any kind of kickback paid to Mr. Chandran?

15      A.   I have no idea.

16      Q.   By you or Mr. Scalia?

17      A.   I can tell you I did not pay any kickback to

18  anybody and I can't speak for Jack, but I assume that's

19  negative as well.

20      Q.   Did you represent to Mr. Chandran that you had

21  in your possession, Blxware, a contract with the federal

22  government, a black budget contract at that time -- at

23  the time of the meeting?

24      A.   And what was the date of the meeting?

25      Q.   Within the two weeks before March 6th, 2008?

Yates Court Reporters   800.669.1866

WCP00654

Edra D. Blixseth  -  December 17, 2009

Page 146

1      A.   No, I did not.

2      Q.   Did Mr. Yankelevitz represent to Mr. Chandran

3   that there was a black budget contract owned by Blxware

4   involving Montgomery's technology?

5      A.   Not in front of me.

6      Q.   Did anyone represent to Wachovia Bank that

7   Blxware had a contract in place with the federal

8   government in connection with the Blxware technology?

9      A.   Not that I'm aware of.

10      Q.   What did you tell Mr. Chandran during this

11   meeting?

12      A.   I've already -- I've already said that I don't

13   recall everything that was said in the introduction,

14   kind of explained the technology, what we were trying to

15   do and that was it.

16      Q.   What did you explain?

17      A.   Explained that, that Dennis had come on board,

18   explained kind of the history of when he came on board,

19   what we thought we were going to be able to do, may have

20   talked about the injunction because part of what I had

21   to explain was why the burn rate went on so long before

22   we could try to take it to commercial and have cash

23   flow.

24      Q.   So your memory now is you believe that someone

25   disclosed to Mr. Chandran the injunction?

WCP00655

Edra D. Blixseth  -  December 17, 2009

Page 147

1       A.   I'm just saying may have.  In going through why

2   by this date we still hadn't taken anything to the

3   marketplace, that may have been talked about.

4       Q.   As of March '08 did you even have a product?

5       A.   Not that we could take to the marketplace.

6       Q.   Were any representations made to you -- made by

7   you to Mr. Chandran in the meeting with regard to having

8   a product that you could take to the marketplace?

9       A.   Not by me.

10       Q.   Did anyone represent to Wachovia Bank in

11   exchange for this $5 million -- did anyone represent to

12   Wachovia Bank in exchange for this $5 million that the

13   technology was about to be sold to either Raytheon or

14   the federal government and, basically, the $5 million

15   can get repaid as soon as those contracts are paid?

16           Did you make any kind of representations like

17   that?

18       A.   No, I did not.

19       Q.   Did you make any kinds of representations like

20   that in any document to anybody?

21       A.   Not that I'm aware of.  We had meetings with

22   Raytheon.  We sent people to go meet with them, so that

23   could have been disclosed that there were meetings or

24   ongoing talks.

25       Q.   Did you prepare an executive resume in which

WCP00656

Edra D. Blixseth  -  December 17, 2009

Page 148

1    those representations in general were made to loads of

2    people?

3        A.   Not that I'm ware of.

4             MR. FLYNN:  Let me just finish Wachovia and

5    then we'll go for lunch.

6             MR. HOLAHAN:  We're not going to stay through?

7             MR. FLYNN:  You want to go straight through?

8             MR. HOLAHAN:  Do you?

9             MR. FLYNN:  Sure.

10            MR. HOARD:  Do I get a vote?

11            MR. BLIXSETH:  We can get you takeout.

12            MR. HOLAHAN:  What is the document?

13            THE WITNESS:  Demand promissory note.

14            MR. FLYNN:  Yeah, let's put that one aside.

15            Yeah, would you mark this, please, 23A, please,

16   Stephanie.

17            (Exhibit 23A was marked for identification.)

18   BY MR. FLYNN:

19       Q.   We'll put it aside, Collateral License

20   Agreement.

21            Let me just ask you, is this your signature on

22   Exhibit 23A, Ms. Blixseth, next to last page.

23       A.   Give me a second.

24       Q.   Last two pages, actually.

25       A.   Looks like my signature.

Yates Court Reporters    800.669.1866

WCP00657

Edra D. Blixseth   -   December 17, 2009

Page 149

1    Q.    Maybe the last page is the notary?

2    A.    No, it's mine.

3    Q.    No, it's your signature too.

4    A.    Yeah.

5         MR. FLYNN:   That's confirming the license

6    agreement.   Let's go to the license agreement.

7         (Exhibit 24 was marked for identification.)

8    BY MR. FLYNN:

9    Q.    Do you recognize Exhibit 24, Ms. Blixseth, as

10   being the license agreement securing the Wachovia loan,

11   saying you were licensing your technology to Blxware?

12        I don't believe your signature is on it, but if

13   you look on page 6 and 7, the software schedule -- 6, 7

14   and 8, the software schedule, the question for you,

15   Ms. Blixseth:   Is this licensing agreement, does it

16   basically reflect your understanding that you owned all

17   the software technology that Montgomery had?

18   A.    Yes.

19   Q.    Thank you.

20        MR. BLIXSETH:   If anybody is hungry, we'll get

21   somebody to run in some sandwiches if you tell me what

22   you're hungry for.

23        MR. HOLAHAN:   We can take a break.

24        MR. FLYNN:   Yeah, we'll take a break.

25        THE WITNESS:   You're throwing these at me so

Yates Court Reporters   800.669.1866

**WCP00658**

Edra D. Blixseth  -  December 17, 2009

Page 150

1   fast, I want to be able to see them.

2   BY MR. FLYNN:

3       Q.   You can put the license agreement aside.

4   That's going to be for another day.

5       A.   But there's no signatures.  I'm trying to look

6   to see who presented this.

7            Who presented this?

8       Q.   These are Wachovia loan documents that are on

9   file with the court.

10      A.   Okay.

11      Q.   Matter of fact, you can see the docket entries

12  at the top of the document?

13      A.   Okay.

14      Q.   This is the 3 million on June 23, '08,

15  Ms. Blixseth, so you're now getting another 3 million.

16      A.   That's what I was recalling when you were

17  asking about the 8- and I said it was 5- and 3-.

18      Q.   Right.

19           Now at this time were you in default with

20  Western Capital in agreeing to do a loan modification

21  with them on June 23rd, '08, on or about that time?

22      A.   I believe so, because I think that's when

23  Matthew was trying to renegotiate the --

24      Q.   Did you disclose to Western Capital -- to

25  Wachovia that you were in default with Western Capital

Yates Court Reporters    800.669.1866

WCP00659

Edra D. Blixseth  -  December 17, 2009

Page 151

1    Partners?

2        A.   I don't recall.

3        Q.   Did you disclose to Wachovia at this time that

4    you were in default with First Bank & Trust?

5        A.   I don't recall.  I don't recall if I was then

6    with them.

7        Q.   Did you disclose to Wachovia that you were in

8    default with American Bank?

9        A.   Yeah, I don't recall.

10       Q.   Okay.  Now on this $3 million, what did you do

11   with that 3 million, Ms. Blixseth?

12       A.   Every time I got money from borrowing, I tried

13   to catch things up, pay things, cover overhead, that

14   kind of thing, so I would just say that's my recall of

15   this amount as well.

16       Q.   Where are all the records relating to where all

17   this money went?

18       A.   You probably have them, because they would have

19   been on Jory's computer.

20       Q.   Ms. Blixseth, where are the records relating to

21   where all this money went?

22       A.   Who knows?  Probably on Jory's computer.

23       Q.   "Who knows?"  Is that your answer?

24            MR. HOLAHAN:  She said --

25            THE WITNESS:  I didn't say, "Who knows?"  I

Yates Court Reporters    800.669.1866

WCP00660

Edra D. Blixseth  -  December 17, 2009

Page 152

1   said they're probably on Jory's computer.

2   BY MR. FLYNN:

3       Q.   Thank you very much.

4           Now, Ms. Blixseth, did you tell Jory Russell on

5   or about June 24th or thereafter to delete or destroy

6   documents off his computers?

7       A.   I told Jory Russell to not only not destroy

8   anything, but anything that he had in his possession to

9   turn over and anything that -- any question he was

10  asked, to answer the truth.

11      Q.   And if, in fact, these financial records for

12  Blxware and these entities have been destroyed off his

13  computers, is it still your testimony that you believe

14  they were previously on the computers?

15      A.   I assume, because that's the -- and it's an

16  assumption of mine because that's the computer Jory

17  used.

18          MR. FLYNN:  Okay.  And I'll represent for the

19  record the financial documents relating to where these

20  monies went are not and if they were on the Russell

21  computers, they have been destroyed.

22          MR. HOLAHAN:  Are you representing that as an

23  expert witness?

24          MR. FLYNN:  I'm just putting that on in the

25  record at this point.

WCP00661

Edra D. Blixseth  -  December 17, 2009

Page 153

1          MR. HOLAHAN:  Do you have any papers

2     documenting that?

3          MR. FLYNN:  Yeah, we'll get into it,

4     Mr. Holahan.

5          Q.   Let's get into page 3 of this document.

6          A.   Which document is this?

7          Q.   Same document, the $3 million you got on

8     June 23rd.  Let me ask you this:  From the little

9     documentation we've been able to put together it appears

10    that every time you got large sums of money you stopped

11    paying your bills; is that true or false?

12         A.   That would almost be reverse of what I would do

13    when I got sums of money.  I would try to catch up and

14    pay everything.

15         Q.   We'll see.

16              Representations and warrantees --

17         A.   Tell me what page.

18         Q.   -- page 3.

19              "To induce the bank to enter into this

20    agreement and make the new loan hereunder, the Borrower

21    represents the warrants to the bank that, A,

22    litigation" -- it's the same litigation clause that

23    there's no litigation pending.

24              Well, in fact, at that time you were involved

25    in evidentiary hearings on contempt orders against

Yates Court Reporters    800.669.1866

Edra D. Blixseth  -  December 17, 2009

Page 154

1    Montgomery that you were paying for in connection with

2    litigation, isn't that true, Ms. Blixseth, in June '08?

3        A.   That Blxware was paying for?

4        Q.   That you, Edra Blixseth, the money was coming

5    from you, was it not?

6        A.   The money was being paid by Blxware.

7        Q.   To pay --

8        A.   That was part of the burn rate that we --

9        Q.   You knew on June 23, '08, in fact, Blxware and

10   Montgomery were in contempt proceedings for not

11   producing the technology in the litigation; isn't that

12   correct, ma'am?

13       A.   I can't -- I can't answer if I was aware of

14   that at the time or that's what was going on at the

15   time.

16       Q.   We'll see.

17            In fact, you were subpoenaed to come in and

18   testify for those contempt proceedings, were you not?

19       A.   I'm not aware that I was.  I didn't testify.

20       Q.   Let's go to the last page.

21            Is that your signature for this 3 million?

22       A.   I believe so.

23       Q.   When you took this $3 million from Wachovia

24   Bank, did you have the means to repay it?

25       A.   I believe I did.

Yates Court Reporters    800.669.1866

WCP00663

Edra D. Blixseth  -  December 17, 2009

Page 155

1       Q.   And why do you believe that you did?

2       A.   I believed every time I took out a loan that I

3   was going to get things finally settled with Tim and I

4   would have the assets and the cash flow to be able to

5   consolidate the assets that I had that were free and

6   clear and be able to take care of all of these loans and

7   get on a positive cash flow.

8           MR. FLYNN:  Thank you.

9           Let's look at Exhibit 28, Pledge Agreement.

10          (Exhibit 28 was marked for identification.)

11  BY MR. FLYNN:

12      Q.   Now this is dated the 23rd of June.  In here

13  you're pledging the security while there are contempt

14  proceedings going on in connection with the security in

15  which you're a party.

16          Did you know that on or about June 23rd?

17          MR. HOLAHAN:  Could you please -- I'm sorry,

18  Counsel, she's a party to what?

19          MR. FLYNN:  She was a defendant at this point

20  in the litigation, Mr. Holahan.  I'm sorry you're not

21  aware of the facts, sir, but that's not my problem.

22          MR. HOLAHAN:  Was she added after the

23  injunction?  Because she's not on the injunction.

24          THE WITNESS:  Yeah, I was added.

25          MR. FLYNN:  The injunction is back in

Yates Court Reporters   800.669.1866

Edra D. Blixseth  -  December 17, 2009

Page 156

1  February '06 --

2          MR. HOLAHAN:  Right.

3          MR. FLYNN:  -- the order in the federal court

4  confirming it is August 2007.

5          MR. HOLAHAN:  Right.

6          MR. FLYNN:  We're now into 2008.  Please follow

7  along, Mr. Holahan.

8          THE WITNESS:  But it wasn't Blxware, it was

9  Dennis Montgomery and eTreppid.

10  BY MR. FLYNN:

11     Q.  What were you pledging here that was then the

12  subject of contempt hearings in federal court and the

13  injunction to get this $3 million?  What were you

14  pledging?

15     A.  The -- what we were going to be doing with the

16  technology, some of which had nothing to do with the

17  eTreppid technology.

18     Q.  What part of it didn't have anything to do with

19  eTreppid technology?

20     A.  We were working a lot of different things in

21  Bellevue and some things separate and we hoped to get

22  the eTreppid thing resolved, but, again, I'm assuming

23  that since Liner brought Wachovia to me and Liner looked

24  at the things that they were aware of what was going on.

25     Q.  Let's cut through this.  Is that why you

WCP00665

Edra D. Blixseth  -  December 17, 2009

Page 157

1  confessed $26.5 million in judgments two months later to

2  the Trepp parties if the technology didn't belong to

3  Trepp?

4      A.   First of all, I don't think two months later is

5  when the judgment was entered, but second of all --

6      Q.   I'm not talking about when the judgment was

7  entered.  I'm talking --

8      A.   That's what you just said.  You said when you

9  entered into --

10     Q.   -- a settlement?

11     A.   That's not what you said.

12     Q.   A confession of judgment.

13          The agreement to confess the judgment was in

14  September '08; isn't that true, Ms. Blixseth?

15     A.   That was the settlement agreement between

16  eTreppid and Montgomery --

17     Q.   In which you agreed to confess judgments if you

18  didn't pay them $26.5 million?

19     A.   I don't know if that was part of what the final

20  agreement was.  I don't know if that was in there.

21     Q.   Let's look at some emails -- and then we'll

22  break for lunch -- between you and Mr. Royer from

23  American Bank when you were getting all this money.

24          MR. HOLAHAN:  Let's see this.

25  ///

Yates Court Reporters    800.669.1866

WCP00666

Edra D. Blixseth  -  December 17, 2009

Page 158

1   BY MR. FLYNN:

2        Q.    Do you remember these emails, Ms. Blixseth?

3        A.    I haven't had time to look at them yet.

4             MR. GLASSER:  What exhibit are you on now?

5             MR. FLYNN:  Is that Exhibit 24?

6             THE WITNESS:  Yes.  No, 29, I think.

7             MR. HOLAHAN:  No, 29.

8             THE WITNESS:  It's hard to fell it's a -4 or

9   -9.

10            MR. FLYNN:  What was the last one?

11            MR. HOLAHAN:  It's 29.  The pledge agreement is

12  28.  You skipped two.

13            MR. FLYNN:  Okay.

14            MR. GLASSER:  29, all right.

15            MR. FLYNN:  29.

16            MR. GLASSER:  Pledge agreement is 29.

17            MR. HOLAHAN:  Did you mean to skip two?

18            MR. FLYNN:  Yeah, I intended to skip.

19            MR. HOLAHAN:  26 and 27.

20            MR. FLYNN:  But just so we're accurate, what

21  did the court reporter put on that exhibit?

22            MR. HOARD:  30 is an email.

23            THE WITNESS:  I think it's 29.  It looks like

24  24, I said, but I think it's 29.

25            MR. GLASSER:  29 in the set you gave us is --

Yates Court Reporters   800.669.1866

**WCP00667**

Edra D. Blixseth  -  December 17, 2009

Page 159

1          MR. HOARD:  It's 30.

2          MR. GLASSER:  Well, 29, in the set is the

3    pledge agreement.

4          MR. HOLAHAN:  Oh, oh-oh.  Pledge agreement is

5    28 that the court reporter marked.

6          MR. GLASSER:  It's 29 in the --

7          MR. FLYNN:  I'll fix that at the break.  For

8    the time being we'll call it Exhibit 30.

9          (Exhibit 30 was marked for identification.)

10         MR. BLIXSETH:  Are you leaving 24 and 25 out?

11         MR. FLYNN:  Yeah, I'm not going over them right

12   now.

13         I want to go over these emails before we break

14   for lunch, Ms. Blixseth.

15         MR. GLASSER:  So the emails are 30.

16         MR. FLYNN:  And we'll fix it at lunch, Brian.

17   We'll call them Exhibit 30.

18         MR. GLASSER:  Okay.

19   BY MR. FLYNN:

20     Q.   Okay.  Ms. Blixseth, we first --

21     A.   Are these in chronological order?

22     Q.   It's generally an email train, so let's start

23   from the back.  Let's see what the last email is.

24     A.   You actually have them in order first to last,

25   it's right.

Yates Court Reporters   800.669.1866

WCP00668

Edra D. Blixseth  -  December 17, 2009

Page 160

1      Q.   Okay.

2      A.   4/14.

3      Q.   4/14, okay.  We've got them in chronological

4  order going forward, for the record.

5           First one is from a Leon Royer and let me ask

6  you this first:  After having quickly looked at these

7  emails -- this is what we have because they were sent to

8  Peters and we've retrieved some -- how long had you been

9  emailing Royer?

10          And by the way, for the record we've subpoenaed

11  all the American Bank records.

12          How long had you been emailing Royer about the

13  loan being in default before April 14th, of '08?

14     A.   I would have no idea.

15     Q.   Had it been going on for months?

16     A.   I would have no idea.

17     Q.   Had you defaulted on the American Bank loan --

18  or strike that.

19          How much had you received as of April 14th,

20  2008, from American Bank?

21     A.   American Bank had a line of credit to me of

22  2 million that had a -- when Matthew was trying to close

23  out the Story Mill, they were at their limit and Leon

24  had suggested that they loan me the $5 million for the

25  trailer park.

Yates Court Reporters    800.669.1866

**WCP00669**

Edra D. Blixseth  -  December 17, 2009

Page 161

1              So the $5 million didn't go to me, it went to

2     pay off the trailer park.  That was a Story Mill

3     obligation back to me.  So the total with American Bank

4     is 7 million of which 2 million was my personal and

5     5 million was Story Mill.

6          Q.   As of April 14th?

7          A.   I believe so.

8          Q.   When was the 5 million given to your son?

9          A.   I don't believe it was given to him.  I believe

10    it was given to pay off to purchase the trailer park and

11    I don't remember when that was.  It must have been '07.

12         Q.   To purchase or to pay off the trailer park,

13    Ms. Blixseth?

14         A.   I think it was to purchase it.  I don't know.

15    I wasn't involved in that, but I think it was the

16    purchase.

17         Q.   How much was paid for the trailer park?

18         A.   I believe it was the 5 million.

19         Q.   When was the 5 million paid by American Bank?

20         A.   I just said I don't recall, but I believe it

21    was in '07.

22         Q.   Was it in November and December of '07?

23              MR. HOLAHAN:  If you don't recall, you don't

24    recall.

25              THE WITNESS:  Yeah, I don't recall.

WCP00670

Edra D. Blixseth  -  December 17, 2009

Page 162

1    BY MR. FLYNN:

2        Q.    Okay.  When did you -- as of April 14, '08, how

3    long had you been in default with American Bank on the

4    7 million?

5        A.    I don't recall.

6        Q.    Now Mr. Royer writes on April 14, to you --

7    you're LearG2; correct?

8        A.    Correct.

9        Q.    Lear, is that a Lear jet?

10       A.    It's my dogs.

11       Q.    G2, is that dog too?

12       A.    It is.

13       Q.    And you happen to have a G2; is that correct?

14       A.    I'm sorry?

15       Q.    Did you have a G2B jet?

16       A.    What does that have to do with anything?  Lear

17   and G2 are my dogs that are deceased and that was my

18   email address.

19       Q.    "Good morning, Edra.  We look forward to

20   receipt of the payoffs on April 21 at the least."

21             What payoffs?

22       A.    You know, I don't know.

23       Q.    The whole 7 million?

24       A.    I don't know.

25       Q.    Next email, April 13 -- well, actually it's the

Yates Court Reporters   800.669.1866

**WCP00671**

Edra D. Blixseth  -  December 17, 2009

Page 163

1    day before, April 13, this is from you to Royer and you

2    say -- Royer writes, "Who will be sending the funds?"

3            You respond, "Sorry, Leon.  I thought I made it

4    clear, but I must not have.  I will be sending the funds

5    out of my account, Edra."

6            What funds?

7        A.   I think that this was one of the phoney Gary

8    Peters' loans, wires that never came to fruition when I

9    thought that they were going to.

10       Q.   As of April 14th you had 5 million from

11   Wachovia.  We haven't got to the First Bank & Trust loan

12   yet.

13           How much did you get in March of '08 from First

14   Bank & Trust?

15       A.   I don't recall.  Without the things in front of

16   me, I don't recall the dates to answer questions like

17   that.

18       Q.   That was an $8-million letter of credit?

19       A.   The ultimate amount was 8-, but that's not what

20   it started out being so I don't recall what the dates

21   were for those.

22       Q.   As of March -- as of April 14th, you had gotten

23   5 million from Wachovia, you had gotten 8 million, as I

24   understand it, from First Bank.  We'll go through the

25   documents.

WCP00672

Edra D. Blixseth  -  December 17, 2009

Page 164

1         Did you pay Royer anything?

2     A.   I don't recall.

3     Q.   Did you tell Royer the funds would be coming

4  out of your account, but they're coming from a third

5  person you were also borrowing money from?

6     A.   He knew how I was getting money to pay him was

7  through a different loan, the loan person, yes.

8     Q.   What did you tell him?

9     A.   I don't recall this one, but I would have told

10  him the truth.

11     Q.   Let me see if I --

12     A.   He knew I didn't have money coming in from

13  income.

14     Q.   Did you tell him that you were borrowing money

15  from someone else who didn't know about his loan to pay

16  him?

17     A.   Of course not.

18     Q.   Where was the money coming from that's

19  referenced in these emails?

20     A.   I just answered your question.

21     Q.   From Gary Peters?

22     A.   Based on reading the one you're asking me to

23  read, I cannot answer that question.

24     Q.   Let's go to the next one.

25         And the next one appears to be the duplicate of

Yates Court Reporters    800.669.1866

**WCP00673**

Edra D. Blixseth  -  December 17, 2009

Page 165

1   the first one, maybe part of a chain.

2          Third page, from LearG2 to

3   CEO@1800investmentgroup.com.

4          Is that Gary Peters?

5      A.   Yes, it is.

6      Q.   "Gary, this is why I was hoping to get that

7   bridge put through ASAP, even if it is only particle."

8      A.   That means "partial," I think.

9      Q.   "This is the bank that Tim is getting lots of

10  information from.  Think I told you about them, want to

11  get the sig loan of mine that is past due and the one I

12  get from Matthew paid off as I had told them I would do

13  it on the 15th before everything changed."

14         What did you mean by "before everything

15  changed"?

16     A.   I have no idea.  There was so many changes.  I

17  would have no idea which one this was in reference to.

18     Q.   "Now they're wanting to help Tim with putting

19  pressure on me."

20         Let me break in there.  Who told you that

21  American Bank wanted to put pressure on you?

22     A.   I just knew by the way that they were doing

23  things.  Tim had worked with Leon Royer and Bruce

24  Erickson a lot of times in a lot of different settings

25  to get information that put pressure on other people, so

WCP00674

Edra D. Blixseth  -  December 17, 2009

Page 166

1   I just assumed it was the same MO there.

2       Q.   All right.  Let me see if I understand this

3   correctly.  You're in default on $7 million.  You're

4   attributing it to put -- to Tim, because he's having the

5   bank put pressure on you even though you're in default

6   on 7 million.

7            Is that what you're saying?

8       A.   No, that's what you said.  You want me to say

9   what I want to say?

10      Q.   Yeah.  What are you saying?

11      A.   What I was saying is banks can be either

12  helpful or not helpful when you're in situations where

13  you're trying to renegotiate loans or pay things or have

14  things done differently.  They can either be helpful or

15  not helpful.

16           With Tim behind the scenes -- and this Leon

17  Royer is not the only one.  He called banks he doesn't

18  deal with, so I knew what he was doing to put pressure

19  on me.

20      Q.   How did you know this again?

21      A.   They would tell me that he called.

22      Q.   Let me get that straight.  American Bank, Leon

23  Royer told you --

24      A.   No, I didn't say that.  You said how were these

25  others.

WCP00675

Edra D. Blixseth  -  December 17, 2009

Page 167

1      Q.   How did you know that Tim was doing something

2   with American Bank to put pressure on you?  Just explain

3   that to me.

4      A.   Well, I had been with him for 25, 26 years and

5   the MO of what I had seen him do before with other

6   people would have me believe that he was doing the same

7   thing now to me.

8      Q.   So did Leon Royer say anything to you about Tim

9   using the bank to pressure you?

10     A.   No, but their attitude and their behavior and

11  what they were willing to do changed.

12     Q.   What changed?

13     A.   They were always willing to be kind of

14  understanding, rewrite some things.  They had been

15  helpful to me, actually, on the 2 million, thinking that

16  I was coming to the end and going to get things settled.

17  That's kind of what we all assumed.

18          And now that that these things were coming due,

19  rather than giving me time or buying me time or figuring

20  out another way to do things, they were putting a lot of

21  pressure on me.

22     Q.   So their attitude is what you detected;

23  correct?

24     A.   That's somewhat of what I detected, yes.

25     Q.   Did Leon Royer know you had just borrowed $5

Yates Court Reporters    800.669.1866

WCP00676

Edra D. Blixseth  -  December 17, 2009

Page 168

1   million from Wachovia Bank?

2       A.   He knew I was borrowing money to survive, so he

3   may have.

4       Q.   Were you signing documents giving them access

5   to your credit reports?

6       A.   I don't recall doing that, but I may have if

7   they asked for it.

8       Q.   Were you giving them cash-flow analyses?

9       A.   I don't know if I gave any to American Bank or

10  not.

11      Q.   Were you giving them financial statements,

12  Ms. Blixseth?

13      A.   I believe that they would ask for updated

14  financial statements.

15      Q.   Now were you reporting on your financial

16  statements your Western Capital $13 million loan?

17      A.   I believe I was not.

18      Q.   Were you fudging the financial statements from

19  loan to loan and from time period to time period to try

20  to get more money?

21      A.   No.  In fact, you used the word "fudging."

22  When things would change, when the asset -- as an

23  example, something you gave me a few documents ago,

24  showed that we valued Porcupine Creek at 200 million,

25  that's because that's the amount that Tim and I were

WCP00677

Edra D. Blixseth  -  December 17, 2009

Page 169

1   putting on it and he was putting 200 million on Desert

2   Ranch as well.

3          Those things changed as the market changed and

4   as time went on so --

5       Q.   In reference to some of the testimony you just

6   gave, I'd like to know --

7       A.   You weren't listen to my answer.  You were

8   reading what Tim wrote.

9       Q.   I heard you.  I heard you.

10          Ms. Blixseth, please.  I want to know exactly

11  who told you when and under what circumstances from

12  these other banks that Tim Blixseth was doing something

13  to put pressure on you.

14          Please identify any individual who told you

15  anything.

16      A.   Are you talking about this email?

17      Q.   No.  I'm talking about your testimony of a few

18  moments ago.

19      A.   Alan Rye told me that Tim would call him.  He

20  had no business with Alan Rye.  He wasn't doing business

21  with Alan Rye anymore; that he was asking questions

22  about my dealings.

23          Kevin McGuire from Palm Desert National Bank

24  would tell me that Tim was calling and giving them

25  information or trying to get information.

Yates Court Reporters   800.669.1866

**WCP00678**

Edra D. Blixseth  -  December 17, 2009

Page 170

1     Q.   What did Mr. Rye say to you that Tim Blixseth
2  had said to him and when?
3     A.   Well, one of the things was that he called and
4  asked me if Jim Dolan was going to be making the payment
5  on the BFI note and I said I assumed so, because I
6  talked to Jim and asked if he was going to be needing an
7  extension and he said no.
8         And he said, "Well, Tim is telling me that
9  Jim's not going to make the payment."  And I said,
10  "Well, that's contrary."  I called Jim afterwards, told
11  him what Alan Rye had told me and he said, "No, I'm not
12  asking for an extension.  I'm planning on making a
13  payment."
14     Q.   When was that, Ms. Blixseth?
15     A.   That would be sometime in '08, so the latter
16  part of '08 because the payment was due in January of
17  '09.
18     Q.   Was the payment made?
19     A.   No, of course not.
20     Q.   So let me see if I understand this.  Sometime
21  in '08, Mr. Blixseth, who has two children in BFI that
22  was securing the loan to First Bank & Trust --
23     A.   Those were adult children.  It wasn't in a
24  trust.
25     Q.   -- wanted to know whether -- how much was the

WCP00679

Edra D. Blixseth  -  December 17, 2009

Page 171

1   payment for?

2       A.   $5 million.

3       Q.   -- whether a $5 million payment was going to

4   come in to BFI, understanding that his two children are

5   beneficiaries under that instrument.

6            Is it your testimony that in that some way

7   shows that Mr. Blixseth was putting financial pressure

8   on you through First Bank & Trust?

9       A.   Alan told me that -- that, first of all, he

10   shouldn't have talked to Tim about it.  Beau and Morgan

11   are adults.  Tim had no reason to call him.  If Beau and

12   Morgan had a question they could have called him.

13           Second of all, he said that it was clear Tim

14   had said, "I don't think that that note is going to be

15   worth anything.  Jim Dolan is having financial pressure.

16   I don't think that the security for Spanish Peaks is

17   going to be worth anything," and, basically, trying to

18   put the fear that it was going to end up being a bad

19   loan because BFI was not going to be paid.

20       Q.   Okay.  Well, we will talk to Mr. Dolan and

21   Mr. Rye.

22           In fact, the payment was not made for

23   5 million?

24       A.   Correct.

25       Q.   Kevin McGuire, what did he say and when?

WCP00680

Edra D. Blixseth  -  December 17, 2009

Page 172

1      A.    Kevin just told me that he got calls from Tim

2    intermittently asking what I was doing and saying that I

3    was going to end up with nothing and be careful of

4    loaning money to me and those kind of things.

5      Q.    Now please explain to me how as of the date you

6    took $35 million from Byrne, August 14th, 2008, and you

7    were showing $900 million in your net worth, please

8    explain to me as fully as you can how you went from

9    $900 million when you got the 35- million, owned

10   Porcupine Creek, owned the Yellowstone Club, and ended

11   up in bankruptcy some six, seven months later with a

12   negative net worth.

13            Please explain that to me, Ms. Blixseth.

14            MR. HOLAHAN:  You're asking for a very long

15   answer.  If you're willing to let her answer --

16            MR. FLYNN:  I'm willing to let her answer.

17     Q.    Please explain how you went from an 8- to

18   $900 million net worth on your financial statements on

19   August 15th, which we're going to get into, and how you

20   ended up broke and cheating all these people out of all

21   this money.

22            How did that happen, Ms. Blixseth?

23            MR. HOLAHAN:  Object to your --

24            MR. FLYNN:  I'll withdraw "cheating."

25     Q.    Not paying all these people all this money and

WCP00681

Edra D. Blixseth  -  December 17, 2009

Page 173

1    Byrne ends up with your major assets.  Please explain

2    how that happened.  Go ahead.

3        A.   I don't even know how to begin to start.

4             MR. HOLAHAN:  I think you should parse that

5    question a little bit better.

6    BY MR. FLYNN:

7        Q.   Can't answer it?

8        A.   It's --

9             MR. HOLAHAN:  Do you want to know how she went

10   from $900 million to having no money a few months later.

11            MR. FLYNN:  Yeah, and Byrne ends up in control

12   of everything.  I want to know that.

13       Q.   How did that happen with Tim Blixseth telling

14   Kevin McGuire she's going to end up with nothing.

15   Please explain to me how that happened, Ms. Blixseth.

16       A.    It's so broad it's hard to answer, but I'll try

17   to answer.

18            Tim Blixseth not only called banks, he

19   called -- he -- Warren Trepp.  He got involved in

20   anything, an asset, that came my direction and tried to

21   sabotage it and did a successful job of sabotaging.

22            So a lot of things that I counted on -- we had

23   a contract to settle the eTreppid so that Blxware could

24   go forward.  We ended up not being able to have the

25   money to make the first payment, so that fell apart.

WCP00682

Edra D. Blixseth  -  December 17, 2009

Page 174

1          That money coming in had a lot to do with what

2    I was counting on coming in.  A lot of what I was told

3    to be certain things ended up not being what I was told

4    them to believe.

5          Based on my financial statements that you say I

6    cheated people out of, I used what Tim Blixseth turned

7    over on the books and records of values.  I used what

8    was talked about in the family court.

9          MR. HOLAHAN:  Are you going to continue to

10   whisper to your client in front of my client as she's

11   answering?

12          THE WITNESS:  And smile and laugh.

13          MR. FLYNN:  Do you have anything else to add?

14          MR. HOLAHAN:  No.  She's not through, but are

15   you going to continue?

16          MR. FLYNN:  Mr. Holahan, please.

17   Q.   Do you have anything else to add?

18          MR. HOLAHAN:  Mr. Flynn --

19          MR. FLYNN:  I'm not responding, Mr. Holahan.

20          MR. HOLAHAN:  Mr. Flynn --

21          MR. FLYNN:  I'm not responding.

22          MR. HOLAHAN:  Mr. Flynn --

23          MR. FLYNN:  Mr. Holahan --

24          MR. HOLAHAN:  Mr. Flynn --

25          MR. FLYNN:  Mr. Holahan --

WCP00683

Edra D. Blixseth - December 17, 2009

```
                                                    Page 175
 1              MR. HOLAHAN:  Are you going to continue --
 2              MR. BLIXSETH:  Sit down, Jack.
 3              MR. FLYNN:  Hold on.  The record will reflect
 4    that Mr. Holahan just leaned across the table and --
 5              This is tape recorded; is that correct,
 6    Stephanie?  So the noise of that slap in my face on my
 7    documents --
 8              MR. HOLAHAN:  I'm trying to get your attention.
 9    I'm making an objection and you won't stop talking.
10              MR. FLYNN:  Mr. Holahan, please cease and
11    desist.
12              MR. HOLAHAN:  No, you stop talking.
13              MR. FLYNN:  You interrupted the witness in the
14    middle of an answer.
15         Q.   Ms. Blixseth, do you have anything further to
16    add to your answer?
17              MR. HOLAHAN:  Yes, she does, but she won't do
18    it now.  We're going to break for lunch.
19              MR. FLYNN:  And Mr. Holahan, you ever do that
20    to me again, sir, I will see you outside --
21              MR. HOLAHAN:  Okay.
22              MR. FLYNN:  -- at the end the deposition.  Do
23    you understand?
24              MR. HOLAHAN:  Yes.
25              MR. FLYNN:  You don't professionally misbehave
```

WCP00684

Edra D. Blixseth - December 17, 2009

Page 176

1   like that, Mr. Holahan.

2           MR. HOLAHAN:  Well --

3           THE WITNESS:  Thank you for the glasses.

4           MR. BLIXSETH:  You might need them.

5           MR. FLYNN:  We're just at the beginning.  We're

6   at the tip of the iceberg, Mr. Holahan.

7           THE REPORTER:  Go off?

8           MR. HOLAHAN:  We're halfway through the day.

9           MR. FLYNN:  We're at the tip of the iceberg,

10  tip of the iceberg.

11          THE WITNESS:  Why does Mike Flynn stare me

12  down, throw something towards my direction and say, "Tip

13  of the iceberg?"

14          MR. FLYNN:  It wasn't.  It was thrown on my

15  papers.

16          THE WITNESS:  Were you not staring me down as

17  you said it?  Can't have it both ways, Mike.

18          MR. FLYNN:  Let's take a break.

19          (Luncheon recess.)

20  BY MR. FLYNN:

21     Q.  Ms. Blixseth, at the end of the -- before the

22  lunch break, end of the morning session, we were

23  discussing how you went from 900 million roughly to zero

24  and I believe your testimony was sabotage of

25  Mr. Blixseth and Mr. Blixseth giving you false numbers;

WCP00685

Edra D. Blixseth  -  December 17, 2009

Page 177

1   is that correct?

2        A.    That was part of it.

3        Q.    What else?

4        A.    Certain things not falling into place, certain

5   things that were told to be values that ended up not

6   being the values or having -- having difficulties in

7   being able to get those values out.

8        Q.    Who told you about certain values that didn't

9   end up being values?

10       A.    Part of it was what was turned over from the

11  things that I got from the MSA on trial balances and

12  that kind of thing that didn't balance.

13       Q.    What trial balances did you get from the MSA

14  that didn't balance?

15       A.    The BGI records.

16       Q.    Okay.  What in the BGI records didn't balance?

17       A.    Specifically, I can't say, just some of the BGI

18  records of the things that were turned over.  There was

19  also things in the MSA of -- just give you a small

20  example, because I can't think of everything without it

21  in front -- there was commissions for Big Springs Realty

22  that were 30 to 60 days in arrears when they were in

23  arrears much more than that.

24       Q.    And you didn't know that?

25       A.    I was aware of -- there was conflicting things

WCP00686

Edra D. Blixseth  -  December 17, 2009

Page 178

1    going on, because in family court, as another example,

2    when I tried to object to the golf course lots with

3    CrossHarbor being sold, it was stated that there was no

4    commissions.

5            And then subsequent to that there was an Eric

6    Ladd commission that I had become aware of, so there

7    were some things, little bits and pieces, that I was

8    aware of and other things that I wasn't aware of.

9        Q.   So give me some of the top five money things

10   that you weren't aware of that ended up sabotaging your

11   plans?

12       A.   I can't think of a lot of things.  One of the

13   things that ended up being huge now for me is that

14   Credit Suisse loan was a secured loan and now it's an

15   unsecured loan.  That's pretty huge.

16           So I can't --

17       Q.   As of the date of the MSA was it secured or

18   unsecured?

19       A.   I believe it was still secured as of that date.

20       Q.   Okay.  Are you saying that because at some

21   point later on it became unsecured that led to your loss

22   of $900 million in some way?

23       A.   The totality of a whole lot of events led to

24   that.

25       Q.   Okay.  Can you identify any other events in

WCP00687

Edra D. Blixseth  -  December 17, 2009

Page 179

1   that totality?

2        A.   Not right now off the top of my head, no.

3        Q.   Have you had any meetings with the liquidating

4   trustee?

5        A.   I've never met the liquidating trustee.

6        Q.   Any meetings with their lawyers?

7        A.   Until today, no.

8        Q.   Have you provided any documents or information

9   through yourself or a third party about the MSA or any

10   of the transactions involving the MSA?

11        A.   I don't think the MSA is a party to that, so

12   I'm not aware.

13        Q.   No.

14             Have you, through a third party such as a

15   lawyer or Mr. Russell or Ms. Yarborough or any third

16   party, provided any information to anyone on the side of

17   the liquidating trust?

18        A.   I don't believe they've asked me for anything.

19        Q.   We're going to get further into the sabotage

20   issues.  Let's finish with Exhibit 30 and I have a

21   couple of questions.

22             You say in here between you and Peters, on the

23   third page, "You just want to keep things transparent

24   between you and me."

25             Did I read that correctly?

WCP00688

Edra D. Blixseth  -  December 17, 2009

Page 180

1      A.    I'm sorry, I'm just getting to where --

2      Q.    At the end of that paragraph, about wanting to

3  keep things transparent between you and Peters?

4      A.    Yes, I see that.

5      Q.    As of April 15 in your prior relationship with

6  Peters had you kept everything transparent between the

7  two of you?

8      A.    To the best of my knowledge.  You know, whether

9  he was really real at this time or not, he was trying to

10  get bridge loans and loans to take out some of these

11  things and take the pressure off.

12           When you asked me on the very first page with

13  Leon, that's what I was referring to.  I didn't know

14  which that loan was.

15      Q.    Was part of that transparency to leak stuff to

16  the press and blame Tim for the leaks?

17      A.    Absolutely not.

18      Q.    Is that in an email that you exchanged with

19  Peters and Fultz?

20      A.    Not that I had anything to do with it.

21      Q.    So if it was sent to you and then you replied,

22  are you saying that wasn't part of a plan that you

23  engineered and then subsequently invited a member of the

24  Associated Press up to one of your properties in Montana

25  who thereafter released an article?

Yates Court Reporters   800.669.1866

Edra D. Blixseth  -  December 17, 2009

Page 181

1          You had nothing to do with that?

2      A.   Not only did I not have anything to do with

3  that, that is not a true statement.  That's been said by

4  Tim in court before.  I told him when we were talking

5  that that's chasing shadows, because that didn't happen.

6  I think you're referring to Matt Brown and that

7  absolutely didn't happen.

8      Q.   Okay.  We'll see.

9          Did you call Gary Peters phoney?

10     A.   Did I call him a phoney?  Give me a time frame.

11     Q.   At any time.  Do you consider Gary Peters to be

12  a phoney?

13     A.   I do now consider him to be a phoney, yes.  I

14  didn't at the time that I thought he was going to

15  perform.

16     Q.   So when you filed your motion to intervene in

17  the Lemond case -- which, parenthetically, Steve Byrnes

18  had, basically, destroyed the value of the Yellowstone

19  Club -- when you filed that motion?

20          MR. BLIXSETH:  Sam Byrne.

21          MR. FLYNN:  I mean Sam Byrne.

22     Q.   When you filed that motion on April 4th, 2008,

23  within days after the Yellowstone Club deal cratered,

24  when you filed that motion did you believe Gary Peters

25  was a phoney at that point in time?

WCP00690

Edra D. Blixseth  -  December 17, 2009

Page 182

1      A.   No, I did not.  I didn't believe he was a

2   phoney at the mediation just before that either.

3      Q.   When you filed that motion to intervene, were

4   you counting on getting $50 million from Gary Peters in

5   order to take over the Yellowstone Club?

6      A.   To interject -- to interject the needed cash

7   flow and cash for what was needed to be done at

8   Yellowstone Club, yes.

9      Q.   Do you have any comprehension -- forgetting

10   Mr. Byrne's testimony for the moment under oath -- of

11   what happened to the value of the Yellowstone Club on or

12   after April 4th when you filed that 200-page Motion to

13   Intervene in Lemond?

14      A.   I'm not clear on your question.

15      Q.   Yeah.

16           Do you know the adverse impact on the

17   Yellowstone Club in the media when you filed that

18   motion?

19      A.   There had already been such bad press between

20   the Lemond litigation and the divorce that that probably

21   added to it, but there had been nonstop for -- since --

22   since just shortly after January of '07 negative press

23   about Yellowstone Club.

24      Q.   Did you believe on or about April 4th when you

25   filed that motion, which we'll get into -- which,

Yates Court Reporters    800.669.1866

WCP00691

Edra D. Blixseth  -  December 17, 2009

Page 183

1    parenthetically, Byrne says destroyed the Yellowstone

2    Club in essence -- when you filed that motion, you did

3    so on the basis that Peters was going to come up with

4    50 million in cash immediately and 500 million to buy

5    the club; is that correct?

6        A.   There were -- it was a two-prong step.  We

7    don't know about the 500 million.  That was a

8    possibility that he had brought up.

9            The first prong was that what needed to be put

10   into Yellowstone Club to stabilize the cash flow and pay

11   the creditors, address the B shareholders, that kind of

12   thing, was the original 50.

13       Q.   Now do you recall, and we've got the document

14   here, that Byrne terminated the loan on March 26?

15       A.   Terminated the loan?

16       Q.   Terminated the purchase of the Yellowstone Club

17   on March 26, '08.  Do you recall that?

18       A.   I don't recall the date.  I recall a

19   conversation that I had with Tim, that he was talking to

20   Byrne and telling him that if he didn't show that they

21   had the funds there to close that he was going to

22   force --

23       Q.   All I need right now is whether you recall the

24   date.

25       A.   But I don't recall the date.

WCP00692

Edra D. Blixseth  -  December 17, 2009

Page 184

1    Q.    March 26.

2          Do you know two days later on March 28 you and

3    your lawyers had a 200-page document prepared with your

4    declarations and Peter's declarations to intervene on

5    the Lemond case?

6    A.    I don't remember it being that close.

7          There was a time frame from the question you

8    just asked me, though, which is the reason I wanted to

9    state what I was stating.  There was a time differential

10   from when everything came down to actually culminating

11   and CrossHarbor saying that they were not going to go

12   forward and the date Tim gave them as drop-dead-show-us-

13   that-you-have-the-money and then they responded that

14   they were not doing it.

15   Q.    Now let me see if we can focus in on the dates

16   and we've got the documents, so we'll get into it, but I

17   need to focus in on the dates for a minute here.

18         Do you recall Gary Peters being in Sam Byrne's

19   office as your representative on March 21, 2008, when

20   you were in court testifying that you were doing nothing

21   to interfere with the Yellowstone Club sale?

22         Do you recall that date?

23   A.    I don't recall that happening at the same time,

24   no.

25   Q.    Okay.  Do you recall Peters going to Sam

WCP00693

Edra D. Blixseth  -  December 17, 2009

Page 185

1    Byrne's office at your behest as your representative?

2        A.    I -- Gary Peters did go and meet with Sam.  Sam

3    had said -- I had introduced Gary to Sam at Yellowstone.

4        Q.    I don't need any more --

5        A.    -- but I do.  I can't answer it that way then.

6        Q.    Fine then you can't answer that.

7        A.    Then take my answer away, because I can't

8    answer the question.

9        Q.    Then five days later the deal cratered.  Do you

10   remember that?  Five days after Peters is in the office,

11   the deal craters.

12       A.    Well, Gary -- I don't remember if it was five

13   days.  Gary had conversations with Tim Blixseth and Bob

14   Sumptner after meeting with Sam Byrne.

15       Q.    You don't remember, fine.  That's all I need

16   for now.

17            Do you remember between March 21, roughly, this

18   time frame, and when the deal is cratering you

19   negotiating with Gary Peters to come up with

20   $500 million to buy the club?

21       A.    Gary came to me and said he might have somebody

22   that is interested and I said, "If there's somebody

23   interested and it's a real deal, put it in writing and

24   we'll see."

25       Q.    Two days after the deal craters -- and we'll

WCP00694

Edra D. Blixseth   -   December 17, 2009

Page 186

1    get into the exhibits -- two days later you've got a

2    200-page motion based on Peters putting 500 million in.

3           Do you remember that?

4       A.    No.  I remember the 50 million.

5       Q.    The 50 million was the bridge and the

6    500 million was the purchase.

7           You don't remember that?

8       A.    The purchase was never something that was an

9    actual offer that was put in.

10      Q.    Now at the time were you telling people,

11   members of the club, and sending emails when you were in

12   default on all these loans that we went through that you

13   had the money to purchase the club?

14      A.    I think that I said that I was able to come up

15   with the money to purchase the club.  I didn't say I had

16   the money to purchase the club.

17      Q.    And how many banks were you in default with

18   when you were telling people at the club that you had

19   the money to purchase the club?

20      A.    That's apples to oranges.

21      Q.    Okay.  Let's go to the next page.  We have to

22   move quickly here.  Let's go to the next page in emails.

23           And you write on this page dated May 5th,

24   "That's their MO.  He wrote back after my answer to him

25   to contact him this afternoon.  I will do what I can to

Yates Court Reporters    800.669.1866

WCP00695

Edra D. Blixseth  -  December 17, 2009

Page 187

1   stall."

2            Stall what?  Stall paying him?

3       A.   I don't know based on what I'm reading.  I have

4   no idea.

5       Q.   You don't know what you meant?

6       A.   Based on what you have in front of me, I don't

7   know what that meant.

8       Q.   Were you trying to stall from paying American

9   Bank?

10      A.   Based on what you have in front of me, I can't

11  tell what this means.

12      Q.   Regardless of what's in front of you, based on

13  this time frame, early May '08, were you trying to stall

14  from paying American Bank?

15      A.   What I wrote was that I should be able to

16  transfer money based on what Gary was saying and then I

17  wasn't going to have the money.  I might be trying to

18  buy some time hoping the money was coming in for that,

19  but that's a guess on my part.

20      Q.   Then you say, "I'd rather it come out next week

21  after Monday," and you put, in caps, "AFTER."  What's

22  that all about, Ms. Blixseth?

23      A.   I have no idea.

24      Q.   What did you want to come out in the media

25  after Monday?

WCP00696

Edra D. Blixseth  -  December 17, 2009

Page 188

1      A.   I have no idea.  I don't even know if that

2   means media.

3      Q.   Let's read down further on a prior email.

4   That's at 12:32 this one is 12:30, two minutes before,

5   to you.  "Edra, I understand clearly the banker is

6   almost threatening you which is illegal with the press

7   issue.  Keep me posted on the wire.  I'm still working

8   on the bridge to find comfort."

9           What's that all about, Ms. Blixseth, that

10   American Bank was threatening you with press?

11      A.   I don't know.

12      Q.   Were you trying to keep the fact that American

13   Bank had forestalled for three or four months from

14   filing a lawsuit against you for default on the loan and

15   you didn't want it to come out if they filed the

16   lawsuit?

17      A.   I'd have to -- if we can read these where I can

18   read all of them and then you can ask me questions it

19   might be easier, because until I read what was written

20   before or after I don't know how to answer.

21      Q.   So you don't remember, is the answer to my

22   question, whether it was because they were threatening

23   to sue you.  Because Peters is saying, "That's a threat,

24   which is illegal with the press issue."  You don't

25   remember what that was about?

WCP00697

Edra D. Blixseth   -   December 17, 2009

Page 189

1      A.   Not exactly.

2      Q.   Okay.  Let's go on.

3           Then you just -- you write an email to Peters

4    the same day and you say, "Gary, this is what I am

5    dealing with.  He knows this kind of press will hurt me

6    in court next week.  'Edra's offering to put in

7    50 million, but is in default of 7 million with American

8    Bank.'"  You put that in quotes.

9           "I made a deal with them last week before I

10   knew that the bridge loan was in trouble to 2 million in

11   interest current and the 5 million in 30 days.  I knew

12   that would give me time to put my LOC together on PC."

13          Now this part in quotes, "Edra is offering to

14   put in 50 million but is in default of 7 million with

15   the American Bank loan," what's that all about,

16   Ms. Blixseth?

17     A.   I don't know, but while you were reading I read

18   ahead to what Leon had written on the next page so I can

19   only then surmise that what I am saying to Gary is that

20   Leon is threatening for that to come out that I'm

21   defaulting on loans with American Bank at the same time

22   that I'm saying I can put 50 into Yellowstone Club.

23     Q.   Yeah.

24          In other words, you had been in court and filed

25   affidavits, which we've got here, saying you had all the

Yates Court Reporters    800.669.1866

WCP00698

Edra D. Blixseth  -  December 17, 2009

Page 190

1  money to buy the Yellowstone Club and you yet were in

2  default on this loan.

3      A.    That was --

4      Q.    You don't see, Ms. Blixseth, some contradiction

5  or hypocrisy in doing that?  Do you see any -- any lack

6  of responsibility on your part in representing in court

7  that you got $500 million to buy the Yellowstone Club

8  and you're in default of over $2 million and the bank

9  saying we're going to sue you for it?

10     A.    Tell me when you're done speaking your

11  statement.

12     Q.    I'm done.

13     A.    Okay.

14     Q.    Do you see any contradiction or hypocrisy?

15     A.    You're making a statement.  What's your

16  question?  Do I see any hypocrisy?

17     Q.    Yeah.

18     A.    Okay.  Now I'd like time to answer.  It's

19  apples to oranges.  If I didn't have the Yellowstone

20  Club to have for someone to either look at a purchase or

21  look at putting money into it -- that wasn't putting

22  money into Edra Blixseth or taking care of Edra

23  Blixseth's personal issues, it was taking care of the

24  Yellowstone Club's person issues that had assets that

25  they could deal with.

WCP00699

Edra D. Blixseth  -  December 17, 2009

Page 191

1         That wasn't money that was going to me to solve
2    my personal issues.  If I could solve Yellowstone Club's
3    issues, then long-term that would help solve my issues
4    as Yellowstone Club would be stabilized then and have
5    value.
6         So no, I don't see hypocrisy in it.  I see that
7    I'm working my damnedest to try to make an asset have a
8    value rather than not have a value because it
9    desperately needed money.  Nobody would give me that
10   amount of money, directly to me.
11       Q.  You didn't own Yellowstone Club at the time you
12   were making the --
13       A.  It was a community property asset.  I owned
14   half of the asset.
15       Q.  Were you telling Royer, "Don't worry.  I'll get
16   control of the club and then I'll get the money and I
17   can pay you"?
18       A.  Absolutely not.
19       Q.  Were you telling Royer that -- at that time did
20   you make those representations to other people at other
21   times?
22       A.  Absolutely not.  That's not what I filed and I
23   didn't make those representations to anyone.  No.
24       Q.  We'll see.
25           Did you write up an executive summary in which

WCP00700

Edra D. Blixseth  -  December 17, 2009

Page 192

1    before you even got the club you said, "Once I'm in

2    control of the club, I can do this, that and the other

3    thing"?

4        A.  I don't remember that, but there was a

5    hypothesis going on of not knowing how the assets were

6    going to end up being divided.

7        Q.  Let's go to the next -- then Royer runs through

8    the amounts you owe him that you've been promising to

9    pay him for some period of time.  We'll find out from

10   his records when we get them.

11            And then Royer writes, "During the period that

12   we were working on Blue Sky, we stopped the legal action

13   concerning the collection of your personal debt."

14            Did he stop legal action against you,

15   Ms. Blixseth?

16       A.  I'm just reading this.  I don't think there was

17   ever a legal action started.  Am I on the wrong page?

18            Ah, sorry.  It was on the wrong page.

19       Q.  Did he tell you that --

20       A.  Can I get time to get caught up here?  Because

21   I was on the wrong page.

22       Q.  I'll read it into the record.

23       A.  I just --

24       Q.  You can keep reading.  "During that time," this

25   is Royer talking, "I read a news article which said

WCP00701

Edra D. Blixseth  -  December 17, 2009

Page 193

1   'Edra's attorney, Deborah Klar, insists that Edra and

2   BFI were the best answer to the settlement case,

3   because,'" in bold and underlined, "'she has immediate

4   access to money to pay the settlement.  Not only that,

5   Klar said Edra has access to enough capital to deal with

6   a looming $375 million from the investment bank Credit

7   Suisse.'"

8           "Imagine my surprise to learn that such a

9   statement had been made in court, yet we cannot obtain

10   our past-due payments.  Today we are restarting that

11   process."

12          Now having read that and put that in the

13   record, I take it from your prior testimony that doesn't

14   indicate to you deceit or deception --

15      A.   No, it does not.

16      Q.   -- on the one part to the bank, when you

17   didn't --

18      A.   Can you read into the record my response?

19      Q.   -- when you were trying to obtain control of

20   Yellowstone Club and represented that you had all this

21   money?

22          And, in fact, Ms. Blixseth, you didn't have the

23   money, did you?  You had promises from Gary Peters;

24   isn't that true?

25      A.   I thought I had money based on --

Yates Court Reporters    800.669.1866

**WCP00702**

Edra D. Blixseth  -  December 17, 2009

Page 194

1      Q.   Thank you.

2      A.   Are you going to read into the record my

3   response which clearly nullifies what you just said my

4   intent was?

5      Q.   I'll let your lawyer do it.  I believe it adds

6   to the deception.

7           You write, "Leon, as I am sure you are aware,

8   there is a difference in having access to funds for an

9   asset that I own or have control over than funds when I

10   do not."

11          You're admitting there you didn't have control

12   over the Yellowstone Club, is that what you're doing, or

13   control over this 500 million from Peters?

14          Is that what you're doing?

15      A.   No.  I didn't have control over it in order to

16   solve my personal issues with American Bank.

17      Q.   "If I am successful in the new case" -- that's

18   the intervention in Lemond -- "I have these funds

19   available for Yellowstone Club."

20          Was that true?

21      A.   I believed it to be true when I wrote this.

22      Q.   Did you actually have the funds?

23      A.   I believed I had letters supporting and I had

24   documents supporting that I had the funds.

25      Q.   But did you have the funds?

WCP00703

Edra D. Blixseth  -  December 17, 2009

Page 195

1       A.    I believed I had the funds available if that

2   went through.

3       Q.    No.  Ms. Blixseth, it's a simple question.

4             Did you, Edra Blixseth, have the funds?

5       A.    It's the same answer as did -- CrossHarbor says

6   that they can close and have the funds available, but

7   didn't have them in the account to be able to show Tim

8   that they had the account.  It's the same thing.

9             I believed I had the funds if that were to go

10  through to have the funds to put into Yellowstone Club.

11      Q.    Then you write at the end --

12      A.    Read the next line.  "They're not for Edra

13  Blixseth, personally."  You keep saying that I was

14  deceiving by saying I had all this money but that I

15  wasn't taking care of my personal obligations.

16            I responded to what you read into the record by

17  telling him that was not for me to use personally.

18      Q.    Did you deceive Wachovia Bank when you didn't

19  inform them there was litigation pending, Ms. Blixseth?

20      A.    No.

21      Q.    Did you deceive Western Capital Partners in

22  June of '08 when you didn't inform them there was

23  litigation pending?

24      A.    I think I've answered this how many times now?

25            MR. HOLAHAN:  Many.

Yates Court Reporters   800.669.1866

WCP00704

Edra D. Blixseth  -  December 17, 2009

Page 196

1          MR. FLYNN:  Let's mark this next one, Order to

2    Show Cause.

3          (Exhibit 31 was marked for identification.)

4    BY MR. FLYNN:

5      Q.  And we can go very quickly on this.  You don't

6    have to read the whole document.  I would -- simply

7    going to read into the record a short part.

8          This is the federal court in Nevada relating to

9    the Trepp litigation and the technology that you were

10   paying Montgomery a hundred thousand dollars a month on.

11     A.  I was paying Montgomery a hundred thousand a

12   month and before that, if you remember, I was paying you

13   hundreds.

14     Q.  Ms. Blixseth, I didn't --

15         Move to strike.

16         Ms. Blixseth, did you know as of late June that

17   the court was issuing an order to show cause for the

18   failure of you and Montgomery to turn over the source

19   code for the technology Montgomery claimed he owned?

20     A.  Does it say me?

21     Q.  You were a party.  It only says Montgomery and

22   Deborah Klar, but you were a party, were you not?

23     A.  I was brought into this.  I saw this and this

24   never says Edra.  I didn't have the source code to turn

25   over.

Yates Court Reporters   800.669.1866

WCP00705

Edra D. Blixseth   -   December 17, 2009

Page 197

1      Q.   So to this day has the source code ever been
2   turned over?
3      A.   You've asked me that three times and my answer
4   is the same.
5      Q.   I'll withdraw it.
6           Does the source code even exist, Ms. Blixseth?
7      A.   I have every reason to believe it exists.
8      Q.   What reason do you have to believe that it
9   exists?
10     A.   Because Dennis Montgomery is able to make
11  things work when asked to make work by different people.
12     Q.   Do you know that on four occasions the
13  United States Government has asked Montgomery to
14  demonstrate the source codes to show that the technology
15  worked and that every single time, twice at eTreppid and
16  twice with you, he's walked out of the meetings and
17  left.
18          You know, Ms. Blixseth, do you not, there's no
19  technology.
20     A.   No, I do not believe that.
21     Q.   So --
22     A.   Just a second.  You make statements, Mike, and
23  then you don't let me respond to them.  I can't tell if
24  you're asking me questions or --
25     Q.   We're going to move on, because they're all

Yates Court Reporters    800.669.1866

WCP00706

Edra D. Blixseth  -  December 17, 2009

Page 198

1    going to come together.

2        A.    Okay.

3        Q.    With regard to this Order to Show Cause, did

4    Montgomery come to you or send you emails and say,

5    "There's going to be contempt hearings requiring me to

6    produce the source code and I'm not going to do it"?

7              Did he say those kinds of things to you either

8    in person or in the email?

9        A.    He said to me that he didn't want to turn over

10   the source code because he felt that then the -- either

11   the government or somebody else would have the source

12   code and be able to circumvent him or us getting paid.

13   He did make those comments.

14             MR. FLYNN:  Okay.  Next Exhibit 32.

15             (Exhibit 32 was marked for identification.)

16   BY MR. FLYNN:

17       Q.    Did you know after three or four days of

18   evidentiary hearing in which you were subpoenaed at one,

19   the United States Federal District Court in Nevada on

20   August 18th, after --

21       A.    What year, sorry?

22       Q.    2000- --

23       A.    I see it.  Okay.

24       Q.    -- 2008.

25       A.    '-8.

WCP00707

Edra D. Blixseth   -   December 17, 2009

Page 199

1    Q.   Same time that -- same time that you were

2    taking the $35 million from Sam Byrne -- issued an order

3    imposing $2500 a day in penalties until the source code

4    was produced?

5    A.   Was this against Liner or Dennis?  Sorry, I

6    can't figure --

7    Q.   If you go to the last -- second page from the

8    back, "Therefore, it is ordered that a monetary contempt

9    sanction is imposed against Dennis Montgomery in the

10   amount of $2,500 a day from the date of the failure to

11   comply, July 23, 2008, through the date the production

12   actually occurs."

13        Did you know that penalty was being imposed,

14   Ms. Blixseth?

15   A.   I think I did hear about that and there was a

16   lot of stuff going back and forth about Dennis having

17   problems gathering what they were asking for with the

18   DOJ restrictions on what could be turned over but --

19        MR. HOLAHAN:  DOD?

20        THE WITNESS:  No, the DOJ at the time.

21        MR. HOLAHAN:  Okay.

22        THE WITNESS:  But I don't -- and I remember

23   this happening, but I don't remember the amount and I

24   don't remember the exact dates.

25   ///

Yates Court Reporters    800.669.1866

WCP00708

Edra D. Blixseth  -  December 17, 2009

Page 200

1   BY MR. FLYNN:

2        Q.    This was happening right around the time you

3   got the $35 million from Byrne.  Did you tell Montgomery

4   you would pay the $2500 a day?

5        A.    No, I did not.

6        Q.    Did he tell you he didn't have the money to pay

7   the $2500 a day and wanted you to pay it?

8        A.    He may have said he didn't have the money to

9   pay it, but the 35 million was all earmarked for

10  everything for Yellowstone Club.

11       Q.    Now did Montgomery threaten you during this

12  period of time to pay the 2500?

13       A.    Threaten me in what way?

14       Q.    In any way.

15       A.    I don't think Dennis has ever threatened me.

16       Q.    Did he threaten you in connection with exposing

17  any computer hacking you had done?

18       A.    Absolutely not.

19       Q.    He had done for you?

20       A.    Absolutely not.

21       Q.    Did he hack into Mr. Blixseth's computers with

22  regard to alleged Cayman Islands accounts during the

23  proceedings and inform you that Tim Blixseth had

24  accounts in the Cayman Islands; that he had picked

25  off -- hacked into the bank accounts in the Cayman

Yates Court Reporters    800.669.1866

**WCP00709**